ORIGINAL

FILED IN CLERK'S OFFICE
U.S.D.C. Atlanta

JAN 28 2010

JAMES N. HATTEN, CLERK
By: _____ White
Deputy Clerk

UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

|  |  |  |
|---|---|---|
| THE UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| v. | ) | Civil No. |
| | ) | |
| THE STATE OF GEORGIA; | ) | **1 10-cV-0249** |
| SONNY PERDUE, Governor, State of | ) | |
| Georgia, in his official capacity; FRANK E. | ) | |
| SHELP, Commissioner, Georgia | ) | |
| Department of Behavioral Health and | ) | |
| Developmental Disabilities, in his official | ) | **CAP** |
| capacity; and RHONDA M. MEDOWS, | ) | |
| Commissioner, Georgia Department of | ) | |
| Community Health, in her official capacity, | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

## COMPLAINT

The United States alleges that the State of Georgia ("State") discriminates

against persons with disabilities in violation of Title II of the Americans with

Disabilities Act of 1990 ("ADA"), 42 U.S.C. §§ 12131-12134, and its

implementing regulations, as interpreted in Olmstead v. L.C., 527 U.S. 581 (1999).

Specifically, the State segregates hundreds of individuals with mental illness,

developmental disabilities, and addictive diseases in institutions that are not the

most integrated setting appropriate to their needs, and fails to provide adequate supports and services to individuals who are discharged from the institutions or who are at risk of institutionalization. The alleged discrimination goes to the heart of the ADA and Congress' intent to eliminate the segregation and isolation of individuals with disabilities. As Congress stated in the Findings and Purposes of the ADA: "Historically, society has tended to isolate and segregate individuals with disabilities, and, despite some improvements, such forms of discrimination against individuals with disabilities continue to be a serious and pervasive social problem." 42 U.S.C. § 12101(a)(2).

## JURISDICTION AND VENUE

1.  The Court has jurisdiction of this action under Title II of the ADA, 42 U.S.C. §§ 12131-12132, and 28 U.S.C. §§ 1331 and 1345. The Court may grant the relief sought in this action pursuant to 28 U.S.C. §§ 2201 and 2202.

2.  Venue is proper in this district pursuant to 28 U.S.C. § 1391, as a substantial portion of the acts and omissions giving rise to this action occurred in the Northern District of Georgia. 28 U.S.C. § 1391(b).

## PARTIES

3.   Plaintiff is the United States of America.

4.   Defendant the State of Georgia, is a "public entity" within the meaning of the ADA, 42 U.S.C. § 12131(1); 28 C.F.R. § 35.104, and is therefore subject to title II of the ADA, 42 U.S.C. §§ 12131 et seq., and its implementing regulations, 28 C.F.R. Part 35.

5.   Defendant Sonny Perdue, Governor of the State of Georgia, is the Chief Executive of the State and responsible for operation of its executive agencies.  Defendant Perdue is sued in his official capacity as Governor.

6.   Defendant Frank E. Shelp is the Commissioner of the Georgia Department of Behavioral Health and Developmental Disabilities ("DBHDD"), and responsible for all operations of DBHDD.  Defendant Shelp is sued in his official capacity as Commissioner of DBHDD.

7.   Defendant Rhonda M. Medows is the Commissioner of the Georgia Department of Community Health ("DCH"), and responsible for all operations of DCH.  Defendant Medows is sued in her official capacity as Commissioner of DCH.

8.   Defendant State delivers mental health, developmental disability, addictive disease, and other disability services (collectively "behavioral health

3

services") primarily through DBHDD and DCH, which includes the Division of Healthcare Facility Regulation ("HFR").

9. The Commissioners of DBHDD and DCH are appointed members of the State's Behavioral Health Coordinating Council ("BHCC"). BHCC develops solutions to the systemic barriers or problems to the delivery of behavioral health services by making recommendations that implement funding, policy changes, practice changes, and evaluation of specific goals designed to improve services delivery and outcomes for individuals served by departments within the State, including DBHDD and DCH.

10. Prior to July 1, 2009, the functions of DBHDD, DCH, and BHCC were performed by the State Department of Human Resources ("DHR"), Division of Mental Health, Developmental Disabilities and Addictive Diseases ("MHDDAD"), and Office of Regulatory Services ("ORS"). These agencies were reorganized pursuant to legislative mandate, effective July 1, 2009, and all of the behavioral health services duties and responsibilities of DHR, MHDDAD, and ORS were assumed by DBHDD, DCH, and BHCC. References to acts, omissions, duties, and

4

responsibilities of DBHDD, DCH, and BHCC throughout shall be understood to include the acts and omissions of their respective predecessor agencies.

## FACTS

### The State's Behavioral Health Care System

11.   DBHDD, DCH, and BHCC (collectively the "State Agencies") administer the State's behavioral health service system, plan the settings in which behavioral health services are provided, ensure quality of care and consumer safety across facilities, and allocate within the behavioral health service system all funds appropriated from federal, state, and any other sources. See, e.g., O.C.G.A. § 37-2 et seq. (2009).

12.   The State Agencies operate the behavioral health service system to further the State's policy of providing adequate mental health, developmental disability, addictive disease, and other disability services to Georgia citizens through a unified system that encourages cooperation and sharing of resources among all providers of services, both governmental and private. See, e.g., O.C.G.A. § 37-2-1(b).

13.   DBHDD provides a range of behavioral health care services.  These services include treatment and support to people of all ages, with mental illnesses,

5

addictive diseases, and developmental disabilities.  See, e.g., DBHDD,
Welcome to the Georgia Department of Behavioral Health &
Developmental Disabilities, http://dbhdd.georgia.gov/portal/site/DBHDD/
(last visited Dec. 29, 2009).

14.   DBHDD administers five Regional Offices that are charged with
implementing statewide initiatives, developing new services, and expanding
existing services.  All state, federal, and other funds appropriated for the
purpose of delivering services are distributed by DBHDD, which allocates
funds between community and institutional programs based on client needs
and utilization.  See O.C.G.A. § 37-2-5.1(c).

15.   DBHDD operates seven separate state psychiatric hospitals which provide
inpatient services to persons with mental illnesses, addictive diseases, and
developmental disabilities.  The seven hospitals are:  Central State Hospital
in Milledgeville ("CSH"), Georgia Regional Hospital in Atlanta ("GRHA"),
Northwest Georgia Regional Hospital in Rome ("NWGRH"), Georgia
Regional Hospital at Savannah ("GRHS"), East Central Regional Hospital
in Augusta ("ECRH"), Southwestern State Hospital in Thomasville
("SWSH"), and West Central Georgia Regional Hospital in Columbus
("WCGRH") (collectively the "State Psychiatric Hospitals").

6

16.   DBHDD offers a range of treatment and support services to help persons with mental illnesses, addictive diseases, and developmental disabilities integrate into, and live in, the community.  These include crisis services, outpatient services, community support services, day and employment services, residential support, family support, supported employment, respite services, community residential services, personal support, and day support.

17.   The State's behavioral health service delivery system also includes those providers that are licensed and regulated by DCH.  See infra ¶¶ 22–23.

18.   DCH licenses and inspects behavioral health service providers, including the State Psychiatric Hospitals.

19.   DCH's enforcement activities include:  inspection of facilities, investigation surveys based on complaints at any facility, follow-up visits, monitoring facility self-reports of serious incidents, and enforcement actions.  During inspections, DCH reviews compliance with state and federal regulations that set basic safety standards.  DCH reviews care provided, range of services provided, staffing and credentialing, systems for ensuring quality of care, and facilities and equipment.

20.    DCH triages, investigates, and responds to complaints at facilities including

the State Psychiatric Hospitals.  DCH issues inspection reports and may

require a plan of correction to be submitted by the facility.

21.    DCH evaluates community service providers' compliance with contract

requirements and monitors the services delivered by providers throughout

the behavioral health care delivery system to ensure access to and quality of

care.

22.    DCH monitors consumer care and safety at acute health care facilities,

including, but not limited to, hospices, hospitals, drug abuse treatment

centers, home health agencies, intensive residential treatment centers,

intermediate care facilities for the mentally retarded, and narcotic treatment

centers.  Individuals with disabilities frequently utilize these acute health

care services and rely upon the availability of such services to support their

ability to live in the community.

23.    DCH monitors consumer care and safety at long-term care facilities,

including adult day care centers, community living arrangements, nursing

homes, and personal care homes.

8

24. Individuals with disabilities frequently utilize the services provided by DBHDD and monitored by DCH, and rely upon the availability of those services to remain living outside the State Psychiatric Hospitals.

### The Individuals Confined to the State Psychiatric Hospitals

25. The individuals served by the State Psychiatric Hospitals include persons with diagnoses of mental illness, addictive disease and/or developmental disability (collectively "Patients").

26. For each of these individuals, the impairment signified by their diagnosis substantially limits one or more major life activities. Many of the individuals served require assistance with one or more of the activities of daily living, such as eating, bathing, toileting, or taking medication. Each of the Patients is a qualified individual with a disability, as defined in the ADA.

27. For example, representative Patient A had a diagnosis of schizophrenia and required supervision to ensure that he took medication necessary to control the symptoms of his illness. Representative Patient B has multiple disabilities including mental retardation and a seizure disorder, and requires assistance in all activities of daily living. Representative Patient C has dual diagnoses of schizophrenia and moderate mental retardation and is capable

9

of performing most self-care skills independently, however, his treatment team recommends that he receive assistance in managing his health care, medications, and money, and that he needs behavior supports, vocational support, and advocacy services.

28.  The Patients in the State Psychiatric Hospitals typically do not object to receiving services in a setting less-restrictive than a State Psychiatric Hospital; indeed, most have affirmatively expressed a preference for community living.

29.  For example, representative Patient C has enjoyed living in the community in the past, and during interviews with treatment professionals at the State Psychiatric Hospital where he is currently confined, asks repeatedly, "can I go home next week?"

30.  The State admits that "[i]ndividuals with disabilities, including some currently living in institutions, can live successfully in the community.  To succeed, they need decent, safe, affordable and accessible housing that is separate from, but provides access to, the community-based supports and services they want and need to live as independently as possible."

31.  The State's treatment professionals agree that hundreds of Patients currently confined to the State Psychiatric Hospitals can be served in the community.

10

32.   All of the nearly 800 individuals with developmental disabilities confined to the State Psychiatric Hospitals can be served successfully in a more integrated setting in the community. The State's policy is to provide services to these individuals in the community. Virtually all professional staff working with these individuals in the State Psychiatric Hospitals agree that these Patients can be served in the community.

33.   Many individuals with developmental disabilities continue to be segregated in the State Psychiatric Hospitals for no reason other than waiting for funding to become available to support their placement in a Home and Community-based waiver slot under the federal Medicaid Waiver Program.

34.   Many Patients with developmental disabilities are hospitalized because there are insufficient crisis stabilization services in the community to address the normal behavioral needs of persons with developmental disabilities and to respond to those needs with additional support on an as-needed basis.

35.   Patients with both a developmental disability and a history of challenging behaviors face a particularly acute shortage of community placements.

36.   For example, Patient C was involved in an incident of aggression at his community home that was being investigated as potential abuse by the

11

caregiver. His record notes that "there was no where else for him to remain in the community so he was readmitted."

37.   Hundreds of individuals are repeatedly re-admitted to the State Psychiatric Hospitals, typically for short stays. These individuals could remain in the community if the State made sufficient supports available in the community. Indeed, the State's treatment professionals regularly find that these Patients do not require continued confinement in the State Psychiatric Hospitals and discharge them to the community, where adequate supports and services are not provided, frequently resulting in emergency readmission.

38.   Treatment professionals in the State Psychiatric Hospitals routinely fail to analyze and address effectively the reasons for readmission for those Patients who are repeatedly readmitted.

39.   Many of the individuals with frequent readmissions to the State Psychiatric Hospitals are discharged to a variety of unsupervised locations, including emergency shelters, the streets, and personal care homes, none of which provides the level of support necessary to support a person with severe mental illness.

40.   For example, representative Patient A's family requested that he be placed in supervised and supported housing prior to his discharge; instead,

12

Patient A was repeatedly discharged to the streets, without any connection to necessary supports. In a pattern repeated numerous times before his untimely death in January 2009, Patient A would stop taking his medication and become ill enough to require re-hospitalization.

41.    Representative Patient D has a substance abuse history and a diagnosis of personality disorder, and has been admitted more than 100 times to a State Psychiatric Hospital. There is no evidence that Patient D, and others like him, receive necessary substance abuse services or supports upon discharge. Patient D's treatment professionals prognosticate that he will return repeatedly to the hospital.

42.    The State's own reviews conclude that assessments conducted by the State Psychiatric Hospitals, including assessments that determine whether Patients can be served in a less restrictive setting, are "totally inadequate."

43.    Hundreds of individuals confined to the State Psychiatric Hospitals receive deficient psychiatric care and treatment, beginning with inadequate psychiatric assessments. Inadequate assessments lead frequently to inaccurate diagnoses, which typically result in insufficient treatment and discharge planning. While confined to the State Psychiatric Hospitals, these

13

Patients do not receive appropriate treatment to support their recovery and eventual discharge to a less restrictive setting in the community.

44.  For example, Patient E is 19 years old, and already has been admitted to a State Psychiatric Hospital 28 times in her young life.  Her diagnoses include moderate mental retardation and four "not otherwise specified" ("NOS") psychiatric diagnoses.  Accepted professional standards require that treatment professionals attempt to resolve NOS diagnoses through further assessment and testing; despite Patient E's frequent hospitalizations, her treatment professional have yet to resolve her NOS diagnoses.  Without an accurate diagnosis, Patient E's treatment is severely compromised and the likelihood that she will be transitioned to the community with supports and services that adequately address her needs is diminished.  For Patient E and others like her, repeated hospitalization is likely.

45.  Individuals who have been confined to the State Psychiatric Hospitals for many years are not actively assessed for opportunities to move to the least restrictive setting appropriate to their needs.

46.  For example, Patient H has multiple diagnoses including mental retardation, and has been confined to a State Psychiatric Hospital for 22 years.  At the annual review of her treatment plan, her treatment professionals focused on

14

goals and objectives that were relevant only in an institutional setting, rather than goals that would facilitate community placement.

47. Patient I resides in a skilled nursing unit and has been confined to a State Psychiatric Hospital for 44 years. At the quarterly review of her treatment plan, her treatment professionals did not review any assessments or discuss any community placement goals.

### Facts Concerning the Most Integrated Settings

48. The State Psychiatric Hospitals are institutions that segregate individuals with mental illness and developmental disabilities from the community. The State Psychiatric Hospital setting discourages patients from engaging independently in activities of daily living, fosters dependence on institutional supports, and erodes the skills necessary for community living. While confined to the State Psychiatric Hospitals, patients have limited access to community activities and amenities and limited opportunities to interact with people who do not have disabilities.

49. For example, Patient J, a gregarious person with a developmental disability whose treatment team has previously recommended that he be placed in the community, gets his haircut at the hospital when he could and should be receiving this most basic of services in the community.

15

50.   Patient K was hospitalized with a diagnosis of depression despite her continuing to work at a local hotel. She was confined to a State Psychiatric Hospital for more than three months until an advocate secured a placement for her outside the hospital.

51.   The State Psychiatric Hospitals are not the most integrated setting appropriate to the needs of the Patients confined to these institutions. Numerous individuals continue to be confined to the State Hospitals because the services necessary to address their medical or behavioral health needs are offered by the State, but not in sufficient quality, quantity, and geographic diversity to serve Patients' needs.

52.   Providing supports and services in the community to Patients with developmental disabilities, mental illness, or substance abuse diagnoses can generate significant cost savings compared to the cost of institutionalizing Patients in the State Psychiatric Hospitals.

53.   The State has not conducted an adequate assessment of the needs of the behavioral health services system, including, particularly, those services necessary in order to provide services to all Patients in the least restrictive settings appropriate to their needs. An adequate assessment, including specific numbers of persons requiring services and realistic cost proposals

16

for those services is a prerequisite to marshaling sufficient resources to provide those services.

54. Supported Housing is a setting in which individuals live in their own apartment and receive services to support their success as tenants and their integration into the community. Supported housing providers offer a variety of supports to meet each individual's needs and allow the individual to live in a more "normalized" setting. Mental Health treatment professionals agree that many, if not all, people with serious mental illness can live successfully in the community in supported housing.

55. The Governor's own 2008 Mental Health Service Delivery Commission admits that individuals with developmental disabilities, mental illness, or substance abuse can live successfully in the community in supported housing.

56. Personal care homes are one source of housing for Patients discharged from the State Psychiatric Hospitals. Personal care homes are not supported housing and often are not settings sufficient to meet the discharged individuals' needs.

57. DBHDD provides extremely limited supported housing services, and numerous individuals continue to be confined to the State Psychiatric

17

Hospitals because specialized services, including supported housing, are not available in sufficient quantity to meet the needs of all Patients requiring those services.

58. Assertive Community Treatment ("ACT") is an intensive form of case management services that often is necessary to enable a person with serious mental illness to live in the community.

59. The State provides ACT teams in some, but not all, geographic areas of the State. Even in areas where ACT services are available, the State's own audits repeatedly conclude that there are insufficient numbers of ACT teams to support all of the individuals who require these services. The State has failed to fill this critical and long-standing gap in the behavioral health care system.

60. Community-based crisis stabilization services are an essential part of a behavioral health service system that effectively delivers treatment and supports to Patients in the least restrictive setting appropriate to their needs.

61. Mobile Crisis Stabilization services and short-term crisis stabilization beds are available in some areas of the State, but not in sufficient quantity or geographic diversity to serve all qualified individuals who require these services.

62.   Lack of income and employment are identified barriers to successful community integration for people with disabilities.

63.   The State Psychiatric Hospitals receive little support from the State's office of vocational rehabilitation, and Supported Employment programs in the State have suffered from budget cuts and services cutbacks in each of the past several fiscal years. The State does not offer sufficient Supported Employment programs to serve all qualified individuals who require these services.

64.   Adequate transportation services are essential to ensuring access to necessary behavioral health care services for individuals with developmental disabilities, mental illness, and substance abuse diagnoses who live in the community.

65.   Transportation services in the State are not coordinated and not available in all areas of the State. The State does not offer sufficient transportation services to serve all qualified individuals who require them to access necessary services.

66.   Patients with substance abuse diagnoses are not provided with sufficient treatment services to address addiction and avoid repeated relapse and reinstitutionalization.

67.   Certain DBHDD staff, known as case expediters, and community providers
      are required by State policy to work with the State Psychiatric Hospitals in
      developing transition plans for the individuals confined to the State
      Psychiatric Hospitals, but they frequently fail to do so.  Transition plans do
      not include the active participation of community providers and, therefore,
      do not adequately provide individuals confined to the State Psychiatric
      Hospitals with an appropriate transition to a community placement.

68.   Professional standards and the State's own policies dictate that assessment
      decisions be based on what is appropriate for the individual, and that the
      State identify and marshal necessary resources to meet those needs in the
      most integrated setting.

69.   The treatment professionals at the State Psychiatric Hospitals typically tailor
      their assessment of a Patient's appropriateness for community placement
      based upon an understanding of what limited community resources are
      available (or not available), rather than specifying what supports and
      services a Patient needs in order to be adequately supported in the
      community.  For example, none of the discharge plans recently reviewed by
      the State's own Mental Health Consultant included supported housing or
      supported employment, both of which enable many individuals with

20

disabilities to live successfully in the community, but neither of which the State adequately supplies.

70.   The State does not collect after-care data sufficient to determine the efficacy of its discharge plans and of the services and supports provided to individuals upon discharge from the State Psychiatric Hospitals.

71.   The State's own Community Service Board professionals have concluded that, without a continuum of services that includes healthy and fully functional community-based programs, the State Psychiatric Hospitals cannot provide services in a safe and effective manner.

72.   The State, through DBHDD, fails to provide services in sufficient quality, quantity, and geographic diversity to enable individuals with mental illnesses, substance abuse diagnoses, or developmental disabilities to be served in the least restrictive setting appropriate to their needs.

73.   The State has had long-standing notice of the deficiencies in its community-based supports and services. In Olmstead v. L.C., 527 U.S. 581, 605 (1999), the Supreme Court stated that Georgia's practice of discharging institutionalized persons to homeless shelters was inappropriate. Yet, the State continues to discharge hundreds of patients each year to homeless

shelters, and recent data from CSH shows that the rate of discharges to

shelters increased in the past few months.

74.    The deficiencies in the State's community-based supports and services have

       been highlighted in the following reports commissioned and/or issued by

       State entities:

       a.    The State's 2003 Olmstead Plan admitted:

                   Individuals with disabilities, including some currently living in
                   institutions, can live successfully in the community. To
                   succeed, they need decent, safe, affordable and accessible
                   housing that is separate from, but provides access to, the
                   community-based supports and services they want and need to
                   live as independently as possible. Nationally, there is a critical
                   shortage of affordable housing. Similarly, Georgia does not
                   have enough affordable housing.

       b.    The State's 2005 Mental Health Gap analysis concluded that the

             number of Assertive Community Treatment teams was insufficient to

             provide services to all discharged patients who require them.

       c.    A 2007 Medical College of Georgia survey warned that individuals

             with developmental disabilities face unnecessary or premature

             admission to CSH, the largest of the Hospitals housing people with

             developmental disabilities, because supports in the community for

22

        crisis intervention appear inadequate to handle the normal behavioral variability of some persons with developmental disabilities.

d.      Defendant Governor Sonny Perdue's 2008 Mental Health Service Delivery Commission Final Report concluded that the State Psychiatric Hospitals currently function as the "front door" to accessing mental health services in the State, rather than as a last resort in a continuum of care for those with chronic mental illness for whom community-based services and supports have been exhausted.

e.      The 2008 Mental Health Service Delivery Commission Final Report and the 2005 Georgia Mental Health Gap Analysis study document extremely high rates of re-admission at the State Psychiatric Hospitals. In each quarter of fiscal year 2009, the State missed its own targets for reducing re-admissions to the Hospitals.

f.      In fiscal year 2009, after budget cuts adversely affected available community housing, the State's Community Service Boards warned DBHDD that redirecting scarce funds in future budgets from community behavioral health services to the institutions would have adverse consequences.

23

75.   The State has had specific notice of the deficiencies causing the violations of federal rights alleged herein, as detailed in three letters to Defendant Governor Sonny Perdue from the Assistant Attorney General of the Civil Rights Division of the U.S. Department of Justice, dated May 30, 2008; January 15, 2009; and December 8, 2009 (Attached as Exhibits 1–3, respectively).

76.   The State has had specific notice of additional deficiencies causing harm to Patients inappropriately confined to the State Psychiatric Hospitals, as detailed in the three letters from the U.S. Department of Justice to Counsel for the State, dated September 9, 2009; November 19, 2009; and November 25, 2009 (Attached as Exhibits 4–8, respectively).

### VIOLATIONS OF THE AMERICANS WITH DISABILITIES ACT

77.   The allegations of Paragraphs 1 through 76 are hereby realleged and incorporated by reference.

78.   Defendants discriminate against "qualified individual[s] with a disability," within the meaning of the ADA, by administering the State's behavioral health system in a manner that denies hundreds of Georgians with mental illness, addictive diseases, and/or developmental disabilities the opportunity to receive services in the most integrated setting appropriate to their needs.

These individuals are qualified to receive services in a more integrated

setting and do not oppose receiving services in a more integrated setting.

79.     The relief sought would not constitute a "fundamental alteration" of the

State's behavioral health service system because the State already provides

the services that the Patients require to live in a more integrated setting.

Thus, there is no defense for the State's failure to provide services in a more

integrated setting.

80.     The State's actions as alleged herein constitute discrimination in violation

of Title II of the ADA, 42 U.S.C. § 12132, and its implementing regulations.

## PRAYER FOR RELIEF

WHEREFORE, the United States of America prays that the Court:

A.     Enjoin Defendants (1) from administering behavioral health services

in a setting that unnecessarily isolates and segregates individuals with disabilities

from the community, (2) to administer behavioral health services in the most

integrated setting appropriate to the needs of the individuals with disabilities, and

(3) to transition each of the Hospitals to a resource center that supports delivery of

community services and serves as a last resort in a continuum of care for those for

whom community-based services and supports have been exhausted; and

B.     Order such other appropriate relief as the interests of justice require.

Dated: 1/28/2010

Respectfully submitted,
FOR THE UNITED STATES:

FOR
_____
SALLY Q. YATES
United States Attorney
Northern District of Georgia

_____
THOMAS E. PEREZ
Assistant Attorney General

SAMUEL R. BAGENSTOS
Deputy Assistant Attorney General
Civil Rights Division

_____
SHANETTA Y. CUTLAR
Chief
Special Litigation Section

_____
JUDITH C. PRESTON
Deputy Chief
Special Litigation Section

26

_Mina Rhee_

MINA RHEE [GA Bar 602047]
Assistant United States Attorney
Northern District of Georgia
600 United States Courthouse
75 Spring Street, SW
Atlanta, GA 30303
Tel: (404) 581-6302
Fax: (404) 581-6163
Email: Mina.Rhee@usdoj.gov

_Mary R. Bohan_

MARY R. BOHAN [DC Bar 420628]
TIMOTHY D. MYGATT [PA Bar 90403]
ROBERT A. KOCH [OR Bar 072004]
EMILY A. GUNSTON [CA Bar 218035]
Attorneys
United States Department of Justice
Civil Rights Division
Special Litigation Section
950 Pennsylvania Avenue, NW
Washington, DC 20530
Tel: (202) 514-6255
Email: Mary.Bohan@usdoj.gov

27