**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION**

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | CIVIL ACTION NO. |
| | ) | 1:10-CV-249-CAP |
| THE STATE OF GEORGIA, et al., | ) | |
| | ) | |
| Defendants. | ) | |
| _____ | ) | |

**JOINT MOTION TO ENTER THE PARTIES'
SETTLEMENT AGREEMENT**

Plaintiff United States and Defendants State of Georgia, et al., having

entered into a Settlement Agreement, jointly move this Court to enter the

Proposed Order Entering the Parties' Settlement Agreement pursuant to

Federal Rule of Civil Procedure 41(a)(2).  The Settlement Agreement is

attached as Exhibit A.

The Parties respectfully request that the Court conditionally dismiss

the above-titled action pursuant to Federal Rule of Civil Procedure 41(a)(2)

and retain jurisdiction to enforce the Settlement Agreement.  See Am.

Disability Ass'n v. Chmielarz, 289 F.3d 1315, 1320 (11th Cir. 2002) ("[I]f the

district court either incorporates the terms of a settlement into its final order

of dismissal <u>or</u> expressly retains jurisdiction to enforce a settlement, it may thereafter enforce the terms of the parties' agreement.").

Consequently, the United States moves this Court to withdraw the United States' Motion for Immediate Relief [Doc. No. 90], and the Parties jointly move this Court to vacate the discovery and hearing set for November 8, 2010, that the Court ordered in Doc. Nos. 42 & 93.

A proposed order is attached.

Respectfully submitted,

FOR THE UNITED STATES:

SALLY QUILLIAN YATES
United States Attorney
Northern District of Georgia

THOMAS E. PEREZ
Assistant Attorney General
Civil Rights Division

SAMUEL R. BAGENSTOS
Principal Deputy Assistant Attorney
    General

JUDY C. PRESTON
Acting Chief
Special Litigation Section

MARY R. BOHAN
Deputy Chief
Special Litigation Section

TIMOTHY D. MYGATT
Special Counsel
Special Litigation Section

  /s/ (Express Permission)     
AILEEN BELL HUGHES
[GA 375505]
Assistant United States Attorney
Northern District of Georgia
600 United States Courthouse
75 Spring Street, SW
Atlanta, GA  30303
Tel:  (404) 581-6302
Fax:  (404) 581-6163
Email:
Aileen.Bell.Hughes@usdoj.gov

  /s/ Robert A. Koch          
ROBERT A. KOCH [OR 072004]
MAX LAPERTOSA [IL 6276608]
RICHARD FARANO [DC 424225]
AARON S. FLEISHER [NY 4431052]
JEFFREY MURRAY [MD]
JENNIFER MONDINO [NY4141636]
Attorneys
U.S. Department of Justice
Civil Rights Division
Special Litigation Section
950 Pennsylvania Avenue, NW
Washington, DC  20530
Tel:  (202) 514-6255
Fax:  (202) 514-0212
Email:  Robert.Koch@usdoj.gov

3

FOR THE STATE OF GEORGIA:

THURBERT E. BAKER
Attorney General
Georgia Bar No. 033887

DENNIS R. DUNN
Deputy Attorney General
Georgia Bar No. 234098

SHALEN S. NELSON
Senior Assistant Attorney General
Georgia Bar No. 636575

MARK J. CICERO
Assistant Attorney General
Georgia Bar No. 125686

JASON S. NAUNAS
Assistant Attorney General
Georgia Bar No. 142051

State Law Department
40 Capitol Square, S.W.
Atlanta, Georgia 30334
Telephone: (404) 656-3357
Facsimile:  (404) 463-1062
Email:  jnaunas@law.ga.gov

  /s/ (Express Permission)___
MARK H. COHEN
Special Assistant Attorney General
Georgia Bar No. 174567
Troutman Sanders LLP
5200 Bank of America Plaza
600 Peachtree Street, N.E.
Atlanta, Georgia 30308
Telephone: (404) 885-3597
Facsimile: (404) 962-6753
Email:
mark.cohen@troutmansanders.com

  /s/ (Express Permission)___
JOSH BELINFANTE
Special Assistant Attorney General
Georgia Bar No. 047399
RobbinsFreed
999 Peachtree Street, N.E.
Atlanta, GA 30309
Telephone: (678) 701-9381
Facsimile: (404) 601-6733
Email:
josh.belinfante@robbinsfreed.com

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF GEORGIA**
**ATLANTA DIVISION**

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | CIVIL ACTION NO. |
| | ) | 1:10-CV-249-CAP |
| THE STATE OF GEORGIA, et al., | ) | |
| | ) | |
| Defendants. | ) | |
| _____ | ) | |

**[PROPOSED] ORDER ENTERING THE PARTIES'**
**SETTLEMENT AGREEMENT**

For good cause shown, and in consideration of the Parties' Joint Motion to Enter the Parties' Settlement Agreement, the Court hereby GRANTS the Joint Motion; dismisses the United States' Motion for Immediate Relief [Doc. No. 90]; conditionally dismisses the above-titled action pursuant to Federal Rule of Civil Procedure 41(a)(2); retains jurisdiction to enforce the Settlement Agreement, which was filed with the Court and is attached as Exhibit A, see Am. Disability Ass'n v. Chmielarz, 289 F.3d 1315, 1320 (11th Cir. 2002); and vacates the discovery and hearing set for November 8, 2010, ordered by the Court in Doc. Nos. 42 & 93.

SO ORDERED this _____ day of _____, 2010.


_____
CHARLES A. PANNELL JR.
United States District Judge

## **Local Rule 7.1D Certification**

By signature below, counsel certifies that the foregoing document was

prepared in Century Schoolbook, 13-point font in compliance with Local

Rule 5.1B.

                     /s/ Robert A. Koch_____

                     ROBERT A. KOCH
                     Attorney
                     U.S. Department of Justice
                     Civil Rights Division
                     Special Litigation Section

# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF GEORGIA
### ATLANTA DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | CIVIL ACTION NO. |
| | ) | 1:10-CV-249-CAP |
| THE STATE OF GEORGIA, et al., | ) | |
| | ) | |
| Defendants. | ) | |

## CERTIFICATE OF SERVICE

I hereby certify that on this 19th day of October, 2010, I electronically filed the JOINT MOTION TO ENTER THE PARTIES' SETTLEMENT AGREEMENT with the Clerk of Court using the CM/ECF system which will automatically send email notification of such filing to the attorneys of record:

Mark J. Cicero, Esq.
Jason S. Naunas, Esq.
Assistant Attorneys General
State Law Department

Mark H. Cohen, Esq.
Lindsey Elisa Bowen, Esq.
Jeremy Patrick Burnette, Esq.
Steven J. Hewitson, Esq.
Kevin Gregory Meeks, Esq.
Lynette Eaddy Smith, Esq.
Jaime L. Theriot, Esq.
Troutman Sanders LLP

Josh Belinfante, Esq.
Jeremy U. Littlefield, Esq.
RobbinsFreed

Joshua H. Norris, Esq.
Georgia Advocacy Office

Ira Burnim, Esq.
Andrew S. Penn, Esq.
Lewis Bossing, Esq.
Bazelon Center
  for Mental Health Law

Kenneth S. Canfield, Esq.
Doffermyre Shields Canfield &
  Knowles, LLP


                    /s/ Robert A. Koch

Exhibit A

**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION**

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | CIVIL ACTION NO. |
| | ) | 1:10-CV-249-CAP |
| THE STATE OF GEORGIA, et al., | ) | |
| | ) | |
| Defendants. | ) | |
| _____ | ) | |

**SETTLEMENT AGREEMENT**

I.    Introduction

    A.    The United States brought this action by the filing of a complaint seeking declaratory and injunctive relief against Defendants based upon alleged violations of the Title II of Americans with Disabilities ADA, codified at 42 U.S.C. § 12101 ("ADA"), and implementing regulations at 28 C.F.R. Part 35, and Section 504 of the Rehabilitation Act of 1973, 29 U.S.C. § 794, and implementing regulations at 45 C.F.R. Part 84 ("Section 504").

    B.    In order to resolve all issues pending between these parties without the expense, risks, delays, and uncertainties of a trial and any appeals that might follow such a trial, the United States and Defendants agree to the terms of this Settlement Agreement as stated below.

    C.    On January 15, 2009, the United States Department of Justice ("DOJ") and the State entered into a settlement agreement which the United States District Court for the Northern District of Georgia entered as an order of the Court on September 24, 2010, in Civil Action No. 1:09-CV-119-CAP.  This Settlement Agreement does not affect the validity of the January 15, 2009 agreement between the parties.

    D.    On July 1, 2008, the State entered a Voluntary Compliance Agreement ("VCA") with the United States Department of Health and Human Services' Office for Civil Rights ("OCR").  This agreement supersedes the VCA.

E.     By entering into this Settlement Agreement, Defendants do not admit to the truth or validity of any claim made against them by the United States.  Defendants also do not speak for the Georgia General Assembly, which has the power under the Georgia Constitution and laws to determine the appropriations for, and to amend laws respecting, the State of Georgia's programs for mental health. However, Defendants acting under their existing authority agree that it will be a condition of their conduct of the mental health program covered by this Settlement Agreement to comply with the Settlement Agreement.

F.     If the United States seeks a judicial remedy for Defendants' noncompliance with the Settlement Agreement in accordance with Section V.C., and at any stage of subsequent enforcement proceedings Defendants or their successors assert insufficient funds or the legislature's amendment or non-amendment of state law as a legal excuse, the United States may rescind its consent to the Settlement Agreement.

G.     All parties acknowledge that the Court has subject-matter jurisdiction over this case, and authority to enter this Settlement Agreement and to enforce its terms.  Defendants acknowledge they are subject to personal jurisdiction of the Court, and that venue is proper in this Court.

H.     The Defendants in these actions are the State of Georgia and, in their official capacities:  the Governor of the State of Georgia, the Commissioner of the Department of Behavioral Health and Developmental Disabilities, and the Commissioner of the Georgia Department of Community Health.

I.     No person or entity is intended to be a third-party beneficiary of the provisions of this Settlement Agreement for purposes of any other civil, criminal, or administrative action, and accordingly, no person or entity may assert any claim or right as a beneficiary or protected class under this Settlement Agreement in any separate action.  This Settlement Agreement is not intended to impair or expand the right of any person or organization to seek relief against the State or their officials, employees, or agents.

J.      The Court has jurisdiction over this action pursuant to 28 U.S.C. § 1331; 28 U.S.C. § 1345; 42 U.S.C. § 1997; and 42 U.S.C. §§ 12131-12132.  Venue is proper in this district pursuant to 28 U.S.C. § 1391(b).

K.      Title II of the Americans with Disabilities Act, 42 U.S.C. § 12101, and implementing regulations at 28 C.F.R. Part 35, and Section 504 of the Rehabilitation Act of 1973, 29 U.S.C. § 794, and implementing regulations at 45 C.F.R. Part 84 ("Section 504"), require, among other provisions, that, to the extent the State offers public services to qualified individuals with disabilities, such services shall be provided in the most integrated setting appropriate to meet the needs of such qualified individuals with disabilities.  Accordingly, throughout this document, the Parties intend that the principle of self-determination is honored and that the goals of community integration, appropriate planning and services to support individuals at risk of institutionalization are achieved.

## II.    Definitions

As used in this Settlement Agreement, the following definitions apply to the terms below, without regard to case, gender, tense, or number:

A.      "Assisted living facility," for purposes of this Agreement, shall mean a residential living arrangement that serves more than 4 persons unrelated to the proprietor in which residential amenities are combined, as needed, with assistance with activities of daily living and personal care.

B.      "DBHDD" shall mean the Georgia Department of Behavioral Health and Developmental Disabilities.

C.      "Developmental Disability" shall mean a severe, chronic disability of an individual that:  (1) is attributable to a significant intellectual disability or combination of significant intellectual disability and physical impairments; (2) is manifested before the individual attains age 22; (3) is likely to continue indefinitely; (4) results in substantial functional limitations in three or more areas of major life activity; and (5) reflects the individual's need for a combination and sequence of special, interdisciplinary, or generic services, individualized supports, or other forms of assistance that are of lifelong or extended duration and are individually planned and coordinated.  For purposes of this Agreement, this definition also includes any individual who is served in a State Hospital as of the Effective Date of this Agreement on a ward or facility designated for individuals with developmental

disabilities, even if the individual does not otherwise meet the above definition.

D.      "DOJ" shall mean the United States Department of Justice.

E.      "Effective Date" shall be the date on which this Settlement Agreement is approved and entered by the Court pursuant to Federal Rule of Civil Procedure 41(a)(2).

F.      "Family supports" shall mean an array of goods and services aimed at providing families with the highly individualized support needed to prevent institutionalization and continue to care for a family member with developmental disabilities at home.

G.      "Home and Community Based Waiver Services" or "State's HCBS Waiver Program" shall mean the program approved by the Centers for Medicare and Medicaid for the purpose of providing services in community settings for eligible persons with developmental disabilities who would otherwise be served in Medicaid Intermediate Care Facilities for the Mentally Retarded (ICF/MR's).  For purposes of this Settlement Agreement, "State's HCBS Waiver Program" includes the services of the COMP and NOW waivers as being implemented on the execution date of this agreement.

H.      "Informed choice" shall mean a voluntary, well-considered decision that an individual, or where legally required, the individual's legal guardian, makes on the basis of appropriate options, information, and understanding.

I.      "OCR" shall mean the United States Department of Health and Human Services' Office of Civil Rights.

J.      "Parties" shall mean the United States and the State of Georgia.

K.      "Serious and persistent mental illness" or "SPMI" shall mean a diagnosable mental, behavioral, or emotional disorder of sufficient duration to meet diagnostic criteria that has occurred within the last year, has resulted in functional impairment which substantially interferes with or limits one or more major life activities, and has episodic, recurrent, or persistent features.

L.      "State" or "Georgia" shall mean the State of Georgia, its agencies, and its departments; the State's employees, agents, or assigns; and their successors or designees.

M.    "State Hospitals" shall mean the facilities, services, and programs supplied or provided to individuals admitted to the hospital at Georgia Regional Hospital at Atlanta ("GRHA"), Georgia Regional Hospital at Savannah ("GRHS"), Central State Hospital ("CSH"), Southwestern State Hospital ("SWSH"), West Central Georgia Regional Hospital ("WCGRH"), Northwest Georgia Regional Hospital ("NWGRH"), and East Central Regional Hospital ("ECRH").

N.    "United States" shall mean DOJ and OCR and their employees, agents, or assigns, and their successors or designees.

## III.  Substantive Provisions

As part of this Agreement to settle and resolve pending litigation between the United States and the State of Georgia, the Parties hereto agree to the measures set forth below:

A.    <u>Serving People With Developmental Disabilities In The Community</u>

    1.    Cessation of Admissions to the State Hospitals

        a.    By July 1, 2011, the State shall cease all admissions to the State Hospitals of all individuals for whom the reason for admission is due to a primary diagnosis of a developmental disability.

        b.    The State will make any necessary changes to administrative regulations and take best efforts to amend any statutes that may require such admissions.

    2.    Enhancement of Community Services

        a.    The target population for the community services described in this Section (III.A) shall be individuals with a primary diagnosis of a developmental disability who are currently hospitalized in the State Hospitals and those who are at risk of hospitalization in the State Hospitals. Inclusion in the target population does not guarantee or create a right to receipt of services.

        b.    HCBS Waiver Schedule & Family Supports

            i.    Pursuant to the schedule set forth below, the State shall provide to individuals with developmental

disabilities in the target population the waiver services provided in the State's HCBS Waiver Program as of the Effective Date of this agreement.

(A)     By July 1, 2011, the State shall move 150 individuals with developmental disabilities from the State Hospitals to the community and the State shall create 150 waivers to accomplish this transition.  In addition, the State shall move from the State Hospitals to the community all individuals with an existing and active waiver as of the Effective Date of this Agreement, provided such placement is consistent with the individual's informed choice.  The State shall provide family supports to a minimum of 400 families of people with developmental disabilities.

(B)     Between July 1, 2011, and July 1, 2012, the State shall move 150 individuals with developmental disabilities from the State Hospitals to the community.  The State shall create 150 waivers to accomplish this transition.  The State shall also create 100 additional waivers to prevent the institutionalization of individuals with developmental disabilities who are currently in the community.  The State shall provide family supports to an additional 450 families of people with developmental disabilities.

(C)     Between July 1, 2012, and July 1, 2013, the State shall move 150 individuals with developmental disabilities from the State Hospitals to the community.  The State shall create 150 waivers to accomplish this transition.  The State shall also create 100 additional waivers to prevent the institutionalization of individuals with developmental disabilities who are currently in the community.   The State shall provide

family supports to an additional 500 families of people with developmental disabilities.

(D)     Between July 1, 2013, and July 1, 2014, the State shall move 150 individuals with developmental disabilities from the State Hospitals to the community.  The State shall create 150 waivers to accomplish this transition.  The State shall also create 100 additional waivers to prevent the institutionalization of individuals with developmental disabilities who are currently in the community.   The State shall provide family supports to an additional 500 families of people with developmental disabilities.

(E)     Between July 1, 2014, and July 1, 2015, the State shall attempt to move any remaining individuals with developmental disabilities from the State Hospitals to the community. The State shall create up to 150 waivers to accomplish this transition.  The State shall also create 100 additional waivers to prevent the hospitalization of individuals with developmental disabilities who are currently in the community.  The State shall provide family supports to an additional 500 families of people with developmental disabilities.

(F)     Any persons with developmental disabilities remaining in State Hospitals on July 2, 2015, shall be served in the most integrated setting appropriate to their needs.

ii.     Community Living Options

(A)     The State shall serve individuals in the target population receiving HCBS Waiver Program services in their own home or their family's home consistent with each individual's informed choice.  In order to accomplish this, funds shall be provided to persons with developmental disabilities

through the State's HCBS Waiver Program, available federal funds, and/or State funds as necessary.

(B)   Individuals in the target population shall not be served in a host home or a congregate community living setting unless such placement is consistent with the individual's informed choice.  For individuals in the target population not served in their own home or their family's home, the number of individuals served in a host home as defined by Georgia law shall not exceed two, and the number of individuals served in any congregate community living setting shall not exceed four.

(C)   Individuals receiving the State's HCBS Waiver Program services shall not be served in a skilled nursing facility, intermediate care facility, or assisted living facility unless service in such a facility is in accordance with the individual's informed choice.

iii.   Support coordination shall be provided to all waiver participants.  For the purposes of this agreement, support coordination shall mean:

(A)   Assembling professionals and non-professionals who provide individualized supports, as well as the individual being served and other persons important to the individual being served, who, through their combined expertise and involvement, develop Individual Service Plans, as required by the State's HCBS Waiver Program, that are individualized and person centered;

(B)   Assisting the individual to gain access to needed medical, social, education, transportation, housing, nutritional, and other services identified in the Individual Service Plan; and

Page **8** of **40**

(C)    Monitoring the Individual Service Plan to make additional referrals, service changes, and amendments to the plans as identified as needed.

iv.    The State may provide funding for the obligations set forth in this schedule through any legal means, including the State's current money-follows-the-person program.

c.    Crisis Response

i.    Mobile Crisis Teams

(A)    By July 1, 2012, the State will have six mobile crisis teams for persons with developmental disabilities.

ii.    Crisis Respite Homes

(A)    Crisis Respite Homes provide respite services to persons with developmental disabilities and their families.  Each Crisis Respite Home will have four beds for use by individuals with developmental disabilities.

(B)    Pursuant to the schedule set forth below, the State will establish 12 Crisis Respite Homes by July 1, 2014.

(1)    By July 1, 2012, the State will have five Crisis Respite Homes for individuals with developmental disabilities.

(2)    By July 1, 2013, the State will establish an additional four Crisis Respite Homes for individuals with developmental disabilities.

(3)    By July 1, 2014, the State will establish an additional three Crisis

Respite Homes for individuals with developmental disabilities.

3. Individuals with Developmental Disabilities and Forensic Status

a. By July 1, 2013, the State shall create a program to educate judges and law enforcement officials about community supports and services for individuals with developmental disabilities and forensic status.

b. Individuals with developmental disabilities and forensic status shall be included in the target population and the waivers described in this Section, if the relevant court finds that community placement is appropriate. This paragraph shall not be interpreted as expanding the State's obligations under paragraph III.A.2.b.

4. Assessing Quality

a. By July 1, 2013, the State will conduct an audit of community providers of waiver services.

b. By the Effective Date of this agreement, the State shall use a CMS approved Quality Improvement Organization ("QIO") or QIO-like organization to assess the quality of services by community providers.

c. To evaluate the provision of care by community providers of waiver services, on an annual basis, the State may:

i. Conduct face-to-face person centered interviews with individuals receiving developmental disability services;

ii. Conduct assessments of care of provider services, including support coordination agencies;

iii. Collect program participant feedback on the quality of the system through participation in the National Core Indicator Survey; and

iv.     Collect provider performance data through the use of specific federal and state performance indicators.

d.     The State shall assess compliance on an annual basis and shall take appropriate action based on each assessment.

B.     <u>Serving Persons With Mental Illness In The Community</u>

1.     Target Population

a.     The target population for the community services described in this Section (III.B) shall be approximately 9,000 individuals by July 1, 2015, with SPMI who are currently being served in the State Hospitals, who are frequently readmitted to the State Hospitals, who are frequently seen in Emergency Rooms, who are chronically homeless, and/or who are being released from jails or prisons.

b.     Individuals with serious and persistent mental illness and forensic status shall be included in the target population, if the relevant court finds that community service is appropriate.

c.     Pursuant to the VCA, the State established a Mental Health Olmstead List.  The State shall ensure that all individuals on the Mental Health Olmstead List as of the Effective Date of this Agreement will, if eligible for services, receive services in the community in accordance with this Settlement Agreement by July 1, 2011.  The Parties acknowledge that some individuals on the Mental Health Olmstead List are required to register as sex offenders pursuant to O.C.G.A. § 42-1-12 et seq.  The Parties further acknowledge that such registration makes placement in the community more difficult.  The Parties may by written consent extend the application of the date set forth in this paragraph as it applies to such individuals.  The written consent described in this paragraph will not require Court approval.

d.     The State shall include any individual in the target population who otherwise satisfies one of the eligibility criteria above and who has a co-occurring condition, such as substance abuse disorders or traumatic brain injuries.

2.      To comply with this Settlement Agreement, the State shall provide the following services to individuals in the target population:

a.      Intensive Services for Individuals with SPMI

i.      Assertive Community Treatment ("ACT")

(A)     ACT is a service that delivers comprehensive, individualized, and flexible treatment, support, and rehabilitation to individuals where they live and work.  ACT is provided through a multidisciplinary team that shall include a psychiatrist, nurse, psychologist, social worker, substance abuse specialist, vocational rehabilitation specialist, and peer specialist.  Services are highly individualized and customized, and address the constantly changing needs of the individual over time.  Among the services that ACT teams provide are:  case management, initial and ongoing assessments, psychiatric services, assistance with employment and housing, family support and education, substance abuse services, crisis services, and other services and supports critical to an individual's ability to live successfully in the community.

(B)     ACT teams shall provide crisis services, including helping individuals increase their ability to recognize and deal with situations that may otherwise result in hospitalization, increase and improve their network of community and natural supports, and increase and improve their use of those supports for crisis prevention.

(C)     ACT teams shall provide services to promote the successful retention of housing, including peer support, and services designed to improve daily living skills, socialization, and illness self-management.

(D)    ACT teams who serve individuals with co-occurring substance abuse disorders shall provide substance abuse treatment and referral services to those individuals. Such ACT teams shall include on their staff a clinician with substance abuse expertise.

(E)    ACT services shall be available 24 hours per day, 7 days per week.

(F)    The number of individuals served by an ACT team shall be no more than 10 individuals per ACT team member. ACT teams shall be comprised of 7 to 10 team members, with at least one member being a peer specialist.

(G)    All ACT teams will operate with fidelity to the Dartmouth Assertive Community Treatment model.

(H)    By July 1, 2013, the State shall have 22 ACT teams according to the following schedule:

    (1)    By July 1, 2011, the State shall have 18 ACT teams.

    (2)    By July 1, 2012, the State shall have 20 ACT teams.

    (3)    By July 1, 2013, the State shall have 22 ACT teams.

ii.    Community Support Teams ("CSTs")

(A)    CSTs have at least three team members, including a nurse, certified peer specialist, and one to two paraprofessionals. CSTs provide services in the individual's own home and ensure that community resources needed for the individual to remain in the community are in place. CST will be provided in areas of the State with lower population density than is needed for ACT, in professional workforce shortage areas, or

in areas to complement existing ACT services.

(B) CSTs will have a staff to client ratio of 1 to 20 in rural areas and 1 to 30 in urban areas.

(C) By July 1, 2014, the State shall have eight CSTs pursuant to the following schedule:

(1) By July 1, 2012, the State will have two CSTs.

(2) By July 1, 2013, the State will have four CSTs.

(3) By July 1, 2014, the State will have eight CSTs.

iii. Intensive Case Management ("ICM")

(A) ICM teams provide coordination of treatment and support services for individuals in the target population.  Oversight of paraprofessionals delivering ICM is provided by a licensed mental health professional. ICM teams assist individuals with SPMI in accessing community resources.

(B) Each ICM teams is comprised of 10 case full-time case managers and one full-time supervisor.

(C) ICM teams will have a staff to client ration of 1 to 20 in rural areas and 1 to 30 in urban areas.

(D) By July 1, 2015, the State shall have 14 ICM Teams according to the following schedule:

(1) By July 1, 2011, the State will have one ICM team.

(2) By July 1, 2012, the State will have two ICM teams.

       (3)    By July 1, 2013, the State will have three ICM teams.

       (4)    By July 1, 2014, the State will have eight ICM teams.

       (5)    By July 1, 2015, the State will have 14 ICM teams.

   iv.    Case Management Services

     (A)    Case Management Services provides coordination of treatment and support services for individuals in the target population who need ongoing support in order to maintain services and supports that are in place.

     (B)    Each Case Management Service provider will have a 1 to 50 client to staff ratio.

     (C)    By July 1, 2015, the State shall have 45 Case Management service providers according to the following schedule:.

       (1)    By July 1, 2012, the State will have five Case Management service providers.

       (2)    By July 1, 2013, the State will have 15 Case Management service providers.

       (3)    By July 1, 2014, the State will have 25 Case Management service providers.

       (4)    By July 1, 2015, the State will have 45 Case Management service providers.

b.    Crisis Services for Individuals with SPMI.

   i.    Crisis Service Centers ("CSCs")

     (A)    Crisis Service Centers provide walk-in psychiatric and counseling services by licensed professionals in a center that is

clinically staffed 24 hours per day, 7 days per week, to receive individuals in crisis, including individuals with co-occurring substance abuse disorders, and to assess and provide services and support, including referrals.

(B)     By July 1, 2015, the State agrees to establish a total of six CSCs according to the following schedule:

(1)     By July 1, 2013, the State will establish one CSC.

(2)     By July 1, 2014, the State will establish an additional two CSCs.

(3)     By July 1, 2015, the State will establish an additional three CSCs.

ii.     Crisis Stabilization Programs ("CSPs")

(A)     CSPs are community-based residential services operated by community providers that provide psychiatric stabilization and detoxification services as an alternative to psychiatric hospitalization.  They are located off the grounds of the State Hospitals.  New CSPs will have 16 beds each.

(B)     By July 1, 2014, the State will establish a total of three additional CSPs according to the following schedule:

(1)     The State will establish one CSP by July 1, 2012.

(2)     The State will establish an additional CSP by July 1, 2013.

(3)     The State will establish an additional CSP by July 1, 2014.

iii.   Community Hospital Beds

(A)   Beginning on July 1, 2011, the State shall retain funding for 35 beds in non-State community hospitals without regard as to whether such hospitals are freestanding psychiatric hospitals or general, acute care hospitals.

iv.   Crisis line

(A)   The State shall operate a toll-free statewide telephone system for persons to access information about resources in the community to assist with a crisis ("Crisis Call Center"). Such assistance includes providing advice and facilitating the delivery of mental health services.

(B)   The Crisis Call Center shall be staffed by skilled professionals 24 hours per day, 7 days per week, to assess, make referrals, and dispatch available mobile services. The Crisis Call Center shall promptly answer and respond to all crisis calls.

v.   Mobile Crisis Services

(A)   Mobile crisis services shall respond to crises anywhere in the community (e.g., homes or hospital emergency rooms) 24 hours per day, 7 days per week. The services shall be provided by clinical staff members trained to provide emergency services and shall include clinical staff members with substance abuse expertise and, when available, a peer specialist.

(B)   Mobile crisis services shall be developed according to the following schedule:

(1)   By July 1, 2013, the State shall have mobile crisis services within 91 of 159 counties, with an average annual

response time of 1 hour and 10 minutes or less.

(2)     By July 1, 2014, the State shall have mobile crisis services within 126 of 159 counties, with an average annual response time of 1 hour and 5 minutes or less.

(3)     By July 1, 2015, the State shall have mobile crisis services within all 159 of 159 counties, with an average annual response time of 1 hour or less.

vi.     Crisis Apartments

(A)     Crisis apartments, located in community settings off the grounds of the State Hospitals and staffed by paraprofessionals and, when available, peer specialists, shall serve as an alternative to crisis stabilization programs and to psychiatric hospitalization.

(B)     Each crisis apartment will have capacity to serve two individuals with SPMI.

(C)     By July 1, 2015, the State will establish a total of 18 crisis apartments according to the following schedule:

(1)     By July 1, 2013, the State will provide six crisis apartments.

(2)     By July 1, 2014, the State will provide 12 crisis apartments.

(3)     By July 1, 2015, the State will provide 18 crisis apartments.

c.      Housing Supports for Individuals with SPMI.

i.      Supported Housing is assistance, including psycho-social supports, to persons with SPMI in the target population that will assist such individuals in attaining and maintaining safe and affordable

housing and support their integration into the community. Supported Housing includes integrated permanent housing with tenancy rights, linked with flexible community-based services that are available to consumers when they need them, but are not mandated as a condition of tenancy.

(A)    Supported Housing includes scattered-site housing as well as apartments clustered in a single building. By July 1, 2015, 50% of Supported Housing units shall be provided in scattered-site housing, which requires that no more than 20% of the units in one building, or no more than two units in one building (whichever is greater), may be used to provide Supported Housing under this agreement. Personal care homes shall not qualify as scattered-site housing.

(B)    It is the intent of the parties that approximately 60% of persons in the target population receiving scattered-site Supported Housing will reside in a two-bedroom apartment, and that approximately 40% of persons in the target population receiving scattered-site Supported Housing will reside in a one-bedroom apartment. Provided, however, nothing in Section III.B.2.c shall require the State to forego federal funding or federal programs to provide housing for persons in the target population with SPMI.

(C)    Bridge Funding includes the provision of deposits, household necessities, living expenses, and other supports during the time needed for a person to become eligible and a recipient of federal disability or other supplemental income.

ii.    Schedules:

(A)    By July 1, 2015, the State will have capacity to provide Supported Housing to any of the

9,000 persons in the target population who need such support.  The Supported Housing required by this provision may be in the form of assistance from the Georgia Department of Community Affairs, the federal Department of Housing and Urban Development, and from any other governmental or private source.

(B)     The State will provide housing supports for approximately 2,000 individuals in the target population with SPMI that are deemed ineligible for any other benefits pursuant to the following schedule:

(1)     By July 1, 2011, the State will provide a total of 100 supported housing beds.

(2)     By July 1, 2012, the State will provide a total of 500 supported housing beds.

(3)     By July 1, 2013, the State will provide a total of 800 supported housing beds.

(4)     By July 1, 2014, the State will provide a total 1,400 supported housing beds.

(5)     By July 1, 2015, the State will provide a total 2,000 supported housing beds.

(C)     The State will provide Bridge Funding for up to 1800 individuals in the target population with SPMI pursuant to the following schedule:

(1)     By July 1, 2011, the State will provide Bridge Funding for 90 individuals with SPMI.  The State will also commence taking reasonable efforts to assist persons with SPMI to qualify in a timely manner for eligible supplemental income.

(2)     By July 1, 2012, the State will provide Bridge Funding for 360 individuals with SPMI.

(3)     By July 1, 2013, the State will provide Bridge Funding for 270 individuals with SPMI.

(4)     By July 1, 2014, the State will provide Bridge Funding for 540 individuals with SPMI.

(5)     By July 1, 2015, the State will provide Bridge Funding for 540 individuals with SPMI.

d.   Supported Employment

   i.   Supported Employment will be operated according to an evidence-based supported employment model, and it will be assessed by an established fidelity scale such as the scale included in the Substance Abuse and Mental Health Administration ("SAMHSA") supported employment tool kit.

   ii.   Enrollment in congregate programs shall not constitute Supported Employment.

   iii.   Pursuant to the following schedule, the State shall provide Supported Employment services to 550 individuals with SPMI by July 1, 2015.

      (A)     By July 1, 2011, the State shall provide Supported Employment services to 70 individuals with SPMI.

      (B)     By July 1, 2012, the State shall provide Supported Employment services to 170 individuals with SPMI.

      (C)     By July 1, 2013, the State shall provide Supported Employment services to 440 individuals with SPMI.

      (D)    By July 1, 2014, the State shall provide Supported Employment services to 500 individuals with SPMI.

      (E)    By July 1, 2015, the State shall provide Supported Employment services to 550 individuals with SPMI.

e.    Peer Support Services

    i.    Peer Support Services are delivered by peers to improve an individual's community living skills, including their ability to cope with and manage symptoms and to develop and utilize existing community supports.  Peer support services may be provided by face-to-face or telephone contact and include outreach, wellness training, and training in self-advocacy.

    ii.    In addition to the peer support services provided by ACT and CST teams, the State will make Peer Support services available to up to an additional 835 individuals with SPMI pursuant to the following schedule:

      (A)    By July 1, 2012, the State shall provide Peer Support services to up to 235 individuals with SPMI.

      (B)    By July 1, 2013, the State shall provide Peer Support services to up to 535 individuals with SPMI.

      (C)    By July 1, 2014, the State shall provide Peer Support services to up to 835 individuals with SPMI.

    iii.    Peer Support availability will be measured by providing funding allow on average 1.5 trips per week per consumer.

C.    <u>Services in the Community</u>

    1.    Individuals under the age of 18 shall not be admitted to, or otherwise served, in the State Hospitals or on State Hospital grounds, unless the individual meets the criteria for emancipated minor, as set forth in Article 6 of Title 15, Chapter 11 of the Georgia Code, O.C.G.A. §§ 15-11-200 et seq.

    2.    Individuals in the target population with developmental disabilities and/or serious and persistent mental illness shall not be transferred from one institutional setting to another or from a State Hospital to a skilled nursing facility, intermediate care facility, or assisted living facility unless consistent with the individual's informed choice or is warranted by the individual's medical condition.  Provided, however, if the State is in the process of closing all units of a certain clinical service category at a State Hospital, the State may transfer an individual from one institutional setting to another if appropriate to that individual's needs.  Further provided that the State may transfer individuals in State Hospitals with developmental disabilities who are on forensic status to another State Hospital if appropriate to that individual's needs.  The State may not transfer an individual from one institutional setting to another more than once.

    3.    Oversight of Community Service Boards and/or Community Providers

        a.    By January 1, 2012, the State shall:

            i.    Establish the responsibilities of community service boards and/or community providers through contract, letter of agreement, or other agreement, including but not limited to the community service boards' and/or community providers' responsibilities in developing and implementing transition plans.

            ii.    Identify qualified providers through a certified vendor or request for proposal process or other manner consistent with DBHDD policy or State law, including providers in geographically diverse

areas of the State consistent with the needs of the individuals covered by this Agreement.

iii.  Perform a cost rate study of provider reimbursement rates.

iv.  Require community service boards and/or community providers to develop written descriptions of services it can provide, in consultation with community stakeholders.  The community stakeholders will be selected by the community services boards and/or community providers.

v.  Require and/or provide training to community service boards and/or community providers so that services can be maintained in a manner consistent with this Agreement.

vi.  Utilize contract management and corrective action plans to achieve the goals of this Agreement and of State agencies.

b.  Beginning on January 1, 2012 and on at least an annual basis, the State shall perform a network analysis to assess the availability of supports and services in the community.

c.  No provision of this Agreement shall provide a basis of liability against the State for the tortious acts or omissions of community service boards and/or community providers.

D.  <u>Transition Planning</u>

1.  By July 1, 2011, the State shall have at least one case manager and by July 1, 2012, at least one transition specialist per State Hospital to review transition planning for individuals who have challenging behaviors or medical conditions that impede their transition to the community, including individuals whose transition planning team cannot agree on a transition plan or does not recommend that the individual be discharged.  The transition specialists will also review all transition plans for

individuals who have been in a State Hospital for more than 45 days.

2.    The Transition Specialists will coordinate with State Hospital staff, the appropriate regional office, and the individual's choice of community provider(s) in the development of a transition plan for these individuals and in the moving of individuals to the community.

3.    Planning for transition to the community

   a.    For persons identified in the developmental disability and mental illness target populations of this Settlement Agreement, planning for transition to the community shall be the responsibility of the appropriate regional office and shall be carried out through collaborative engagement with the discharge planning process of the State Hospitals and provider(s) chosen by the individual or the individual's guardian where required.

   b.    The regional office shall maintain and provide to the State Hospital a detailed list of all community providers, including all services offered by each provider, to be utilized to identify providers capable of meeting the needs of the individual in the community, and to provide each individual with a choice of providers when possible.

   c.    The regional office shall assure that, once identified and selected by the individual, community service boards and/other community providers shall actively participate in the transition plan (to include the implementation of the plan for transition to the community).

   d.    The community service boards and/or community providers shall be held accountable for the implementation of that portion of the transition plan for which they are responsible to support transition of the individual to the community.

IV.    Quality Management

A.    By January 1, 2012, the State shall institute a quality management system regarding community services for the target populations

specified in this Agreement.  The quality management system shall perform annual quality service reviews of samples of community providers, including face-to-face meetings with individuals, residents, and staff and reviews of treatment records, incident/injury data, and key-indicator performance data.  The system's review shall include:

1.  The implementation of the plan regarding cessation of admissions for persons with developmental disabilities to the State Hospitals.

2.  The service requirements of this Agreement.

3.  The contractual compliance of community service boards and/or community providers.

4.  The network analysis.

B.  The State's quality management system regarding community services shall analyze key indicator data relevant to the target population and services specified in this Agreement to measure compliance with the State's policies and procedures.

C.  Beginning on July 1, 2012 and ending on July 1, 2014, the State's quality management system shall create a report at least once every six months summarizing quality assurance activities, findings, and recommendations.  The State shall make them publicly available on the DBHDD website.

V.  <u>Implementation of the Agreement</u>

A.  The implementation of this Settlement Agreement shall begin immediately upon the Effective Date.

B.  Within one month from the Effective Date of this Settlement Agreement, the State shall appoint a Settlement Agreement Coordinator to oversee compliance with this Settlement Agreement and to serve as a point of contact for the United States and the Independent Reviewer(s).

C.  The State shall maintain sufficient records to document that the requirements of this Settlement Agreement are being properly implemented and shall make such records available to the Independent Reviewer(s) and United States for inspection and copying on a reasonable basis.

D.   In order to determine compliance with this Agreement, and to the extent they are within the State's custody or control, the Independent Reviewer(s) and the United States shall have full access to persons, employees, residences, facilities, buildings, programs, services, documents, records, and materials that are necessary to assess the State's compliance and/or implementation efforts with this Settlement Agreement. Such access shall include departmental and/or individual medical and other records. The Independent Reviewer(s) and the United States shall provide reasonable notice of any visit or inspection. In addition, the United States shall exercise its access to DBHDD employees in a manner that is reasonable and not unduly burdensome to the Department's affairs. The Parties agree in cases where there in an emergency situation that presents an immediate threat to life, health or safety of individuals, neither the United States nor Independent Reviewer(s) will be required to provide the State notice of such visit or inspection. Such access shall continue until this case is dismissed.

E.   The State shall notify the Independent Reviewer(s) promptly upon the death of any individual actively receiving services pursuant to this agreement. The State shall, via email, forward to the United States and the Independent Reviewer(s) electronic copies of all completed incident reports and final reports of investigations related to such incidents as well as any autopsies and death summaries in the State's possession.

## VI.   Independent Reviewer(s)

A.   The Parties have jointly selected Elizabeth Jones as the Independent Reviewer(s) for the Settlement Agreement. In the event that Elizabeth Jones is unable to fulfill his/her duties under this Settlement Agreement, the Parties will select a replacement. If the Parties are unable to agree on a replacement, they shall each submit the names of up to three candidates to the Court, and the Court shall select the replacement.

B.   The Independent Reviewer(s) shall conduct the factual investigation and verification of data and documentation necessary to determine whether the State is in compliance with the terms of this Settlement Agreement at least annually, commencing on July 1, 2011 during the pendency of the Settlement Agreement. The Independent Reviewer(s) will file with the Court a written report on the State's performance within 60 days after the close of each review cycle. The Independent

Reviewer(s) will provide both the United States and State a draft of his or her report at least 10 business days before issuing the report. Both Parties will have five business days to review and comment on the proposed report before it is filed with the Court. The Parties may agree to allow the Independent Reviewer(s) an additional 20 days to finalize a report after he or she receives comments from the Parties, and such an agreement does not require Court approval.

C.    The Independent Reviewer(s) may:

1.    Have ex parte communications with the Parties and the Court at any time, and speak with stakeholders at the Independent Reviewer(s)' discretion.

2.    Testify in this case regarding any matter relating to the implementation, enforcement, or dissolution of the Settlement Agreement, including, but not limited to, the Independent Reviewer(s)' observations, findings, and recommendations in this matter.

D.    No Independent Reviewer(s) shall be:

1.    Liable for any claim, lawsuit, or demand arising out of the monitoring of this Settlement Agreement. This paragraph does not apply to any proceeding before this Court for enforcement of payment of contracts or subcontracts for monitoring this Settlement Agreement.

2.    Subject to formal discovery, including, but not limited to, deposition(s), request(s) for documents, request(s) for admissions, interrogatories, or other disclosures. The Parties are not entitled to access the Independent Reviewer(s)' records or communications, although the Independent Reviewer(s) may provide copies of records or communications at the Independent Reviewer(s)' discretion. The Court may review all records of the Independent Reviewer(s) at the Court's discretion.

E.    To determine compliance with this Agreement, the Independent Reviewer(s) will have full access to residents, persons, employees, residences, facilities, buildings, programs, services, documents, records, and materials that are necessary to assess the State's compliance and/or implementation efforts with this Settlement Agreement. To determine compliance with this Agreement, the Independent Reviewer(s) may also enter any facility or program

providing services to persons covered by this Agreement and may interview, on a confidential basis or otherwise, persons directly affected by the Settlement Agreement with such person's consent.

F.     DHBDD, through its employees or agents, will collect data with regard to each element of required performance under the terms of the Settlement Agreement and make it available on a timely basis to the Independent Reviewer(s).

G.     In addition to the other duties described above, by October 30, 2013, the Independent Reviewer(s) shall (1) assess whether the crisis and respite services, including mobile crisis teams, required under this agreement for individuals with developmental disabilities are adequate to address the needs of the target population; and (2) assess whether the Community Support Team model, as implemented by the State, provides services that are sufficient to meet the needs of the members of the target population who receive their services through CSTs.  The Independent Reviewer(s) then shall provide recommendations to the Parties as to what, if any, additional crisis and respite services may be necessary.  The parties shall consider any such recommendations and may modify the Settlement Agreement in accordance with the provisions of Section VII.E.  The Independent Reviewer(s)'s assessment described in this paragraph shall neither be binding on the Parties nor given presumptive weight by the Court.

H.     Budget of the Independent Reviewer(s)

1.     Within 60 days of appointment, the Independent Reviewer(s) shall submit to the Court for the Court's approval a proposed budget for the first twelve months of operations.  The parties agree that the anticipated budget for the Independent Reviewer(s) shall be no more than $250,000 for fiscal year 2012 plus an equivalent amount prorated through the remainder of fiscal year 2011.

2.     The Independent Reviewer(s) will provide the Parties a draft of the proposed budget at least thirty days in advance of submission to the Court.  The Parties shall raise with the Independent Reviewer(s) any objections they may have to the draft of the proposed budget within ten days of its receipt.  If the objection is not resolved before the Independent Reviewer(s)' submission of a proposed budget to the Court, a Party may file the objection with the Court within ten days of the submission of

the proposed budget to the Court.  The Court will consider such objections and make any adjustments the Court deems appropriate prior to approving the budget.

3.      Thereafter, the Independent Reviewer(s) shall submit annually a proposed budget for the Court's approval in accordance with the process set forth above.

4.      At any time, but at least 30 days after sending to the Parties for review, the Independent Reviewer(s) may submit to the Court for approval a proposed revision to the approved budget, along with any explanation of the reason for the proposed revision. The Parties shall have an opportunity to submit an objection to the Court concerning a proposed revision to the approved budget in accordance with the process set forth above.  Budget revisions will be effective upon approval by the Court.

I.   Reimbursement and Payment Provisions

1.      The cost of the Independent Reviewer(s), including the cost of any consultants to the Reviewer(s), shall be borne by the State in this action.  All reasonable expenses incurred by the Independent Reviewer(s) in the course of the performance of the duties of an Independent Reviewer shall be reimbursed by the State in accordance with State regulations, and shall be paid no later than 30 days after submission.  The Court retains the authority to resolve any dispute that may arise regarding the reasonableness of fees and costs charged by the Independent Reviewer(s).  The United States will bear its own expenses in this matter.

2.      The State shall deposit $100,000.00 into the Registry of the Court as interim payment of costs incurred by the Independent Reviewer(s).  This deposit and all other deposits pursuant to this Order shall be held in the Court Registry Investment System and shall be subject to the standard registry fee imposed on depositors.  The Independent Reviewer(s) shall submit monthly statements to the Court, with copies to the Parties, detailing all expenses the Independent Reviewer(s) incurred during the prior month.  The Court shall order the clerk to make payments to the Independent Reviewer(s).  The clerk shall make those payments within 10 days of the entry of the Order directing payment. Within 45 days of the entry of each Order directing payment, the

State shall replenish the fund with the full amount paid by the clerk in order to restore the fund's total to $100,000.00.

3.    The Independent Reviewer(s) shall not enter into any contract with the State while serving as an Independent Reviewer.  If an Independent Reviewer resigns from his or her position as Independent Reviewer, the former Independent Reviewer may not enter into any contract with the State on a matter related to this Agreement without the written consent of the United States while this Agreement remains in effect.

4.    Nothing in this provision shall be interpreted as altering the role of the Independent Reviewer(s).  The parties agree that an Independent Reviewer is not an agent of the Court, nor does an Independent Reviewer have any authority to act on behalf of the Court.

VII.   Construction and Termination

A.    The Parties agree jointly to file this Agreement with the United States District Court for the Northern District of Georgia, Atlanta Division, in United States v. Georgia, Civil Action No. 1:10-CV-249-CAP.  The joint motion shall request that the Court enter the Settlement Agreement pursuant to Federal Rule of Civil Procedure 41(a)(2), conditionally dismiss the complaint in this action, and retain jurisdiction to enforce the Settlement Agreement.  The Parties further agree to jointly file a motion with the Court, to withdraw the United States' motion for preliminary injunction and to enforce the Settlement Agreement in case styled United States v. Georgia, Civil  Action No. 1:09-CV-119-CAP, to vacate the hearing set for November 8, 2010, and to terminate any ongoing discovery in that action; the motion shall request that the case be returned to the Court's inactive docket.  If the Court does not retain jurisdiction to enforce the Settlement Agreement, the Settlement Agreement shall be void.

1.    The Parties anticipate that the State will have substantially complied with all provisions of the Settlement Agreement by July 1, 2015.  Substantial compliance is achieved if any violations of the Agreement are minor or occasional and are not systemic.

2.    The Court shall retain jurisdiction of this action for all purposes until the State has substantially complied with all provisions of

this Settlement Agreement and maintain substantial compliance with all provisions for one year.

3. The Parties may agree to jointly ask the Court to terminate the Settlement Agreement before the end of the five-year term, provided the State has substantially complied with all provisions of the Settlement Agreement and maintained substantial compliance with all provisions for one year.  If the case has not yet been dismissed, the Parties agree to ask the Court for a non-evidentiary hearing on the status of compliance on or near July 1, 2015.  If the Parties agree that there is non-compliance, or if there is a dispute about compliance, the Parties will so inform the Court, and the Court may set additional hearing dates as appropriate. The Parties may agree jointly at any time to allow for additional time to resolve compliance issues.

B. If the State believes it has achieved substantial compliance with a portion of the Settlement Agreement and has maintained substantial compliance for one year, it shall notify the United States and Independent Reviewer(s).  If the United States and the Independent Reviewer(s) agree with the State's assessment of substantial compliance, the State shall be relieved of that portion of the Settlement Agreement.

C. With the exception of conditions or practices that pose an immediate and serious threat to the life, health, or safety of individuals covered by this Agreement, if the United States believes that the State has failed to fulfill any obligation under this Settlement Agreement, the United States shall, prior to initiating any court proceeding to remedy such failure, give written notice to the State which, with specificity, sets for the details of the alleged noncompliance.

1. With the exception of conditions or practices that pose an immediate and serious threat to the life, health, or safety of individuals covered by this Agreement, the State shall have 45 days from the date of such written notice to respond to the United States in writing by denying that substantial noncompliance has occurred, or by accepting (without necessarily admitting) the allegation of noncompliance and proposing steps that the State will take, and by when, to cure the alleged noncompliance.

2.   If the State fails to respond with 45 days or denies that substantial noncompliance has occurred, the United States may seek an appropriate judicial remedy.

D.   If the State timely responds by proposing curative action by a specified deadline, the United States may accept the State's proposal or offer a counterproposal for a different curative action or deadline, but in no event shall the United States seek an appropriate judicial remedy for the alleged noncompliance until at least 30 days after the State has responded under Subsection VII.C above and until both sides have conferred in good faith to resolve any outstanding differences.

1.   The parties may, by mutual agreement, extend the time period specified in this paragraph.  If the Parties reach an agreement that varies from the provisions of this Settlement Agreement, the new agreement shall be reduced to writing, signed, and filed with the Court for approval.

2.   If the Parties fail to reach agreement on a plan for curative action, the United States may seek an appropriate judicial remedy.

3.   Notwithstanding the provisions of Sections VII.C & D, with the exception of conditions that pose an immediate and serious threat to the life, health, or safety of individuals covered under this Settlement Agreement, the United States shall not issue a noncompliance notice nor seek a judicial remedy for the first nine months after the entry of this Settlement Agreement.

E    Any modification of this Settlement Agreement shall be executed in writing by the Parties, shall be filed with the Court, and shall not be effective until the Court enters the modified agreement and retains jurisdiction to enforce it.

F.   The Settlement Agreement shall be applicable to, and binding upon, all Parties, their employees, assigns, and their successors in office.  If the State contracts with an outside provider for any of the services provided in this agreement, the agreement shall be binding on the contracted parties, including agents and assigns.

G.   The State shall ensure that all appropriate State agencies take any actions necessary for the State to comply with provisions of this Settlement Agreement.

H.  If the State fails to make any necessary appropriations to comply with this Settlement Agreement, the United States has the right to withdraw its consent to this Agreement and revive any claims otherwise barred by operation of this Settlement Agreement.

I.  The United States and the State shall bear the cost of their fees and expenses incurred in connection with this case.

VIII.  <u>General Provisions</u>

A.  The State agrees that it shall not retaliate against any person because that person has filed or may file a complaint, provided assistance or information, or participated in any other manner in the DOJ's and/or OCR's investigations related to this Settlement Agreement. The State agrees that it shall timely and thoroughly investigate any allegations of retaliation in violation of this Settlement Agreement and the non-retaliation provision of CRIPA and take any necessary corrective actions identified through such investigations.

B.  If an unforeseen circumstance occurs that causes a failure to timely fulfill any requirements of this Settlement Agreement, the State shall notify the United States and the Independent Reviewer(s) in writing within 20 calendar days after the State becomes aware of the unforeseen circumstance and its impact on the State's ability to perform under the Settlement Agreement. The notice shall describe the cause of the failure to perform and the measures taken to prevent or minimize the failure. The State shall take all reasonable measures to avoid or minimize any such failure.

C.  Failure by any Party to enforce this entire Settlement Agreement or any provision thereof with respect to any deadline or any other provision herein shall not be construed as a waiver, including of its right to enforce other deadlines and provisions of this Settlement Agreement.

D.  The Parties shall promptly notify each other of any court or administrative challenge to this Settlement Agreement or any portion thereof, and shall defend against any challenge to the Settlement Agreement.

E.  The United States and the State of Georgia release the other from any and all claims and obligations arising out of the allegations set forth in the complaint.  Except as provided in this Settlement Agreement,

during the term of this Agreement, the United States will not bring a claim arising under the ADA or the Rehabilitation Act for those claims.

F.   The Parties represent and acknowledge this Settlement Agreement is the result of extensive, thorough and good faith negotiations.  The Parties further represent and acknowledge that the terms of this Settlement Agreement have been voluntarily accepted, after consultation with counsel, for the purpose of making a full and final compromise and settlement of any and all claims and for the express purpose of precluding any further or additional claims arising out of the allegations set forth in the complaints and pleadings in these Actions.  Each Party to this Settlement Agreement represents and warrants that the person who has signed this Settlement Agreement on behalf of his or her entity is duly authorized to enter into this Settlement Agreement and to bind that Party to the terms and conditions of this Settlement Agreement.

G.   The Parties agree that the provisions of this Settlement Agreement are lawful, fair, adequate, and a reasonable resolution of the pending lawsuit.

H.   Nothing in this Settlement Agreement shall be construed as an acknowledgement, an admission, or evidence of liability of the State under the Constitution of the United States, federal or state law, and this Agreement may not be used as evidence of liability in this or any other civil or criminal proceeding.

I.   This Settlement Agreement may be executed in counterparts, each of which shall be deemed an original, and the counterparts shall together constitute one and the same agreement, notwithstanding that each party is not a signatory to the original or the same counterpart.

J.   "Notice" under this Settlement Agreement shall be provided by overnight courier to the following or their successors:

> Chief of the Special Litigation Section
> United States Department of Justice
> Civil Rights Division
> 601 D Street, N.W.
> Washington, D.C.  20004
>
> Director of the Office for Civil Rights
> United States Department of Health and Human Services
> 200 Independence Avenue, S.W.

Room 515F, HHH Building
Washington, D.C.  20201

Attorney General of Georgia
40 Capitol Square, S.W.
Atlanta, Georgia  30334

Executive Counsel to the Governor
201 State Capitol
Atlanta, GA  30334

Independent Reviewer(s)

FOR THE UNITED STATES:


SALLY QUILLIAN YATES
United States Attorney
Northern District of Georgia


THOMAS E. PEREZ
Assistant Attorney General
Civil Rights Division
U.S. Department of Justice


SAMUEL R. BAGENSTOS
Principal Deputy Assistant Attorney General
Civil Rights Division


JUDY C. PRESTON
Acting Chief
Special Litigation Section


MARY R. BOHAN
Deputy Chief
Special Litigation Section


TIMOTHY D. MYGATT
Special Counsel
Special Litigation Section

_[signature]_
AILEEN BELL HUGHES
Assistant United States Attorney
Northern District of Georgia

_[signature]_
ROBERT A. KOCH
MAX LAPERTOSA
RICHARD FARANO
~~AARON S. FLEISHER~~
JEFFREY MURRAY
JENNIFER MONDINO
Attorneys
Special Litigation Section

_[signature]_
ROBINSUE FROHBOESE
Special Counsel for Community Integration
Special Litigation Section

Executed on this 19ᵗʰ day of Oct, 2010

FOR THE UNITED STATES:


_Georgina Wudugo_
GEORGINA C. VERDUGO
Director
Office for Civil Rights
United States Department of
  Health and Human Services


_Roosevelt Freeman_
ROOSEVELT FREEMAN
Regional Manager
Office for Civil Rights


_Mary T. Giliberti_
MARY T. GILIBERTI
Supervisory Civil Rights Analyst
Office for Civil Rights


_Chris Griffin_
CHRIS GRIFFIN
Assistant Regional Counsel
Office of the General Counsel,
  Region IV
United States Department of
  Health and Human Services


Executed on this 19th day of Oct, 2010

FOR THE STATE OF GEORGIA:

_____
SONNY PERDUE
Governor, State of Georgia


_____
FRANK E. SHELP
Commissioner, Georgia Department of Behavoral Health
 And Developmental Dsabilities


_____
CLYDE L. REESE, III
Commissioner, Georgia Department of Community Health


Executed on this 19th day of Oct, 2010

FOR THE STATE OF GEORGIA:

_____
SONNY PERDUE
Governor, State of Georgia

_____
FRANK E. SHELP
Commissioner, Georgia Department of Behavioral Health
  And Developmental Disabilities

_____
CLYDE L. REESE, III
Commissioner, Georgia Department of Community Health

Executed on this 19th day of Oct., 2010