REPORT OF THE INDEPENDENT REVIEWER

In the Matter Of

**United States of America v. The State of Georgia**

Civil Action No. 1:10-CV-249-CAP

September 25, 2017

## INTRODUCTORY COMMENTS

The intent of this Report is twofold.

First, it is meant to acknowledge the important work that has been accomplished to date by the State of Georgia under the terms of the Settlement Agreement and its Extension. Systemic reform is complex and requires major investments of time, energy and resources. The State and its Department of Behavioral Health and Developmental Disabilities (DBHDD) have agreed to create, fund and implement new constellations of community-based services; develop or revise policies and protocols; and establish workforce resources that can demonstrate relevant knowledge and performance competencies.

The focus of these efforts includes adults with a developmental disability (DD) or a serious and persistent mental illness (SPMI) who are institutionalized in myriad settings, including State Hospitals, or who are at risk of institutionalization.

Systemic reform has been and continues to be essential, if there is to be a genuine opportunity for skill development/recovery and meaningful participation in typical community experiences with non-disabled people.  Pursuit of these positive outcomes is critical to ensure needed change.

Second, it is clear that the date envisioned for substantial compliance with the Settlement Agreement and its Extension is approaching; there are now less than ten months remaining in the anticipated timeframe.

As this Report will document, there are major gaps in the State's performance that must be addressed, if there are to be recommendations for findings of compliance with certain Provisions in the next Report to the Court, scheduled for March 2018. These Provisions are summarized at the end of this Report.

In light of the approaching compliance date, the Independent Reviewer is compelled to stress the urgency needed to demonstrate substantial progress in achieving outcomes that have not been realized thus far.

The Independent Reviewer and her consultants have prepared findings regarding each of the Provisions included in the Extension Agreement. Recommendations have been included, as appropriate, for consideration by the State. In many instances, these recommendations are derived from past experiences with systemic reform, especially the areas of significant challenge.

The work for this Report prompted findings that reflected positive change or continuity of effort as well as findings of continued concern that remain to be addressed.  Selected findings are noted below.

Supports for Individuals with a Developmental Disability:

- The site visits conducted for this Report again confirmed that the transition process for individuals with DD moving from State Hospitals to community-based settings continues to be strengthened. There is evidence that Support Coordinators are engaged during the transition process and during the stages of post-transition monitoring. The Support Coordinators and their Supervisors interviewed for this Report were knowledgeable about their responsibilities. They were also very articulate in describing the barriers to performance in these critical roles. The implementation of a strengthened transition process and the close involvement of Support Coordination through every aspect of the community placement process will continue to be one of the most valuable safeguards in the reform of the system.

- There continues to be the inclusion of individuals with DD and forensic status in the planning and implementation of community placements. Examples of strong agency support and carefully prepared discharge plans were noted in the site visits, as were the appropriately supervised opportunities for community-based experiences and skill development.

- There have been helpful changes in the High Risk Surveillance List and its accompanying protocols so that intervention strategies are clearer and can be more closely monitored. Integrated Clinical Support Team (ICST) resources continue to evolve although there are gaps and inadequacies in certain areas of the State. There is a need for continued progress but there is evidence of planning and outreach to community practitioners.

- The rate increases for certain community residential and clinical services have been implemented.  However, it is not yet clear if the rate increases have produced improved outcomes, as is expected.

- Although the transition process for community placement of individuals with DD from State Hospitals has been strengthened, the current pace of such transitions will not permit the implementation of integrated community placements for all institutionalized individuals by June 2018, the anticipated timeframe for completion of the Extension Agreement. This very real likelihood still requires discussion and deliberate action with a sense of urgency.

- The availability of needed clinical services/supports, although enhanced for certain individuals through the Integrated Clinical Supports system, remains limited in scope. Support Coordinators still report difficulty in finding clinical resources in the local community. There are still unresolved issues with regard to whether, and how well, Support Coordinators, the Office of Health and Wellness/Regional Field Offices, and the ICST are addressing

outstanding issues to meet individuals' needs, especially those with complex needs.

- Investigations must be completed in a timely manner in order to identify and resolve programmatic or systemic weaknesses. Until this is accomplished, the safeguards in this system will remain incomplete.

- Far too many individuals with DD who could work are not working in integrated settings and far too many individuals who need other day activities are not receiving them according to their needs.

In addition to the findings noted above, the work for this Report involved the examination of unanticipated issues in the community that have caused considerable concern among individuals with DD and/or their families, residential providers and advocates. These issues center on changes in the number of skilled nursing hours allocated to certain individuals; the reports by some individuals, who now live in their own homes, that they are being encouraged or required to accept a shared setting; and the reviews of Individual Support Plans by clinicians in the Regional Field Offices or Central Office that result in fewer approved nursing hours than those recommended by the individual's own team of supports. All of these issues are of great concern and require further clarification or resolution.

The Independent Reviewer's consultant, Laura Nuss, was asked to examine these issues. The memorandum summarizing her findings has been shared with the Parties and with the Amici. DBHDD has agreed to discuss these findings in a meeting with the Independent Reviewer and Ms. Nuss on September 28, 2017.

<u>Supports for Individuals with SPMI:</u>

- The Georgia Housing Voucher Program remains a very commendable model of interagency collaboration. The Memorandum of Agreement required under the Extension Agreement is in place and is effective. Resources for Supported Housing and Bridge Funding continue to be accessible; these funds have resulted in stable home environments for individuals with SPMI.

- There continues to be a conscientious effort to reduce referrals to shelters upon discharge from the State Hospitals. There has been notable receptivity to examining strategies for strengthening the discharge planning process.

- As referenced in the last Report to the Court, DBHDD's process for identifying, assessing, and linking to Supported Housing individuals in State Hospitals (especially those with readmissions), those being released from jails and prisons, those with frequent contact with hospital emergency departments, and those who are chronically homeless needs prompt

attention. The pace of such activities has not increased and the protocols for these activities remain essentially the same.

Without immediate and substantial change to DBHDD's current approach, it is difficult to see how the Agreement's requirements for access to Supported Housing for all members of the Target Population can be met in the time remaining for implementation of the Agreement.

Finally, DBHDD is strongly encouraged to document positive outcomes that can provide tangible evidence of the changes in the systems of support for individuals with DD or SPMI. Data about outcomes have not been provided and would be extremely helpful in explaining the work that has been accomplished and the challenges that remain. Recommendations for the reporting of outcomes are again included in the conclusion to this Report.

## METHODOLOGY AND ACKNOWLEDGEMENTS

The Extension Agreement requires, in Paragraph 42, that the "Independent Reviewer shall issue compliance reports semi-annually. These reports shall include a detailed reporting on each discrete task and timeframe in this Extension Agreement. "

In order to address this responsibility, fieldwork was conducted for the preparation of this Report:

Developmental Disabilities:

The Independent Reviewer's last Report to the Court, filed on March 24, 2017, included reviews of a representative sample of individuals with DD residing in community-based settings, primarily group homes or host homes. The findings from those reviews were discussed with DBHDD leadership staff from the Division of Developmental Disabilities.

The fieldwork for this Report focused on: 1) following up the actions taken to resolve the concerns cited about certain individuals in the above sample; 2) examining the actions taken to address the identified needs of selected individuals included on the June 2017 High Risk Surveillance List; and 3) evaluating the adequacy of community transitions from State Hospitals to community residential settings.

Nineteen individuals with DD were selected for on-site review:

- Individuals residing in community settings in Regions 1, 2 and 3 were the primary focus. Two individuals in this targeted sample--women visited at least twice previously--were specifically reviewed again to determine the status of their clinical interventions. Nine individuals were selected from the High Risk Surveillance List. Seven individuals had transitioned from a State Hospital in FY17.

  Nurse consultants to the Independent Reviewer conducted these eighteen site visits. In ten cases, additional on-site interviews with the Support Coordinator were conducted either by the Independent Reviewer or her consultant, Ms. Nuss.

- One individual in Region 6, who transitioned from West Central Hospital in Columbus to a group home as part of the FY16 placements, was reviewed. This individual had a forensic status. The Independent Reviewer met with this gentleman at his residence and interviewed his Intensive Support Coordinator.

The site visits involved observation at the residence and, in some instances, the day program as well as interviews with the staff and, if possible, the individual. Documentation, including Individual Support Plans, medical records, clinical assessments and progress notes were reviewed, as available.

Reports from the nurse consultants' site visits have been forwarded to the Parties. DBHDD and the Independent Reviewer have agreed to meet on September 28, 2017 to discuss these reports. Observations from these reviews are included as examples throughout this Report to the Court.

Two of the nurse consultants to the Independent Reviewer met with the Director of the Office of Health and Wellness (OHW) to learn about current protocols and oversight mechanisms. There was a discussion of the role of the Regional Field Office clinicians and the methods for identifying, communicating and resolving health-related concerns. Additionally, the nurse consultants' preliminary observations from their completed site visits were shared.

In order to better evaluate the implementation of Provisions regarding Support Coordination, Laura Nuss, a consultant to the Independent Reviewer, met with leadership staff of the Division of Developmental Disabilities. In addition, she held a meeting with the Executive Directors of Support Coordination Agencies. This meeting included a wide-ranging conversation regarding the implementation of new policies and procedures related to Support Coordination and the effectiveness of the system of supports, including the High Risk Surveillance List, incident reporting, Integrated Clinical Support Teams, the Issues and Referral System and the STAR system.

The report by Ms. Nuss, which summarizes her review of Support Coordination, is attached.

<u>Mental Health</u>

Three consultant reports are attached to this Report. These reports are focused on Supported Housing (Martha Knisley); discharge planning for forensic individuals in State Hospitals (Beth Gouse); and discharges to shelters (Beth Gouse).

In preparation for these reports, extensive clinical record review was completed at the State Hospitals. The record review focused on the twenty-six individuals discharged to shelters from Georgia Regional Hospital Atlanta (GRHA) between January 1 and June 30, 2017; sixteen individuals with repeated admissions to GRHA within a one year period; PATH data for individuals discharged from GRHA between January 1 and June 30, 2017; and discharge planning for individuals with forensic status in each State Hospital. (Individuals with DD currently hospitalized in forensic units of the State Hospitals were included in the record reviews.)

Site visits were made to boarding homes in the greater metropolitan Atlanta area.

Interviews were held with hospitalized individuals; clinical leadership at the State Hospitals; the Benefits and Outreach Services Manager at GRHA; PATH teams from Regions 1 and 3; Assertive Community Treatment (ACT) Teams (8) from Regions 1 and 3; Housing Coordinators from Regions 1, 2 and 3; the Deputy Commissioner for Housing at the Department of Community Affairs (DCA); and the Director of the Office of Homeless and Special Needs Housing.

Several meetings and telephone conferences occurred with the leadership and staff of the Division of Behavioral Health in order to obtain current information and to discuss issues that required clarification.

Throughout the course of this case, the Independent Reviewer and her consultants have greatly benefitted from frequent, thoughtful and candid meetings with Commissioner Judy Fitzgerald and her staff in the Office of the General Counsel, the Division of Developmental Disabilities, the Division of Behavioral Health, the Office of Forensic Services, and the Division of Accountability and Compliance. The openness of and accessibility to the leadership of DBHDD is a very considerable asset in the implementation and monitoring of the Settlement and Extension Agreements.

The Director of Settlement Coordination and Hospital Systems Quality Management and her Assistant worked tirelessly to organize meetings and site visits, update information and provide extensive amounts of data. Their unfailingly good natured and competent support is very much appreciated by the Independent Reviewer and each of her consultants.

Commissioner Frank Berry, Department of Community Health (DCH), remained accessible for conversations and to provide any assistance needed for the review of the obligations in the Settlement and Extension Agreements. The strong inter-Departmental coordination between DBHDD and its sister agencies at DCH and DCA is recognized as a major strength in Georgia's state system.

Throughout this reporting period, very productive meetings continued to be held periodically with attorneys for the United States Department of Justice and for the State of Georgia. Discussions continue to be thoughtful, forthright and focused on outcomes. In July 2017, site visits were conducted to community residences, supported housing and ACT Teams in Regions 1 and 3 with attorneys for the United States, the Special Assistant Attorney General for the State of Georgia and the Director of the Office of Transitions.

As required by the Extension Agreement in Paragraph 43, quarterly meetings with the Amici and the Parties continue to be convened. A meeting was held on July 7, 2017 and another is now scheduled for October 5, 2017. Since the agendas are lengthy and additional discussion is often warranted, the Commissioner and her Attorneys have encouraged further meetings with the Amici alone. These meetings

have been scheduled for August and September 2017 and will center on provider recruitment, crisis intervention, supported housing, forensic clients, ACT and transitions from State Hospitals.

The advocacy community's unrelenting interest in and unwavering support for the implementation of the Settlement and Extension Agreements' goals and outcomes cannot be overstated. The Independent Reviewer and her consultants have relied extensively on the knowledge of this broad-based community and greatly appreciate the responsiveness to our requests and the anticipation of the questions that need to be asked to ensure accuracy and depth in our findings.

Finally, the support of the Governor and the Legislature must again be recognized. The State of Georgia has allocated a substantial amount of funding for the development and implementation of the community-based services and related initiatives included in the Settlement and Extension Agreements.

The Parties were provided the opportunity to review the draft of this Report and to provide comments and/or clarifications. All comments were seriously considered; changes were made as the Independent Reviewer thought appropriate.

## FOUNDATIONAL PROVISIONS

Paragraph I.K. of the Settlement Agreement requires that "to the extent the State offers public services to qualified individuals with disabilities, such services shall be provided in the most integrated setting appropriate to meet the needs of such qualified individuals with disabilities." This core Provision is applicable to all subsequent Provisions of the Settlement Agreement and its agreed upon Extension.

Although the Parties have agreed to remove certain Provisions of the Settlement Agreement from active monitoring, numerous Settlement Agreement Provisions remain under active monitoring. (Extension Agreement, Paragraphs 5 and 46.)

The Parties to this Agreement have determined that five Provisions from the first Settlement Agreement will not be released and will remain as "foundational" Provisions. The five Provisions include:

### III.A.1.a.

By July 1, 2011, the State shall cease all admissions to the State Hospitals of all individuals for whom the reason for admission is due to a primary diagnosis of a developmental disability.

A recent analysis of the census of each State Hospital indicated that, as of June 30, 2017, there were twenty-eight non-forensic individuals with both DD and a mental health diagnosis hospitalized on adult mental health units: East Central Hospital Augusta (11); Georgia Regional Hospital Atlanta (6); Georgia Regional Hospital Savannah (7); West Central Regional Hospital Columbus (4). Eight of these individuals are in the active placement process. Reportedly, these individuals were hospitalized due to their psychiatric diagnosis and symptomology.

As of June 30, 2017, there are 143 individuals with DD in forensic units in the State Hospitals: Central State Hospital (49); East Central Hospital Augusta (27); Georgia Regional Hospital Atlanta (12); Georgia Regional Hospital Savannah (23) and West Central Hospital Columbus (32). Thirty-three individuals are in the active placement process. Courts have ordered the admission of these forensic individuals.

Although there had been transfers of individuals between State Hospitals as a result of the closures at Central State Hospital in Region 2, Southwestern State Hospital in Region 4 and Northwestern State Hospital in Region 1, there have been no new admissions to the ICF units at Gracewood or the SNF units at either Gracewood or Georgia Regional Hospital Atlanta since the beginning of the Settlement Agreement. As of June 30, 2017, there are 142 individuals placed at Gracewood in the ICF units. Twenty-two of these individuals are in the active placement process. There are 53 individuals in the Skilled Nursing units at Gracewood (25) and Georgia Regional Hospital Atlanta (28). There are a total of five individuals from both sites in the active placement process.

There is no evidence that any non-forensic individual has been admitted to a State Hospital due to a primary diagnosis of a developmental disability. There have been Court-ordered admissions of individuals with a DD diagnosis who have forensic status.

### III.A.2.b.ii.(B).

Individuals in the target population shall not be served in a host home or a congregate community living setting unless such placement is consistent with the individual's informed choice. For individuals in the target population not served in their own home or their family's home, the number of individuals served in a host home as defined by Georgia law shall not exceed two, and the number of individuals served in any congregate community living setting shall not exceed four.

There are no known placements in group residences with more than four individuals or host homes with more than two individuals with DD. All recent placements comply with these requirements. DBHDD has stated that it will not approve any setting that exceeds the size requirement.

However, certain residential settings established in the early years of this Agreement continue to operate even though they are inconsistent with the expectations implicit in this Provision.

For example, two men reviewed for this Report live in a duplex located in Rome. There are four individuals on each side of the duplex; a total of eight. There is a large shared parking lot in front that is used by all staff working on both sides of the duplex. There is a single fenced backyard.

DBHDD is again encouraged to review all existing sites in order to determine whether any residential settings need to be replaced. Since this is an issue that has been raised in previous Reports, it is requested that DBHDD inform the Independent Reviewer and the Department of Justice as to any actions it has taken or plans to take to address this issue.

### III.A.3.b.

Individuals with developmental disabilities and forensic status shall be included in the target population and the waivers described in this Section, if the relevant court finds that community placement is appropriate. This paragraph shall not be interpreted as expanding the State's obligations under paragraph III.A.2.b.

DBHDD continues to meet its obligations under this Provision. The twenty-nine placements made during FY17 included nine individuals with DD and forensic

status. The placements reviewed for this Report demonstrated that State Hospital and community staff worked closely together to develop appropriately designed Individual Support Plans reflective of the relevant Court's Orders. The placements were notable for skill-building strategies and for the emphasis on the acceptance of responsibility.

It is also important to note that the provider agencies that support these individuals with forensic histories have been mindful of their obligations to minimize any potential risks while ensuring access to community resources. However, there are areas of community-based support, especially employment, which would benefit from further development.

For example:

An individual (J.P.) placed in FY16 was reviewed for this Report in early August 2017. He has done very well in his new residence; appointments with a community therapist have replaced his Behavior Support Plan, which is no longer necessary. J.P. is very interested in employment and has begun to search for work in a local business. However, his Court Orders require one to one staffing in a community setting. This requirement complicates his job search. It would be helpful to him, and to others, if employment specialists could be more informed about strategies for job searches for individuals with a serious forensic history. The standard job application/interview process is not a realistic approach.

A similar situation regarding the search for employment was noted in the site visit to S.H., a young woman living in Region 2. She transitioned from Central State Hospital in May 2017. Her background has been a barrier to employment; she has been refused job interviews as a result.

Increased emphasis on employment as an integral part of discharge planning might help expedite the transition of individuals with forensic histories from State Hospitals to community settings. Courts would be provided with further evidence of the individual's interest in becoming a responsible member of their community. As noted above, there are 143 individuals with DD in the forensic units at State Hospitals; only 33 of these adults (23%) are included in the active placement process.

### III.B.2.a.i.(G).

All ACT teams will operate with fidelity to the Dartmouth Assertive Community Treatment model.

This Provision received detailed examination for this Report. The Independent Reviewer's consultant, Dr. Angela Rollins, led the inquiry. As referenced above, a meeting was held with eight ACT Teams from Regions 1 and 3; fidelity reviews for all ACT Teams established under the Settlement Agreement were reviewed;

supplemental data were requested; and several discussions took place with staff from the Division of Behavioral Health.

DBHDD continues to require adherence to the Dartmouth Assertive Community Treatment model and continues to measure compliance of its ACT Teams to the Dartmouth Fidelity Scales (DACTS).

As reported previously, a preliminary review of the discrete scores for certain ACT Teams raised questions about the rate of client turnover in the Teams' caseloads. The turnover is driven by high rates of both graduation and drop out. Since ACT was designed as a service that would maintain treatment engagement with mental health clients who frequently drop out of traditional office-based services and, as a result, experience poor outcomes such as frequent hospitalizations, housing instability/homelessness, and increased contacts with the criminal justice system, the volume of caseload turnover needed to be carefully examined.

It must be noted that the DACTS criteria are lenient in rating graduation and drop out rates from ACT services.

Several areas of data that relate to length of stay were examined:

Graduation rate fidelity item

Although none of the twenty-two ACT Teams scored a 1 or a 2, there were nine Teams that scored a 3 on this fidelity item. A score of 3 means that 18-37% of the Team's clients are expected to graduate within a year. Despite the DACTS rating of 3, this is still a high graduation percentage in a short span of time for ACT services. By comparison, in FY16, thirteen of the twenty-two Teams scored a 3 on this item; therefore, there is a slight improvement since last year.

Drop out rate fidelity item

Although none of the twenty-two ACT Teams scored a 1 or a 2 on this item, six of twenty-two scored a 3. A score of 3 indicates that 21-35% of the Team's caseload drops out of services over a twelve month period. This is a fairly high percentage for one year, despite the rating of 3. In FY16, five of the twenty-two Teams scored a 3, so the statewide average moved in the wrong direction, but not significantly so.

Census

ACT census rates steadily increased over the year for the majority of the Teams. Statewide, the ACT Teams accumulated a net gain of almost 100 clients over the year, from 1553 individuals in July 2016 to 1645 in June 2017. The total number of unique ACT clients served across the year is unknown without more detailed information from claims data.

In the meeting with representatives from eight ACT Teams in Regions 1 and 3, they described graduating clients before they really felt the individual had derived full benefit from ACT. Teams reported that they are not denied ACT authorizations, but they and their agency utilization managers have stopped attempting to request authorizations in most cases when they know from past experience that the ACT authorization will not be granted. As an example, one Team described a client who had attained a level of stability from severe symptoms and who had obtained supported housing. The Team then received a 90-day ACT authorization to transition the client to less intensive services. The individual was able to "hold everything together" for 90 days, because it is a relatively short period of time, but then "fell apart" with less support after the 90 days were over. The next time the Team encountered this individual, he was in a jail setting where he had severe injuries from fights caused by his aggressive symptomatic behaviors. Several Teams agreed with this example and concurred that something similar had happened in their own experiences. When asked, Teams estimated that 10-15% of the clients who have graduated from their Team have experienced another negative outcome (such as jail or hospital admission) and are then referred again to ACT. In discussing this particular issue with DBHDD fidelity reviewers, they thought return to ACT might happen occasionally, but they estimated it might be closer to a 5% return. Without reliable systematic tracking of these data, there are only conflicting anecdotal reports.

Comparisons of policies between Georgia and other states indicated important differences regarding continued eligibility for ACT services. For example, Washington State's discharge criteria for ACT state that the decision should be made when the individual can "demonstrate an ability to function in all major role areas (i.e., work, social, self care) without requiring ongoing assistance from the program for at least one year without significant relapse when services are withdrawn." North Carolina does not include a specific timeframe in its criteria but makes reference to continuation of ACT supports for individuals who need ACT to obtain new goals or when there is evidence of regression when intensive services are withdrawn. Whereas Georgia's continuing stay criteria have improved over time by becoming less restrictive, the bulk of continuing stay criteria still require demonstration of continued poor functioning to stay on ACT, rather than allowing for a period of continued ACT service during a state of tenuous recovery and the absence of major dysfunction.

Dr. Rollins has made the following recommendations:

- Expand system data management and analyses to track both ACT lengths of stay and more comprehensive outcomes for clients. It would be important to examine whether short lengths of stay on ACT are associated with less optimal outcomes.

- Allow at least a six-month ACT transition authorization once it is determined that an individual is ready for graduation. (As noted above, Washington State requires one year of sustained better role functioning for discharge.) Teams can begin transitioning the client to less frequent and intensive supports to stimulate the next step in lower levels of care in order to see whether the individual decompensates. If the individual does decompensate, the ACT Team can step up services again without discharging and starting all over.

- Require Beacon, as the Administrative Services Organization, to track ACT lengths of stay and outcomes for all ACT clients. Negative outcomes, such as hospital admissions or incarcerations, after the discontinuation of ACT should be reflected in the evaluation of the authorization processes used by Beacon.

### III.C.1.

Individuals under the age of 18 shall not be admitted to, or otherwise served, in the State Hospitals or on State Hospital grounds, unless the individual meets the criteria for emancipated minor, as set forth in Article 6 of Title 15, Chapter 11 of the Georgia Code, O.C.G.A. §§ 15-11-200 et seq.

As of the time of this Report, DBHDD remains in compliance with this Provision. There is no evidence that any individual under the age of 18 years has been admitted to a State Hospital or served on State Hospital grounds throughout the period of the Settlement Agreement.

In her last Report, the Independent Reviewer requested that the Parties designate two other Provisions as "foundational." Those Provisions are:

### III.C.2.

Individuals in the target population with developmental disabilities and/or serious and persistent mental illness shall not be transferred from one institutional setting to another or from a State Hospital to a skilled nursing facility, intermediate care facility, or assisted living facility unless consistent with the individual's informed choice or is warranted by the individual's medical condition. Provided, however, if the State is in the process of closing all units of a certain clinical service category at a State Hospital, the State may transfer an individual from one institutional setting to another if appropriate to that individual's needs. Further provided that the State may transfer individuals in State Hospitals with developmental disabilities who are on forensic status to another State Hospital if appropriate to that individual's needs. The State may not transfer an individual from one institutional setting to another more than once.

As referenced in the Independent Reviewer's last Report, this Provision is partially reflected in Provision 10 of the Extension Agreement. This Provision requires that the State give seven days notice to the Independent Reviewer if it determines that any individual with DD's "most integrated setting is a State Hospital or any public or private skilled nursing facility, intermediate care facility for developmental disabilities, or psychiatric facility."

As reported below, the Independent Reviewer was not provided with any advance notice of the transfer of seven individuals from Gracewood and one individual from GRHA to nursing facilities.

The Extension Agreement does not contain comparable language or any restriction on transfers for an individual with SPMI.  This information can be important when assessing the capacity and effectiveness of the mental health system and the availability of community-based supports throughout the State.

The Independent Reviewer again requests that this Provision be determined as foundational and that such notice be provided regarding the transfer of any individual with SPMI. Information received from DBHDD regarding discharges from State Hospitals confirms that such transfers do occur. For example, 6% of the discharges of forensic clients were to medical facilities or nursing homes.

### V.E.

> The State shall notify the Independent Reviewer(s) promptly upon the death of any individual actively receiving services pursuant to this Agreement. The State shall, via email, forward to the United States and the Independent Reviewer(s) electronic copies of all completed incident reports and final reports of investigations related to such incidents as well as any autopsies and death summaries in the State's possession.

In her last Report, the Independent Reviewer requested that she be provided with the death reports of all individuals with SPMI in the Target Population. These reports had not been provided routinely during FY17, unlike the reporting that occurred prior to the Extension Agreement.

DBHDD's position is that the obligation to report the deaths of individuals with SPMI who are in the Target Population was not carried over into the Extension Agreement. Nonetheless, in an effort to be cooperative and open, on August 8, 2017, DBHDD agreed to provide all available information regarding individuals with SPMI who had committed suicide. The reporting of other deaths involving adults with SPMI was described as being too broad and burdensome. DBHDD stated that it could not "fulfill (your) request for information about AMH deaths of individuals who are homeless because we do not track information in that way."

As agreed, on August 17, 2017, DBHDD provided the Independent Reviewer with information about deaths by suicide. This information is under review. Although its overall position on this Provision has been clearly stated, the State's willingness to provide this important information on suicides is recognized and appreciated.

It seems important, nonetheless, to discuss this matter more fully. The information about deaths can provide valuable insight into the effectiveness of the mental health system and its responsiveness to an individual's needs for support.

The Department of Justice is in agreement that the Independent Reviewer is entitled to all death information and reports about members of the Target Population, including those with mental illness. The Extension Agreement made no change to the Settlement Agreement Provision in this regard. Providing only a limited subset of death by suicide information is not sufficient. For example, as was the case reported in a prior year, someone with SPMI who dies homeless and under a bridge may not have been assessed for and linked to supported housing per Settlement Agreement/Extension Agreement criteria.

Furthermore, the Extension of the Settlement Agreement, in Paragraph 5, requires that the "State's obligations under all provisions of the Settlement Agreement remain in force until they have been terminated pursuant to Section VII.B. of the Settlement Agreement." This Provision has not been terminated.

**Other Settlement Agreement Provisions**

By agreement of the Parties, the released provisions are not subject to active monitoring by the Independent Reviewer unless information is received that indicates a possible change in expected compliance.

In January 2017, the Independent Reviewer received a complaint from a reliable source that one mobile crisis team was not responding to calls for assistance from a hospital emergency room in Region 5. This complaint alleged a violation of Provision **III.B.2.b.v. (A)**. This Provision requires that:

> Mobile crisis teams shall respond to crises anywhere in the community (e.g., homes or hospital emergency rooms) 24 hours per day, seven days per week.

In April 2017, the Independent Reviewer met with the complainants to discuss their concerns. Both the Independent Reviewer and the complainants informed DBHDD of the nature of the complaint. The Independent Reviewer requested and received documentation from DBHDD about the performance of the mobile crisis team in question. Although the Division of Behavioral Health subsequently held discussions with concerned agencies and stakeholders, this matter was not resolved. The Director of the hospital emergency room continues to report failures to respond in a timely manner to individuals in crisis, thus resulting in lengthy stays in the emergency room.

The Independent Reviewer is scheduled to visit this emergency room on October 3, 2017. Attorneys for the Department of Justice and the State will conduct a site visit to this mobile crisis team on October 4, 2017.

After the completion of these inquiries, the Independent Reviewer will summarize her findings and recommendations; she will report them to the Parties.

### EXTENSION AGREEMENT PROVISIONS RELATED TO PERSONS WITH DEVELOPMENTAL DISABILITIES

To the extent possible, given the information and documentation available, this Section addresses each of the Provisions related to individuals in the Target Population with a developmental disability.

**Specific Provisions**

Transitions from State Hospitals to the Community:

> **6.** Between July 1, 2015 and June 30, 2016, the State shall transition at least 25 individuals with DD from the State Hospitals to the community. The State shall provide COMP waivers to accomplish these transitions.

The Settlement Agreement and its Extension required the State to provide a total of 775 waivers in order to permit the transition of individuals with DD from a State Hospital to a community-based residential setting. The State has created those waivers; they are still available for the 366 individuals with DD who remain institutionalized.

As discussed in the Independent Reviewer's last Report, DBHDD placed twenty-six individuals with DD from the State Hospitals during the above-referenced time period.  COMP waivers were used for these placements.

The placements from the State Hospitals were as follows: Gracewood (9 individuals); Georgia Regional Hospital Savannah (9 individuals); West Central Regional Hospital (3 individuals); East Central Hospital (2 individuals); and Central State Hospital (3 individuals).

It was documented that Support Coordination was engaged prior to the transition, as required by DBHDD policy and by the terms of the Extension Agreement. DBHDD's Transition Fidelity Committee approved each of the twenty-six placements completed in FY16.

In preparation for her last report, the Independent Reviewer or one of her consultants conducted site visits to twenty-three of the twenty-six individuals placed in FY16.[1] Reports on each of the visits were provided to DBHDD and the Department of Justice. In each instance where a concern was noted, DBHDD examined the issue and provided updated information in a conference call with the Independent Reviewer.

---

[1] The Independent Reviewer visited a twenty-fourth individual, J.P., in August 2017. His placement is stable and there have been positive gains in reducing behavioral concerns.

In preparation for this latest Report, one individual, C.B., was revisited to confirm that the issues of concern had been fully addressed:

- The health-related issues cited for C.B. in the nurse consultant's report of December 7, 2016 have been addressed. There is evidence of an annual physical exam; the Primary Care Physician's recommendations have been addressed; laboratory and previously recommended diagnostic tests have been completed. However, new concerns were identified during the visit conducted on July 22, 2017. These concerns included the failure to monitor nutritional and bowel status and the lack of RN oversight of the LPN staff. Furthermore, her day program closed in 2016 (date could not be determined) and there was a notable lack of meaningful activity/interaction.

  The High Risk Surveillance List posted in July 2017 indicated that there was "confirmation of compliance with indicated clinical assessments and supports; to continue surveillance due to complexity."

Two individuals placed in FY16 are deceased. The investigations for the first individual (N.J.) found no correlation between the death and transition from the State Hospital. His death was determined to be unpreventable in the Columbus investigation. The DHBDD investigation cited the failure to initiate prompt CPR. The second death report (W.D.) was relayed verbally to the Independent Reviewer but the critical incident report was not forwarded until August 23, 2017. Although this gentleman died on June 16, 2017, the investigation has not been completed. Mr. D. was discussed in the Independent Reviewer's last Report. His death was reportedly attributed to a stroke.

  **7.** Between July 1, 2016 and June 30, 2018, the State shall create and regularly update a planning list for prioritizing transitions of the remaining persons with DD in the care of State Hospitals for whom a community placement is the most integrated setting appropriate to his or her needs. The State shall transition individuals on the list to the community at a reasonable pace. The State shall provide COMP waivers to accomplish these transitions.

There is a Planning List that is updated quarterly. As of June 30, 2017, there are sixty-eight individuals on the List. These individuals are currently placed in East Central Hospital (Augusta); Gracewood; Central State Hospital; Georgia Regional Hospital Savannah; West Central Regional Hospital (Columbus); and Georgia Regional Hospital Atlanta.  Forensic clients are included in the List.

There continue to be numerous discussions with DBHDD regarding the reasonable pace of transitions. The lack of availability of appropriate community residential and clinical support options has continued as a substantial barrier. The lack of substantially meaningful progress with regard to the implementation of the Provider Recruitment Plan and the provider certification process are also major factors that affect the opportunities to transition individuals to a more integrated

setting. As of the date of this Report, the State has not recruited a single new provider to its DD system or certified an existing provider agency, per its Provider Recruitment Plan.

There were twenty-six transitions in FY16 and twenty-nine transitions in FY17. If the slow pace of twenty-nine transitions a year were to continue into the future, it would take the State a dozen years or so to place all 366 remaining individuals from the State Hospitals. This is incongruent with the Extension Agreement's anticipated compliance date of June 2018.

At the time of this Report, there were 366 individuals[2] with DD placed in all State Hospitals:

| State Institution | AMH (Active) | Forensic (Active) | ICF (Active) | SNF (Active) | Total (Active) |
|---|---|---|---|---|---|
| ECRH | 11(5) | 27(6) | 0 | 0 | 38(11) |
| GRACEWOOD | 0 | 0 | 142(22) | 25(4) | 167(26) |
| CSH | 0 | 49(13) | 0 | 0 | 49(13) |
| GRHA | 6(1) | 12(0) | 0 | 28(1) | 46(2) |
| GRHS | 7(2) | 23(8) | 0 | 0 | 30(10) |
| WCGRH | 4(0) | 32(6) | 0 | 0 | 36(6) |

*(Active) = those individuals who are in the active placement process.

As stated earlier, there are 28 (8) individuals with DD in the State Hospitals' Adult Mental Health units; 143 (33) individuals in forensic units; 142 (22) individuals in the ICF at Gracewood; 53 (5) individuals in SNF units at Gracewood and GRHA.

> **8.** Any individuals with DD remaining in the State Hospitals on June 30, 2018 shall be served in the most integrated setting appropriate to their needs.

This Provision is not yet in effect. DBHDD has informed the Independent Reviewer that they know of no individual who requires continued institutionalization once appropriate community supports are available. The Independent Reviewer asks this question repeatedly.

Once again, it is important to emphasize that the current pace of placements will not permit the implementation of integrated community placements for all currently institutionalized individuals by June 30, 2018. Enhanced, expanded and prioritized effort by the State is vital to implementing strategies needed to accelerate the transition planning process and the development of appropriate community options.

---

[2]. All statistics are provided by DBHDD. This number is larger than reported in the Independent Reviewer's last report. Apparently, the number of clients with DD was not accurate as reported earlier.

**9.** In determining whether to include an individual on the transition planning list, the State shall consider the recommendations of the individual's hospital treatment team and representatives from the Office of Transition Services who have experience with and knowledge of service delivery in the community, as well as the preferences of the individual, family member(s), and, as the individual indicates, other persons who are important to the individual and/or who may support the individual in the community.

As reported previously, based on interviews with Hospital staff, the Director of the Office of Transitions, and Support Coordinators involved in transitions, this Provision is being implemented as written. Placement decisions have reflected the preferences of the individual and/or the family. These preferences include the location of the community residential setting and the choice of housemates, if any. Residential providers have discussed family involvement and individual/family preferences during site visits. In addition, there is evidence that there continues to be outreach by the leadership of Gracewood to families who may have been reluctant to consider community placement. It is still unclear, however, if the State's efforts to date have ensured that all of the families are fully educated and informed about current expanded community options and that all available strategies, such as consultation with individuals/families who have experienced transitions or site visits to representative community-based residential settings, have been fully explored.

**10.** The State shall notify the Independent Reviewer within 7 days of when the State determines that any individual's most integrated setting is a State Hospital or any public or private skilled nursing facility, intermediate care facility for [individuals with] developmental disabilities, or psychiatric facility. In that instance, the State shall provide the Independent Reviewer with all information relied upon to make that determination so that the Independent Reviewer may conduct an independent assessment and report the assessment to the Parties. If the State makes no such determination, the expectation is that the individual will be placed on the transition planning list (referenced in Paragraph 7) for transition to a community home.

This Provision has not been fully implemented as written. As discussed below, the State failed to notify the Independent Reviewer of the transfer of eight State Hospital residents with DD to other institutional settings, contrary to the letter and intent of existing Agreement requirements. However, the problem now appears to be corrected.

Apparently, DBHDD staff had some confusion or disagreement as to how this Provision applied to individuals with DD who were to be transferred to hospice care from a medical facility due to their declining medical condition. Without prior notice or review by the Independent Reviewer, eight individuals from Gracewood (7) and GRHA (1) were discharged to hospice settings. These individuals were still on the

rolls of Gracewood and GRHA at the time they were hospitalized and then transferred.

The Independent Reviewer learned of this problem from an advocate. The non-compliance was reported to the State and instructions about this Provision were given to Gracewood and GRHA clinical leadership. A conference call was held on August 4, 2017 regarding the expectation of proper notification for individuals with DD recommended for transfer to hospice settings from a medical facility.

> **11.** The State shall form a transition planning team for every individual upon placement of that individual on the transition planning list. The transition planning team shall consist of the individual, hospital treatment team, case expeditor, support coordinator, Integrated Clinical Support Team, community service providers (once selected), the individual's family member(s), and, as the individual indicates, other persons who are important to the individual and/or may support the individual in the community. The transition planning team must identify (using protocols or criteria established by DBHDD that employ person-centered planning) the types of supports, services, adaptive equipment, supervision, and opportunities for community integration that will promote a successful transition for the individual. Prior to the individual's discharge, all contracted residential, day, clinical, medical and other providers (once selected) shall participate in the transition process and receive training in any procedures or protocols needed to serve the individual. All non-contracted providers who will be providing services to the individual may participate in the transition process and receive training in any procedures or protocols needed to serve the individual. The transition planning team shall verify that the supports, services, adaptive equipment, and supervision identified in the transition plan are arranged and in place at discharge.

The transition process has been considerably strengthened and, overall, appears to be carefully managed and supervised. It continues to be reviewed. Information received through ongoing discussions with the Office of Transitions, Hospital staff, Support Coordinators and community providers confirm that the transition planning teams are formed as expected; person-centered planning occurs; and training is provided to community providers prior to the individual's discharge from the State Hospital.

However, one serious issue was identified as a result of recent site visits. The Division of Developmental Disabilities was notified promptly that this finding required thorough review.

In the site visit review of the recent placement of B.B., the scope and individualization of the training provided to community staff was reported as inadequate. Community staff described the training as rushed, too generalized and too brief. This criticism was reported to the Director of the Office of Transitions; she

was asked to review this specific complaint and to review the overall training content and the extent to which individualized training occurs prior to placement. In addition, it was recommended that training about transition trauma be reviewed in order to ensure that it is thorough, explicitly clear, and individualized.

The importance of reviewing B.B.'s transition stems from the very serious consequences she experienced as a result of poorly trained and supervised residential staff. She refused to eat; lost weight; was hospitalized and required a period of recovery in a skilled nursing facility. The apparent indifference shown by the residential staff was equally disturbing; they did not bother to visit her during her hospitalization nor did they provide her with any personal possessions that might have comforted her.

It is requested that DBHDD inform the Independent Reviewer of its response to this issue by October 1, 2017.

> **12.** The State shall monitor individuals during and after transition from the State Hospitals (a) to identify and address identified gaps or issues with services, supports, adaptive equipment, and clinical, medical, day, residential, or other providers to reduce the risk of admission to other institutional settings, deaths, or injuries, and (b) to track community integration and positive outcomes. The State shall conduct post-transition monitoring with, at a minimum, in-person visits by the individual's support coordinator within 24 hours of transition, at least once a week during the first month the individual is in the community, and at least monthly for the next three months.

There is a well-established schedule for post-transition monitoring, which now includes a stronger presence by Support Coordination. The High Risk Surveillance List does provide information about the post-transition tracking of health and behavioral concerns.

Interviews with Support Coordinators involved with seven individuals transitioned during FY17 indicated a depth of knowledge about the individuals' preferences and needs for support. Additionally, these Support Coordinators were aware of unanticipated issues that needed to be addressed in order to ensure health, safety and/or meaningful community participation. This number of interviews is too small to permit generalizations; these initial observations, while encouraging, will need to be supplemented with actual outcome data.

Despite the requirements of this Provision, there has been no documentation provided to the Independent Reviewer or her consultants regarding the tracking of community integration or positive outcomes.

> **13.** The State shall operate a system that provides the needed services and supports to individuals with DD in the community through a network of

contracted community providers overseen and monitored by the State or its agents. To identify, assess, monitor, and stabilize individuals with DD in the community who face a heightened level of risk due to the complexity of their medical or behavioral needs and/or their community providers' inability to meet those needs, the State shall maintain a High Risk Surveillance List as set forth in Paragraph 14, provide statewide clinical oversight as set forth in Paragraph 15, and administer support coordination as set forth in Paragraph 16.

This over-arching Provision is discussed in more discrete detail below. Although there is progress in developing and implementing the policies and procedures necessary to identify, assess, monitor and stabilize individuals with DD who may be at heightened risk, it is still premature to determine that the statewide system has met the explicit terms of these requirements. There continue to be gaps in the system of supports and oversight that have not been addressed sufficiently so that risk can be eliminated or minimized.

**14.a.** The State shall maintain a "High Risk Surveillance List" (the "List") that includes all individuals with DD who have transitioned from the State Hospitals to the community during the term of the Settlement Agreement and this Extension Agreement. The List shall include each individual's name, date of birth, provider(s), current address, region, HRST score, and a summary of critical incident reports and clinical findings that indicate medical or behavioral needs that may create a heightened risk for the individual. The State shall monitor the following information for all individuals on the List: critical incident reports, support coordination notes, and clinical assessments. The State shall update the List at least once per month.

DBHDD has issued a monthly High Risk Surveillance List (the "List") since July 15, 2016. Unless an individual's name is removed due to death, an out-of-state move, or other factors, these lists contain the names of individuals who transitioned from State Hospitals under the terms of the Agreement. The List contains the birth date, provider agency, address, Region and the most recent HRST score.

Since the issuance of the Independent Reviewer's last Report, there was a concerted effort by the Director of Settlement Coordination and the Director of the Office of Health and Wellness (OHW) to improve the formatting of the List and to correct any inaccuracies. As a result, the most recent documents are easier to follow and appear to be more accurate. The Director of OHW has reported that critical incident reports, Support Coordination notes and clinical assessments are monitored routinely to provide relevant information and follow-up activity for each of the individuals on the List.

Now that the formatting and organization of the List has been addressed, it is recommended that there be a stronger focus on verifying that all individuals who require attention are actually included and are being monitored.

For example:

On July 18, 2017, a site visit was made to the residence of J.B. in Region 1. The nurse consultant who reviewed J.B. provided this description:

> The home has minimal personalization in the shared areas and the furniture is marred. There is a freestanding cabinet with a lock in the living room, which contains cleaning supplies. Two bedrooms do not have doors, but have curtains hanging in place of the doors.  One of those doors has a metal doorframe and the other has no doorframe.  Staff report that it will be replaced with a metal frame.   There are no doors as staff state that the men destroy the doors.  Mr. B's bedroom has a bed and dresser with minimal personalization.
> There are two bathrooms.  One bathroom has a solid metal toilet.  When asked the reason for this toilet, the staff reported that the men pull up and break the ceramic toilets; therefore, a metal one was installed. The dining room has a table with a bench on each side for sitting.
> There is a fenced back yard with two swings and a basketball hoop.  There is a bent area on the top rail of the fence. There is no outside furniture.

One of the reasons for smaller settings is to maximize learning opportunities and to individualize teaching strategies. As evidenced by this description, if the explanations are indeed accurate, staff have not been effective in reducing/eliminating undesirable behaviors and instead have inserted controls in the environment. None of this information in referenced on the List's notation about J.B.

Furthermore, the site visit raised concern about the level of psychotropic medications prescribed for J.B. He receives five anti-psychotic medications and one anti-epileptic medication, even though he has not had a seizure since moving to this residence in 2008. The nurse consultant described J.B. as follows:

> When I entered the home, Mr. B. was slouched down in the chair with his head hanging down. He did not acknowledge me.  When I spoke to him, he gave eye contact for a few seconds.  When I extended my hand to shake his, he put out his hand and held my hand briefly.  He made no other interactions with myself, staff or housemates. He appeared to have a mildly depressed level of consciousness – was responsive but very slow.
> Mr. B. was observed to have a circumorbital hematoma of his left eye (a bruised area surrounding his left eye.)  Staff state that they initially observed the "black eye" on the morning of July 15, 2017 but they did not know how it

occurred. He had not been seen by the doctor but staff stated that they would take him this same date.

No one living in this home goes to a day program.  Staff state that they have not been able to find appropriate day programs for the men.  Staff take the men on "community outings" daily such as trips to the mall, stores and park.

It has been reported that another residential provider will assume responsibility for this residence and the individuals who live there. Another site visit will be conducted prior to the next Report to determine whether any changes have been made.

In response to these observations, DBHDD has informed the Independent Reviewer that the Behavior Specialist who works with J.B. is, as of July 3, 2017, providing monthly behavioral notes to the psychiatrist for additional coordination and recommendation.  In addition, the pharmacy has now been asked to review the psychotropic medications to determine/rule out synergistic interaction between the medications. Upon completion of the review, any recommendations will be shared with the treating psychiatrist.

The review of this Provision also indicated that the follow-up to issues reported for an individual on the List require continuing examination.

For example:

During a site visit in December 2016, it was reported by the Independent Reviewer's nurse consultant that a bed gauge was missing for C.R., who needs the head of her bed to be elevated. OHW was informed and subsequently advised the Independent Reviewer that the gauge had been ordered. However, a subsequent visit to C.R., on July 17, 2017, documented:

> There is no mechanism to measure the elevation of the head of the bed. During the visit in December 2016, a recommendation was made to obtain a gauge to go onto the hinge of the bed that would identify the degree of head elevation. Staff indicated that they had made a mark on a pad that was supposed to be behind the head of the bed, indicating where the head of the bed had to be for a 30-degree elevation. However, the pad was several feet from the head of the bed and not being utilized...Ms. R. does not have a day program as staff have been unsuccessful in finding one with adequate nursing support to meet her needs. Staff state that Ms. R. sleeps a lot in the daytime and they are attempting to obtain Community Integration Activities for her.

Ms. R. has lived in this residence since March 1, 2011. She requires continuing oversight. The List received in July 2017 only reports that she requires a positioning plan to be developed.

The following requirements must be assessed on a case-by-case basis. DBHDD has instructed the field that these requirements must be met.

> **14.b**. Based on a records-based clinical review, uniform screening criteria, and other indications of heightened risk factors or concern, the State designated, and will continue to designate, certain individuals on the List as "High Risk." The State may escalate other individuals on the List to "High Risk" status in the following circumstances (or "escalation criteria"):

> **14.b.(i).** Health-Related: an increase in HRST score; known emergency room visit or hospitalization; recurring serious illness without resolution; diagnosis with an episode of aspiration, seizures, bowel obstruction, dehydration, gastro-esophageal reflux disease (or GERD); or unmet need for medical equipment or healthcare consultation;

The List, as now developed, relies on notification about these criteria. Once notified, the individual is included on the section of the List that documents tracking activities.

> **14.b.(ii).** Behavioral: material changes in behavior, a behavioral incident with intervention by law enforcement, or functional or cognitive decline;

See above.

> **14.b.(iii).** Environmental: threat of or actual discharge from a residential provider, change in residence, staff training or suitability concern, or accessibility issues that relate to the health or safety of the individual (including loss of involved family member or natural supports or discharge from a day provider).

See above.

> **14.b.(iv).** Other: confirmed identification of any factor above by a provider, support coordinator, family member, or advocate.

See above.

> **14.c.** For each individual on the List designated as "High Risk," the State shall conduct the oversight and intervention outlined in the following subparts, until the State determines that the individual is stable and no longer designated as "High Risk."

DBHDD provides an accounting of its interventions. However, the accuracy and completeness of reporting continues to require verification and oversight.

28

**14.c.(i).** Upon designation of an individual as "High Risk," the State (through the Office of Health and Wellness) shall oversee that the initial responses to the identified risk(s) are completed and documented on the schedule set forth below, until the risk is resolved.

See above.

**14.c.(i).(1).** For an emergency, the provider shall initiate appropriate emergency steps immediately, including calling 911 or crisis services, and shall notify the individual's support coordinator, the Field Office, and the Office of Health and Wellness.

Compliance with this requirement is directly related to the implementation of the Statewide Clinical Oversight protocol that became effective on July 1, 2017. For the next Report, the Independent Reviewer will analyze whether or not the protocol is being properly implemented.

**14.c.(i).(2).** For deteriorating health that is not imminently life-threatening, the provider shall respond and inform the individual's support coordinator within the first 24 hours. If the risk is not resolved within 72 hours, the support coordinator (or provider) shall notify the Field Office and the Office of Health and Wellness.

See above.

**14.c.(i).(3).** For a health, behavioral, or environmental risk not resulting in destabilization of health or safety of the individual, the provider shall respond, inform the individual's support coordinator, and verify completion of responsive steps with the support coordinator no later than the support coordinator's next visit, or 30 days, whichever is sooner.

See above.

**14.(ii).** If the risk is not resolved through the initial responses outlined in Paragraph 14.c.(i), the State shall conduct an in-person assessment of that individual in the time period indicated by the imminence and severity of the risk, bit no later than 7 days after completion of the initial response.

See above.

**14.(ii).(1).** The assessment shall be conducted by a Registered Nurse or other trained medical professional with an advanced medical degree and expertise in the area(s) of risk identified for the individual. The assessment shall include direct observation of staff who work with the individual to verify the staff's knowledge and competencies to implement all prescribed risk reduction interventions (e.g., meal time protocols or behavior support

29

plans). The assessment shall, at a minimum, identify any concerns or issues regarding the individual's health or behavioral needs and identify necessary follow-up activities (with a schedule for completion) to address those concerns or issues.

See above.

**14. (ii).(2).** The findings or the assessment, plus any follow-up activities and schedules, must be noted on the List and recorded in the individual's electronic record for access by the individual's support coordinator, community providers, the Integrated Clinical Support Team, Field Office staff, and the Office of Health and Wellness.

The information noted on the List is limited. Furthermore, community residential providers interviewed for the review of individuals for this Report were not aware of the High Risk Surveillance List per se and, although they may receive information from the Regional Nurse, did not realize that this was connected to an individual's designation as High Risk.

**14. (ii).(3).** If the assessment finds service delivery deficiencies that jeopardize the physical or behavioral health of an individual, the State shall require all provider staff (including direct support staff, house managers, Registered Nurses, Licensed Practical Nurses, and Certified Nursing Assistants) who are responsible for delivering services to that individual to receive competency-based training in that service delivery area (i.e., training through which the staff demonstrates successful service delivery in a scenario closely resembling one in which the services will be delivered).

This level of detailed information has not been provided.

**14.(ii).(4).** The State (through the Office of Health and Wellness) shall oversee that the follow-up activities identified in the assessment are completed and documented (and repeated or revised, as needed), until the risk is resolved.

This criterion requires confirmation through case-by-case reviews. The Independent Reviewer has submitted reports from her site visits. The individual reports are to be discussed at a meeting on September 28, 2017.

DBHDD has informed the Independent Reviewer that a statewide clinical oversight database is maintained for those individuals outside of the High Risk Surveillance List classification. The processes for resolution and stabilization are identical to the processes for those on the High Risk Surveillance List. The databases were implemented simultaneously.

**15.a.** The State shall implement statewide clinical oversight that is available in all regions to minimize risks to individuals with DD in the community who

face a heightened level of risk due to the complexity of their medical or behavioral needs, as indicated by one or more of the circumstances listed in Paragraph 14.b. (i)-(iv) above. This includes multidisciplinary assessment, monitoring, training, technical assistance, and mobile response to contracted providers and support coordinators who provide care and treatment to individuals with DD in the community.

DBHDD continues to build its capacity to implement statewide clinical oversight through its Office of Health and Wellness and its regional nursing staff. It also involves the clinical supports provided through CRA Consulting, a consultant group retained by DBHDD. The CRA subcontract with Benchmark was terminated as of July 1, 2017.

In response to the Independent Reviewer's draft Report, DBHDD provided three monthly reports, for June through August 2017, summarizing the work performed under contract with CRA Consulting. These documents were received on September 22, 2017. As a result, there has not been time to thoroughly review and analyze the information. It was reported that there is ICST availability statewide. There were a total of 443 pre and post transition referrals to the ICST Team. There were 178 assessments requested and 216 technical assistance requests.

The Independent Reviewer will continue to request these monthly reports and will summarize the facts in her next Report to the Court.

> **15.b.** Statewide clinical oversight is provided through a team of registered nurses with experience caring for individuals with DD, behavioral experts (with a master's level degree in behavior analysis, psychology, social work, or counseling), occupational therapists, physical therapists, and speech and language therapists. This team includes personnel in the Office of Health and Wellness and each regional Field Office.

As stated above, DBHDD has organized its statewide clinical oversight through its Office of Health and Wellness, its Regional Field Offices and its expanded contract with CRA.  Any individual, regardless of HRST score, is eligible for assistance through these resources. It was requested that DBHDD clarify this eligibility with Support Coordinators. Apparently, some Support Coordinators are under the impression that a higher level of HRST score is required.

Further analysis is dependent on the receipt of more detailed information and the thorough review of the recently submitted information regarding the work of CRA Consulting. (See 15.a. above.)

> **15.c.** No later than March 31, 2017, the State shall develop a protocol that includes the following components:

This protocol was issued and then revised after comments by the Director of Settlement Coordination and the Independent Reviewer. As of June 19, 2017, a Statewide Clinical Oversight protocol was finalized. It became effective July 1, 2017.

> **15.c.(i).** The protocol shall state the responsibilities and timeframes for contracted providers and support coordinators to engage the statewide clinical oversight team to assist in addressing issues that place individuals at heightened risk. The protocol must include the following schedule for completion and documentation of the responses to the identified risk(s), until the risk is resolved:

The protocol includes this information. For her next Report, the Independent Reviewer will analyze whether or not the protocol is being properly implemented.

> **15.c.(i).(1).** For an emergency, the provider shall initiate appropriate emergency steps immediately, including calling 911 or crisis services, and shall notify the individual's support coordinator, the Field Office, and the Office of Health and Wellness.

The protocol requires these actions. For her next Report, the Independent Reviewer will analyze whether or not the protocol is being properly implemented.

> **15.c.(i).(2).** For deteriorating health that is not imminently life-threatening, the provider shall respond and inform the individual's support coordinator within the first 24 hours. If the risk is not resolved within 72 hours, the support coordinator (or provider) shall notify the Field Office and the Office of Health and Wellness.

The protocol requires these actions. For her next Report, the Independent Reviewer will analyze whether or not the protocol is being properly implemented.

> **15.c. (i).(3).** For a health, behavioral, or environmental risk not resulting in destabilization of health or safety of the individual, the provider shall respond, inform the individual's support coordinator, and verify completion of responsive steps with the support coordinator no later than the support coordinator's next visit, or 30 days, whichever is sooner.

The protocol requires these actions. For her next Report, the Independent Reviewer will analyze whether or not the protocol is being properly implemented.

> **15.c.(ii).** The protocol shall determine the circumstances when, and set forth mechanisms through which, the statewide clinical oversight team receives electronic notification when individuals with DD in the community face a heightened level of risk, which may include the circumstances listed in Paragraph 14.b. (i)-(iv). The protocol shall set forth the timeframes for the

State's review and response and shall require that the State's response be based on the imminence and severity of the risk.

The protocol requires these actions. For her next Report, the Independent Reviewer will analyze whether or not the protocol is being properly implemented.

**15.d.** No later than June 30, 2017, the State shall train its contracted providers and support coordinators on the protocol developed under Paragraph 15.c.( i), how to recognize issues that place an individual at heightened risk (including through critical incident reports and the State's support coordination tool), and how to request consultation and/or technical assistance from the Field Offices and the Office of Health and Wellness. The protocol shall become effective no later than July 1, 2017.

The Statewide Clinical Oversight protocol became effective on July 1, 2017. It describes signs and symptoms that may place an individual at risk. Training was conducted on June 26 through June 29, 2017.

Although evidence of the training sessions was provided, it is not possible to determine from the sign-in sheets whether all community providers have been made aware of the protocol and its requirements.

DBHDD has been requested to provide more complete information about attendance; this information has not yet been received.

**15.e.** The State shall provide or facilitate consultation (by phone, email, or in person), technical assistance, and training to contracted providers and support coordinators who serve individuals with DD in the community who face a heightened level of risk due to the complexity of their medical or behavioral needs. No later than June 30, 2017, the State shall provide a centralized and continuously monitored hotline and email address to receive requests for consultation and/or technical assistance. The State shall assess, assign for response, and respond to such requests as indicated by the nature, imminence, and severity of the need identified in the request.

This Provision is only partially implemented.

An email address was established as of June 26, 2017. An error in the address was corrected. When the Independent Reviewer used the corrected email address, on a Friday at 4:40 p.m., a response was received within ninety minutes.

A centralized and continuously monitored hotline has not been established. Reportedly, DBHDD is investigating whether this responsibility can be assigned to GCAL, the crisis hotline. There is no date as to when this may be implemented.

**15.f.** No later than June 30, 2017, the State shall have medical and clinical staff available to consult with community health practitioners, including primary care physicians, dentists, hospitals, emergency rooms, or other clinical specialists, who are treating individuals with DD in the community who face a heightened level of risk due to the complexity of their medical or behavioral needs and/or to provide assistance to community providers and support coordinators who report difficulty accessing or receiving services from community healthcare practitioners.

DBHDD has reported that it has organized an Integrated Clinical Support Team (ICST) through its contract with CRA. Professionally licensed/credentialed clinical professionals now are available to provide guidance/advice to community health practitioners or to assist residential providers and Support Coordinators with physical therapy, occupational therapy, speech/language therapy, nutritional consultation, psychiatric consultation, behavioral therapy and nursing consultation. For her next Report, the Independent Reviewer will report on ICST visit data, both individual and systemic, along with an analysis of the effectiveness of the ICST at minimizing poor outcomes and supporting positive outcomes for individuals in the Target Population.

The Office of Health and Wellness coordinates consultation with community clinicians and the clinical members of the ICST, when indicated. For her next Report, the Independent Reviewer will report on OHW activities data, both individual and systemic, along with an analysis of the effectiveness of OHW at minimizing poor outcomes and supporting positive outcomes for individuals in the Target Population.

DBHDD has implemented an Improving Health Outcomes (IHO) team to facilitate the intra-organizational assessment of selected providers. As a result of the organizational assessment, specific sites are identified for further assessment of the implementation of indicated individual supports. Contracted clinicians with the IHO can complete individual clinical assessments, either independently or in collaboration with community providers.

However, further analysis of compliance with this Provision depends on the receipt of additional information and data. There needs to be evidence of statewide availability as well as information about specific individuals with DD who have benefitted from these clinical supports and documentation of the outcomes resulting from the clinical intervention.

The Independent Reviewer would expect a full accounting of the implementation of this Provision for her next Report.

**16.a.** No later than July 1, 2016, the State shall revise and implement the roles and responsibilities of support coordinators, and the State shall oversee and monitor that support coordinators develop individual support plans,

monitor the implementation of the plans, recognize the individual's needs and risks (if any), promote community integration, and respond by referring, directly linking, or advocating for resources to assist the individual in gaining access to needed services and supports.

The Independent Reviewer retained Laura Nuss to assist her with the review of Support Coordination, including the Provisions discussed below. A copy of Ms. Nuss's report is attached to this Report to the Court and will be filed with the Court. There are several important findings that require further discussion and review.

A meeting with DBHDD has been scheduled for September 28, 2017 so that Ms. Nuss can discuss her findings and the Division of Developmental Disabilities can clarify or amend the information gathered through site visits and interviews.

DBHDD Policy, Reporting Requirements for Support Coordination, 02-437, requires that Support Coordination Agencies submit performance reports on a monthly basis. The policy requires that the report include:

1. Caseload size by Support Coordinator;
2. Number of ISPs approved by the DBHDD Field Office within the past month;
3. Participant Face-to-Face Visit Requirements Performance; and the
4. Number of Quality Outcome Measures Reviews Completed/ number due per policy requirements.

DBHDD reviews these reports to verify compliance with Support Coordination roles and responsibilities. These data are also found in the Consumer Information System (CIS).

Ms. Nuss queried DBHDD officials as to the methods used by the State to verify the data provided in these reports or entered into CIS. DBHDD staff do not specifically conduct any quality assurance reviews of these data, but did reference, both in the meeting and in writing, the role of Delmarva, a contractor with the Administrative Services Organization, in conducting provider reviews that include assessment of the ISP. Delmarva conducts 100 provider reviews per year; it is also scheduled to complete reviews of two Support Coordination Agencies in FY18. DBHDD Regional Field Staff also complete quality assurance reviews of the ISP prior to approval. On an annual basis, DBHDD's Office of Procurement and Contracts renews the Letter of Agreement with Support Coordination Agencies based on an agreement to comply with waiver and DBHDD policy.

DBHDD's *Fiscal Year Annual Support Coordination Performance Report*, Appendix A: Methods for Support Coordination Performance Analysis, indicates that the report also used data retrieved from the CIS to create the metrics to evaluate Support Coordination performance. Findings from quality assurance activities designed to verify the data or evaluate the quality of the Support Coordination activities, such as in the development of the ISP or the effectiveness of monitoring, are not included in

the annual performance report.  The Annual Performance Report will be discussed more fully in 16.c.

Support Coordination policies require internal quality assurance activities on the part of the Support Coordination Agencies, including a 25% case review each quarter by Intensive Support Coordinator Clinical Supervisors.  These reviews are to be available to DBHDD staff, but it is not clear when DBHDD staff would verify this requirement.

> **16.b.** No later than July 1, 2016, the State shall require all support coordinators statewide to use a uniform tool that covers, at a minimum, the following areas: environment (i.e., accessibility, privacy, adequate food and clothing, cleanliness, safety), appearance/health (i.e. changes in health status, recent hospital visits or emergency room visits), supports and services (i.e., provision of services with respect, delivery with fidelity to ISP, recent crisis calls), community living (i.e. existence of natural supports, services in most integrated setting, participation in community activities, employment opportunities, access to transportation), control of personal finances, and the individual's satisfaction with current supports and services. The support coordination tool and the guidelines for implementation shall include criteria, responsibilities, and timeframes for referrals and actions to address risks to the individual and obtain needed services or supports for the individual.

DBHDD has implemented the use of a uniform tool and published guidelines for implementation of the tool, as required.  The tool itself is comprehensive, but for purposes of data analysis, could be strengthened.  Most items in the tool ask multiple questions that will make it difficult when aggregated to identify specific areas by provider agency and/or system-wide that may need quality improvement initiatives.  For example:

> Item 9. *Are the ISP, healthcare plans, nursing plans, medical crisis plans current and available to staff? Are they being implemented? Are nursing hours being provided as indicated on the ISP?*

This item requires a review of and response for four major components of an individual's support planning, an assessment of whether those plans are being implemented, and a separate question regarding the provision of nursing services. If this information was collected in more discrete elements, it could provide actionable data regarding the performance of specific provider types and specific providers and would thus contribute to quality assurance and improvement efforts.

Support Coordinators record his/her findings in each item as either: (a) Acceptable; (b) Coaching – is required due to a concern or issue; (c) Non-Clinical Referral (Unacceptable with Critical Deficiencies); (d) Non-Clinical Referral (Unacceptable with Immediate Interventions); (e) Clinical Referral (Unacceptable with Critical Deficiencies); (f) Clinical Referral (Unacceptable with Immediate Interventions).

There is guidance provided regarding the recommended timelines that should be entered for due dates in the data system, but the Support Coordinator may use professional judgment when entering an expected due date for completion of an identified issue. The Support Coordinator is expected to enter on-going updates into the data system until the matter is resolved or is elevated.

The DBHDD Fiscal Year Annual Support Coordination Performance Report for FY17 reports that over 21,000 issues were reported in the Fiscal Year, and less than 1% remained unresolved or incomplete at the close of the Fiscal Year. The report indicated that of the "over 21,000" issues, only 10%, or approximately 2,100 reached Referral status, suggesting the effectiveness of the Support Coordinator in providing coaching to resolve the issue or concern. The Annual Report stated that less than 1% of all Referrals remained unresolved or incomplete and required follow-up by the Division of Accountability and Compliance within DBHDD.

Upon request, DBHDD provided additional information regarding open and closed Referrals by Support Coordination and Region, the average time to close Referrals, and the average age of open Referrals. The report provided on August 12, 2017 included information for the period from January 1, 2017 through June 30, 2017. The report indicated there were 2,613 Referrals of which 938 remained open. The average number of days required to close a Referral was 52 and the average number of days current Referrals were open was 48.75.

> **16.c.** At least annually, the State shall consider the data collected by support coordinators in the tool and assess the performance of the support coordination agencies in each of the areas set forth in Paragraph 16.a.

As noted in 16.a, the DBHDD *Fiscal Year 2017 Annual Support Coordination Performance Report*, Appendix A: Methods for Support Coordination Performance Analysis, indicates that the report uses data retrieved from the CIS to create the metrics to evaluate Support Coordination performance. The report states that "the initial analysis for this report focuses mainly on establishing baseline performance metrics and on the IQOMR".[3] The report provides data on the following metrics:

1. Referral Rates – number of Referrals made by Support Coordinators for selected questions from the IQOMR for the entire population served by DBHDD;
2. Face-to-Face Visit Compliance – by CRA and CLS versus non CRA and CLS individuals; by Support Coordination and Intensive Support Coordination; by Region; and, by CRA;
3. Caseload Compliance – allowing for mixed caseloads of Support Coordination and Intensive Support Coordination per DBHDD policy *Support Coordination Caseloads, Participant Admission, and Discharge Standards, 02-432*;

---

[3] DBHDD *Fiscal Year 2017 Annual Support Coordination Performance Report*, Page 9.

4.  <u>Creation of Individual Service Plans</u> – by Support Coordination Agency.

<u>Referral Rates</u>

DBHDD reports that over 21,000 issues were recorded by Support Coordination Agencies as a result of monitoring using the statewide tool, Individual Quality Outcome Measure Review. Reportedly, 90% of the issues were resolved by the Support Coordination Agencies through Coaching, without a Referral to the State. The Support Coordination Performance Report does not, but should, provide aggregate data regarding the number of issues reported by each Support Coordination Agency; an analysis of the percent of issues reported relative to the number of people served; the number of issues reported in each Focus Area; or the average amount of time required to resolve the issue.

It is essential that these data be provided; the Independent Reviewer requests these data for her next Report to the Court.

All of these data would provide a robust picture of the effectiveness of the Support Coordination agencies in monitoring the implementation of services and supports and the ability of the Support Coordination Agencies to recognize the individual's needs and risks. This should be done and it should be shared with the Independent Reviewer and her consultant for examination and analysis.

The Report provides data on the number of Referrals made to the State for all individuals for the period of January through June 2017 for select questions from the IQOMR.  Three out of seven Focus Areas are reported:

1.  Appearance and Health:  Question 7 and 8 (out of 5 total questions available);
2.  Supports and Services: Question 13 and 14 (out of 4 total questions available);
3.  Home and Community Opportunities: Questions 19, 20, 21, 22 and 23 (all questions included).

Of note, in Appearance and Health, Questions 9 and 10 are not reported; this is not acceptable. Question 9 covers the implementation of healthcare and nursing plans and the provision of nursing hours; Question 10 addresses the receipt of medical/therapeutic appointments and required assessments and evaluations. Absent entirely is the Focus area covering Behavioral and Emotional Health; this is also not acceptable.

The analysis provided in the report is limited to simply reporting the aggregate number of referrals for the individual questions received each month (January through June 2017), and whether there is any statistically significant variance in the number reported month to month.  Reporting is not captured by the Support Coordination Agency.  It is not clear what quality insight can be gained by analyzing

whether there is a difference in the aggregate in the number of referrals received month to month. Instead, the State should record and analyze the quality of the interventions and whether or not they support positive outcomes in individual cases. The existing data will provide a baseline as reported by DBHDD to evaluate if the number of referrals are increasing, which could indicate that Support Coordination Agency Coaching efforts are becoming less effective, but this must be combined with a review of quality and outcome information to gain a truly meaningful picture of the effectiveness of Support Coordination services.

As noted above, data were requested from DBHDD regarding the total number of Referrals made by individual Support Coordination agencies. Ms. Nuss included the estimated number of individuals supported by each Support Coordination Agency as drawn from the DBHDD Support Coordination Performance Report. The number of individuals served is a rough estimate. The data are presented below.

| SC Agency | Number of Referrals | Estimated Number of Individuals Served | Rate Per 100 Individuals |
|---|---|---|---|
| Benchmark | 93 | 250 | 37.20 |
| CareStar | 85 | 110 | 77.27 |
| Columbus | 338 | 4000 | 8.45 |
| Compass | 106 | 125 | 84.80 |
| Creative Consulting | 1262 | 3500 | 36.06 |
| Georgia Support Serv. | 356 | 1450 | 24.55 |
| PCMSA | 354 | 2450 | 14.44 |

Looking at Referral data in this way reveals variance across the Support Coordination Agencies that could provide more insight into performance. This will be most effective if combined with an analysis of quality and outcome measures supported by Support Coordination activities.

Face to Face Visit Compliance

The Performance Report provides data for April through June 2017, as reported in CIS. Compliance rates for individuals living in CRA and CLS settings receiving Support Coordination services range from 92.9% to 99.6% across the six Regions, with only two out of eighteen data points (months) falling below 96.5%. For individuals receiving Intensive Support Coordination services, compliance rates rise to 98.08% to 100%. This is extremely high performance, although it must be noted this is self-reported.

Following receipt of the draft Report to the Court, DBHDD informed the Independent Reviewer that the electronic record system which contains all documentation of visits and subsequent support coordination activity is used to validate reports submitted by

Support Coordination agencies. Reportedly, the system calculates documentation entries and is the only platform used for Support Coordination documentation. Therefore, DBHDD reports that reliability of the information is high.

DBHDD will be queried further about its response during the meeting scheduled for September 28, 2017. It is essential that these data be measured stringently so that all data are confirmed as accurate and valid. In fact, it may be necessary to implement additional meaningful Quality Assurance measures.

These same data are presented for individuals who live in non-CRA or CLS settings. Overall performance is similar for this group of individuals.

Caseload Compliance

The Performance Report indicates that in June 2017 "nearly each SC agency had near 100% compliance with the caseload size policy".[4] Professional Case Management Services of America had the highest compliance rate (76 out of 78 in compliance) and Georgia Support Solutions had the most Support Coordinators out of compliance (14 out of 45).

This performance has been independently reviewed by Ms. Nuss. Her findings are documented below under Provision 16 e.

Creation of Individual Service Plans

The Performance Report indicates that none of the Support Coordination Agencies have more than two percent of ISPs out of compliance with policy. Columbus had the highest proportion of ISPs out of compliance by a statistically significant margin. The Performance Report does not provide data regarding ISP approval rates performance by the Support Coordination Agency or the State. These are important data for both CMS compliance and to ensure services and supports are authorized in a timely manner and so should be collected. DBHDD indicated it does not maintain data in a manner that would enable the State to distinguish whether the ISP was not approved on time due to a deficiency in the ISP document submitted by the Support Coordination Agency, or if it was due to a delay in the Regional Office. DBHDD should change this practice in order to capture this information.

Conclusions

The Performance Report does not draw conclusions regarding performance of Support Coordination Agencies or offer any recommendations for quality improvement initiatives. The report indicates it will serve as a baseline for future

---

[4] DBHDD *Fiscal Year 2017 Annual Support Coordination Performance Report,* Page 28.

reporting and analysis. The data reported reflect excellent performance in face-to-face visits, caseload compliance and timely creation of the ISP but, based on the work completed by the Independent Reviewer and her consultants, there are doubts about the accuracy of some of the data. The data presented from the IQOMR do not, but should, provide useful information to evaluate Support Coordination Agency performance. As referenced earlier, all data are self-reported.

In its response to the draft Report to the Court, DBHDD replied that it will consider the evidence and analysis presented in the Performance Report, along with other information, in evaluating the performance of Support Coordination agencies and quality improvement activities. Conclusions about performance and recommendations for quality improvement activities will emanate from quality improvement processes and leadership/management judgment, based partially on evidence provided in the Performance Report, as well as additional information.

The Independent Reviewer will continue to review this issue and will continue to include field evaluation of face-to face-visits during the next review period. In the end, the whole point of Support Coordination is to help meet the needs of individuals with DD and to support positive outcomes. At this time, the Performance Report is largely documenting the existence of Support Coordination without any meaningful analysis of whether Support Coordination interventions are actually effective.

> **16.d.** No later than June 30, 2017, the State shall provide support coordinators with access to incident reports, investigation reports, and corrective action plans regarding any individual to whom they are assigned. Support coordinators shall be responsible for reviewing this documentation and addressing any findings of gaps in services or supports to minimize the health and safety risks to the individual. (Support coordinators are not responsible for regulatory oversight of providers or enforcing providers' compliance with corrective action plans.)

DBHDD has provided access to the Reporting of Critical Incidents (ROCI) application to the CRAs and published a User's Guide on June 7, 2017. Each CRA has two staff persons who are permitted to access the system for confidentiality reasons. Each day, the agencies enter the system and send emails to individual Support Coordinators, if an incident has been entered into the system. DBHDD has created a specific Code to be used in Support Notes to track the responses taken by individual Support Coordinators in response to the incident report, investigation reports and corrective action plans.

During site visits, Intensive Support Coordinators and Clinical Supervisors reported that the system was in fact operational; they were very pleased with the change in policy. Nonetheless, the Intensive Support Coordinators acknowledged they did not

always know when a critical incident occurred, and firmly believed it was important for the Support Coordinator to be informed and involved in the Corrective Action Plan. This calls into question whether the system is effectively operational. In the next review period, DBHDD will be asked to provide specific data regarding the result of any actions taken by Support Coordinators once this information is provided to them for assessment. The Independent Reviewer and her consultants will focus on serious incidents and negative outcomes to assess if Support Coordination intervened promptly, effectively and expertly to help meet the needs of individuals in the Target Population.

> **16.e.** The caseload for support coordinators shall be a maximum of 40 individuals. The caseload for intensive support coordinators shall be a maximum of 20 individuals.

Despite its efforts, DBHDD is not in compliance with the requirements of this Provision. The Performance Report indicates that, in June 2017, "nearly each Support Coordination Agency had near 100% compliance with the caseload size policy."[5] According to the Performance Report, Professional Case Management Services of America (PCMSA) had the highest compliance rate (76 out of 78 in compliance) and Georgia Support Solutions had the most Support Coordinators out of compliance (14 out of 45).

DBHDD subsequently provided caseload data for Intensive Support Coordinators, dated July 5, 2017, for this Report. DBHDD measures mixed caseloads by counting each Intensive Support Coordination (ISC) individual as being equal to three non-Intensive Support Coordination individuals when determining if the mixed caseload exceeds forty people. If the Support Coordinator has ten ISC individuals, then the total caseload cannot exceed twenty persons.[6] Using that methodology, results from these data revealed the following compliance rates:

| Support Coordination Agency | Compliance Rate |
|---|---|
| Benchmark | 100% |
| CareStar | 100% |
| Compass | 100% |
| Creative Consulting | 96% |
| PCMSA | 94% |
| Columbus | 72% |
| Georgia Support Solutions | 20% |

---

[5] DBHDD *Fiscal Year 2017 Annual Support Coordination Performance Report,* Page 28.

[6] DBHDD Policy *Support Coordination Caseloads, Participant Admissions, and Discharge Standards, 02-432*

According to the information received and analyzed, there are four out of seven agencies (57%) that are not in compliance with the requirements for caseload size. Furthermore, it is the Independent Reviewer's strong recommendation that the use of "mixed caseloads" be discontinued. DBHDD's own policy (see footnote for reference), dated January 4, 2017, states that it is " DBHDD's preference that Intensive Support Coordination caseloads include only Intensive Support Coordination waiver participants." Mixed caseloads can be difficult to manage. The intent of the limitations on caseload size was to ensure that sufficient time was available to address any issues of concern and to be proactive in preventing them.

The failure to properly manage and accurately report caseload size is of substantial concern.

> **16.f.** Support coordinators shall have an in-person visit with the individual at least once per month (or per quarter for individuals who receive only supported employment or day services). Intensive support coordinators shall have an in-person visit with the individual as determined by the individual's needs, but at least once per month. Some individuals may need weekly in-person visits, which can be reduced to monthly once the intensive support coordinator has determined that the individual is stable. In-person visits may rotate between the individual's home and other places where the individual may be during the day. Some visits shall be unannounced.

The DBHDD *Fiscal Year 2017 Annual Support Coordination Performance Report*, provides aggregate data regarding compliance with minimum policy standards for Face-to-Face visits.

**CRA and CLS Support Coordination Face to Face Visit Compliance**

| Month | Support Coordination | Intensive Support Coordination |
|-------|---------------------|-------------------------------|
| April 2017 | 97.97 | 99.06 |
| May 2017 | 97.57 | 99.45 |
| June 2017 | 96.75 | 99.10 |

**Non CRA and CLS Settings Support Coordination Face to Face Visit Compliance**

| Month | Support Coordination | Intensive Support Coordination |
|-------|---------------------|-------------------------------|
| April 2017 | 95.38 | 99.32 |
| May 2017 | 93.31 | 98.27 |
| June 2017 | 93.88 | 98.31 |

These data would support evidence of compliance with requirements for at least once per month or once per quarter face-to-face visits. Intensive Support Coordination was intended to provide more frequent visits, if necessary, especially for those individuals in decline or in crisis. During the Independent Reviewer's site visits, Intensive Support Coordinators reported having the time to provide more

support, but did not necessarily <u>visit</u> the individual more often. This entirely defeats the purpose of reducing caseload size. The Independent Reviewer will seek to audit these data to verify compliance during the next review period. There will be a special focus on how often the Intensive Support Coordinators visited individuals when they were experiencing decline or crisis.

> **16.g.** For individuals with DD transitioning from State Hospitals, a support coordinator shall be assigned and engaged in transition planning at least 60 days prior to discharge.

This Provision appears to be in compliance.  For example, in this review period, S.J. was transitioned from Georgia Regional Hospital Savannah on May 22, 2017.  A Support Coordinator was involved with her transition planning and visits.  A new Intensive Support Coordinator was selected following her move to the community and conducted her post-transition visits, as required per policy.

> **17.a.** Crisis respite homes provide short-term crisis services in a residential setting of no more than four people.

Since extensive fieldwork in each of the crisis respite homes was completed earlier in FY17, site visits to these residences will be repeated for the Independent Reviewer's next Report to the Court.

Based on the monthly documentation provided to the Independent Reviewer and to the Department of Justice, it is clear that these residences are not used only on a short-term basis.

For example, according to documentation provided by DBHDD for June 2017, there were twenty-three out of twenty-eight individuals (82%) with lengths of stay greater than thirty days. This is not consistent with the requirements in the Settlement and Extension Agreements.

For example:

- Two individuals (C.B. and M.W) have been in a crisis respite home since 2013 and 2014 respectively. A provider had been identified for C.B. but not for M.W.;

- Three individuals (L.P., T.R., and F.W.) have resided in the crisis home for 12-24 months. Providers have been identified for T.R. and F.W.;

- Eight individuals have been in crisis homes for 6-12 months. Providers have been identified for seven individuals (J.W., N.H., R.J., J.T., Q.B., D.C., and S.B.) but not for D.F.;

- Ten individuals have been in crisis homes for 3-6 months. Providers have been identified for seven of these individuals (J.F., T.H., L.C., D.H., D.D., K.W., and J.K.) but not for the remaining three individuals (S.C., H.R., and L.G.).

The reasons why providers have not been identified are included in the monthly report. This is valuable information to be considered in the implementation of the Provider Recruitment Plan. A primary barrier to placement from the crisis respite homes is lack of provider capacity in the community. In spite of the fact that, for months now, the new COMP waiver has been approved with higher rates, the State has been unable to recruit a single new provider to its community system. Moreover, the State has failed to certify any existing provider as capable of meeting the needs of individuals with complex conditions. As a result, individuals remain in the crisis homes for unduly prolonged periods of time.

> **17.b.** Individuals living in crisis homes shall receive additional clinical oversight and intervention, as set forth in Paragraph 15.

This Provision will be re-evaluated through individual case reviews for the next Report to the Court.

> **17.c.** The State shall track the length of stay in crisis respite homes, and, on a monthly basis, shall create a list of individuals who are in a crisis respite home for 30 days or longer, the reasons why each individual entered the crisis respite home, the date of entry to the home, and the barriers to discharge. The State shall provide these monthly lists to the United States and the Independent Reviewer.

DBHDD has submitted the required lists on a monthly basis. Each list contains the information required by this Provision. These lists have been very useful in identifying the reasons for placement in a crisis home; the lack of progress being made in locating community providers; and the issues that deter provider interest and thus delay transitions to more integrated residential settings.

> **17.d.** The State shall assess its crisis response system for individuals with DD in the community, including the use of crisis respite homes and alternative models for addressing short-term crises. Following that assessment, and no later than June 30, 2017, the State shall meet with the Independent Reviewer, the United States, and the Amici to discuss the State's plans for restructuring the crisis system, including methods of minimizing the occurrence of individuals leaving their homes during crisis and limiting individuals' out-of-home lengths of stay at crisis respite homes.

The State submitted its plan for the redesign of crisis services to the Department of Justice and to the Independent Reviewer. The highlights of the planning document were presented at the Parties' meeting on July 7, 2017. However, the time for discussion was abbreviated.

Overall, the plan is positive in that it acknowledges deficiencies in the existing crisis system. However, the plan presents proposed actions that do not appear to address underlying issues. For example, the plan seeks to convert some crisis homes to permanent community homes, primarily to address the 30-day stay requirement. This administrative solution does not resolve the service-delivery issues facing those with complex behavioral needs. The plan also seems to rely heavily on the recruitment of new community providers and that has not yet occurred.

Additional meeting time is necessary to more fully discuss the State's proposed plans for its crisis response system. Once that meeting is completed, it is recommended that the plan be finalized for prompt implementation.

> **18.** Within six months of the Effective Date of this Extension Agreement, the State shall develop and implement a strategic plan for provider recruitment and development that is based on the needs of individuals with DD in the State Hospitals and in the community. The plan shall identify the service capacity needed to support individuals with DD and complex needs in community settings. The plan shall take into account services and supports that promote successful transitions and community integration. The State shall use the plan to identify and recruit providers who can support individuals with DD and complex needs in community settings.

DBHDD's "Provider Development and Recruitment Plan" was issued on November 28, 2016. The Plan was revised on June 30, 2017. The revised document was provided to the Independent Reviewer and the Department of Justice on August 8, 2017.

The Independent Reviewer has commented on this Plan in two discussions with DBHDD. On August 8, 2017, she reviewed the major barriers to provider recruitment and expansion with DBHDD leadership.

As referenced above, the State has failed to recruit a single new provider to the system since the Plan was initially drafted. Even the approval of the revised COMP waiver, with significant additional funding to enable higher rates, has not enabled the State to retain new providers.

Given the very high importance of this Plan and its impact on the transition of institutionalized individuals to the community, it is critical that timelines be adjusted to permit some degree of implementation and oversight before June 30, 2018. Even in the revised Plan, key initiatives are beginning near the end of the timeframe for anticipated compliance with the Extension Agreement.

It is requested that a full discussion of the proposed actions for provider expansion and recruitment, and their respective timeframes, be held with the Department of

Justice, the Amici and the Independent Reviewer in order to be briefed more fully on the status of the initiatives and the outcomes that have been achieved to date.

> **19.** The State shall create a minimum of 100 NOW waivers and 100 COMP waivers between July 1, 2015 and June 30, 2016; 100 NOW waivers and 125 COMP waivers between July 1, 2016 and June 30, 2017; and 100 NOW waivers and 150 COMP waivers between July 1, 2017 and June 30, 2018, for individuals with DD who are on the waitlist to prevent admission to a public or private skilled nursing facility, intermediate care facility for [individuals with] developmental disabilities, or psychiatric facility.

DBHDD reported a total of 527 admissions to the NOW and COMP Waivers in FY17. There were 239 admissions to the NOW Waiver and 288 admissions to the COMP Waiver.

It must be noted, however, that the waiting list for DD services is estimated at approximately 9,000 individuals statewide.

> **20.** The State shall implement an effective process for reporting, investigating, and addressing deaths and critical incidents involving alleged criminal acts, abuse or neglect, negligent or deficient conduct by a community provider, or serious injuries to an individual.

The State has implemented a process for reporting and investigating deaths and critical incidents.

As described in more detail below, the system cannot be characterized now as either effective or complete. There are delays in completing investigations, including those of deaths possibly resulting from aspiration pneumonia, sepsis and bowel obstruction.

Although a standard reporting format has been used, there is significant variability in the basis for substantiating or not substantiating neglect.

The reviews completed for this Report continue to document serious concerns about the adequacy of provider agencies' nursing supports for medically complex or fragile individuals. The recurrent observation of substandard nursing practice or oversight is a clear indication that risk has not been uniformly ameliorated throughout the system of support for individuals with DD.

As stated in the last Report to the Court, the investigation process will continue to require review.  It is imperative that the investigation process and its findings result in remedial measures whenever a deficiency is identified. The remedial measures should be applied broadly, not just at the site of the investigation. Otherwise, any lessons learned through the investigation process will not be applied and the system of community supports will not be strengthened.

**21.** The State shall conduct a mortality review of deaths of individuals with DD who are receiving HCBS waiver services from community providers according to the following:

As reported previously, DBHDD is conducting mortality reviews as required by this Provision. However, there are areas of incomplete or inadequate implementation.

**21.a.** An investigation of the death shall be completed by an investigator who has completed nationally certified training in conducting mortality investigations, and an investigation report must be submitted to the Office of Incident Management and Investigations ("OIMI") within 30 days after the death is reported, unless an extension is granted by the State for good cause. The investigator must review or document the unavailability of: medical records, including physician case notes and nurses' notes (if available); incident reports for the three months preceding the individual's death; the death certificate and autopsy report (if available); and the most recent individual support plan. The investigator may also interview direct care staff who served the individual in the community. The investigation report must address any known health conditions at the time of death, regardless of whether they are identified as the cause of death. The State shall conduct a statistically significant sample of "look-behind" investigations to assess the accuracy and completeness of provider-conducted investigations of deaths, and the State shall require providers to take corrective action to address any deficiency findings.

As reported previously, the credentials of DBHDD's investigators have been reviewed. They have been trained under the auspices of LRA, a nationally recognized trainer in the investigation of critical incidents, including deaths.

In order to ensure that all investigators have the requisite credentials, DBHDD has assumed the responsibility for investigating all deaths of individuals with DD. Provider agencies no longer conduct the investigations into deaths. Therefore, a statistically significant sample of "look behind" investigations is no longer necessary. The Columbus Organization continues to be retained to review the investigations completed by DBHDD, if the deceased individual was discharged from a State Hospital under the terms of the Settlement Agreement.

The DBHDD investigations follow a standard format and generally include the requirements enumerated in this Provision. However, the findings and recommendations in certain investigations raise concerns about thoroughness and, even more importantly, the legitimacy of the conclusions drawn from the investigation. For example:

- C.Bi. was well known to the Independent Reviewer; site visits were made to her residence on two separate occasions and the status of her programming

was last discussed with her provider in January 2017. She presented with serious behavioral challenges and required two to one staffing.  On February 17, 2017, she drowned in the bathtub.

The investigation was completed on April 7, 2017. The delay was attributed to waiting for the autopsy report, although this has not been typically cited as a cause for suspending the investigative activities. Many deaths do not result in autopsies.

Neglect was not substantiated despite the fact that there were questions regarding the degree of supervision required during bath time. The Behavior Support Plan in effect at the time of her death stated that C.Bi. required "line of sight at all times" and "there were no specific instructions on how staff were to monitor C.Bi. every five to seven minutes while she was in the bathroom." In addition, there was evidence in the investigation report of other occasions when staff left C.Bi. to go to McDonalds, raising questions about ongoing supervision, and conflicting statements that raised issues about staff credibility in reporting their actions while on duty.

Multiple elements of this death are consistent with a finding of neglect. It is disturbing that that conclusion was not reached.  The coroner determined that the cause of death was accidental drowning. Given that determination, there should have been further investigation into how such an accident could have happened to an individual with enhanced staffing requirements.

The Community Mortality Review Committee (CMRC) is expected to review this death; the date of its review was not provided.

The review of the investigation reports submitted by DBHDD confirmed repeated examples of the 30-day deadline not being met as required. Reasons for delays include other assignments or mandatory training. In addition, there are vacancies in the positions allocated to the investigation functions.

According to the information received, in FY17, there were 160 deaths reported of individuals with DD. There were sixty-eight investigations received. Examples of investigations that are not yet completed or received include:

- G.W. lived in a residence under the responsibility of a provider in Region 4. There was concern about neglect. G.W. died on January 24, 2017.

- B.M. lived in another house under the same provider referenced above. He died unexpectedly on June 7, 2017. There have been three deaths at his residence since 2014.

- E.Mc. was hospitalized in March 2017 for sepsis and pneumonia. She died on April 3, 2017.

- C.E. was reported to have an incident of bowel obstruction. He died on March 24, 2017.

- M.V.'s death on March 17, 2017 was unexpected and followed vomiting at his day program.

It would seem that the death of anyone living in a residence under the responsibility of a provider where there have been documented concerns about the quality of care would prompt even closer monitoring in the homes to ensure that proactive and promptly reactive measures are taken to meet the individualized needs of those still living in the same residence, especially those similarly situated who are in decline or crisis. There also needs to be timely completion of investigations into adverse incidents, including death.

Additionally, there should be greater clarity in reporting if and when the findings from investigations are reported to the appropriate law enforcement and regulatory enforcement agencies. This information should be included in the investigation report itself.

The delay in the completion of investigations continues to complicate a thorough review of this Provision.

The Independent Reviewer has identified five agencies that require additional, more intensive review due to the number or circumstances of unexpected deaths. These findings will be discussed in the next Report to the Court.

> **21.b.** The Community Mortality Review Committee ("CMRC") shall conduct a mortality review of all unexpected deaths, any expected death that is identified by the State's Medical Director or OIMI Director, and any expected death where a condition cited as a cause of death was identified fewer than 30 days before the death. The mortality review shall be completed within 30 days of completion of the investigation and receipt of relevant documentation. The minutes of the CMRC's meetings will document its deficiency findings and its recommendations, if any.

The CMRC meets to review the deaths of individuals with DD and with a mental health diagnosis and to discuss/approve recommendations. Minutes are shared with the Department of Justice and the Independent Reviewer. The CMRC submitted minutes for eleven months in FY17; the CMRC did not meet in June 2017.

In the minutes for the nine months reviewed, there was documentation that the CMRC had reviewed the deaths of fifty-five individuals with DD.

Additional recommendations for actions by either the provider or DBHDD were approved in fifteen cases.  In some, but not all, cases, the CMRC's recommendations are assigned to specific DBHDD staff or Divisions. In some, but not all, cases, the recommendation has a due date assigned.

The CMRC instructed that one investigation, in the case of A.G., be reopened.

The completion of CMRC recommendations will be reviewed for the Independent Reviewer's next Report. She is scheduled to attend the CMRC's meeting on October 24, 2017.

> **22.** The State shall require providers to take corrective actions in response to the CMRC's deficiency findings, and the State shall implement a system that records the deficiencies identified in investigative reports and mortality review and that tracks the corrective actions plans, including the community providers' timely completion of required actions. The State shall separately track the CMRC's recommendations.

As referenced above, there is a tracking process but there are delays in the completion and filing of relevant information. It is not possible to report that the requirements of this Provision have been met. The Independent Reviewer will study this in depth and include analysis in her next Report.

> **23.** The State shall generate a monthly report that includes each death since July 1, 2015; any corrective action plan(s) resulting from the death; the community provider(s) involved; the corrective action taken by the community provider, as verified by the State; and any disciplinary action taken against the provider(s) for failure to implement corrective action (if applicable). The State shall provide the report to the United States and the Independent Reviewer.

DBHDD issues this information to the Department of Justice and to the Independent Reviewer on a monthly basis.

> **24.** The State shall collect and review its data regarding deaths of individuals with DD in the community to identify systemic, regional, and provider-level trends, if any. The State shall consider its mortality data, publicly available national mortality data, and recommendations from the CMRC. The State shall develop and implement quality improvement initiatives, including those to reduce mortality rates for individuals with DD in the community, as determined by the State from its assessment of mortality data and trends.

DBHDD submitted an Annual Mortality Report on August 22, 2017. This report is based on the deaths of individuals with DD who received NOW or COMP waivers in calendar year 2016. The Report includes important detail about the age, gender,

disability, residential settings, and health care risk levels of 170 deceased adults. Causes of death are identified and aggregated based on the actual death certificates. The four leading causes of death for the individuals included in the analysis are specified as heart disease, disability, aspiration pneumonia and sepsis.

DBHDD's report summarizes the work of the CMRC. It also cites twenty-nine critical risk practices related to the deaths analyzed for the report. These practices include neglect (10) and failures to respond to changes in health conditions (6) or health-related emergencies (7).

Now that this Annual Mortality Report has been completed, DBHDD has stated that it will prepare an analytical report summarizing its Quality Improvement Plans, actions and results. A specific date for the release of this analysis has not been provided.

It will be essential to discuss these findings and action plans at the earliest possible time. Many of the Provisions in the Extension Agreement underscore the urgent need to proactively address potential risk and to promptly intervene when an individual's health condition declines.  In the meantime, the Independent Reviewer will request and review the specific information relied upon for the findings related to critical risk practices.

> **25.** At least annually, the State shall publish a report on aggregate mortality data including the number of deaths, causes of death, classification of death, and trends.

See above. The Annual Mortality Report was published on August 22, 2017.

> **26.** DBHDD shall identify and attempt to address barriers to obtaining hospital records for the purpose of reviews of deaths of individuals with DD in the community.

DBHDD addressed the barriers to obtaining hospital records in a detailed Memorandum dated May 31, 2017. Under existing law, DBHDD's access to hospital records is limited. Authorization is required from an individual with legal authority to grant permission for the release of records. Changes in the statutes governing the release of hospital records would require legislative approval. DBHDD does not recommend that approach as a viable solution.

It is recommended that this Provision be discussed at the Parties' meeting scheduled for October 5, 2017. It is unclear how this Provision can be addressed any further.

> **27.** The State shall develop a protocol for determining which deaths of individuals with DD in the community should result in an autopsy. The protocol (as may be amended) shall be applied to all deaths that occur after

the protocol is effective. The State shall provide a copy of the protocol to the Independent Reviewer, the United States, and the Amici for comment before it is finalized.

DBHDD has prepared this protocol. The Memorandum from the Commissioner is dated May 31, 2017. The Independent Reviewer has requested that there be a discussion about the protocol at the Parties' meeting scheduled for October 5, 2017. The Amici did not receive a copy of the Memorandum.

**28.** By June 30, 2017, the State shall require all of its support coordination agencies and contracted providers serving individuals with DD in the community to develop internal risk management and quality improvement programs in the following areas: incidents and accidents; healthcare standards and welfare; complaints and grievances; individual rights violations; practices that limit freedom of choice or movement; medication management; infection control; positive behavior support plan tracking and monitoring; breaches of confidentiality; protection of health and human rights; implementation of ISPs; and community integration.

This Provision has been addressed. DBHDD revised the Provider Manual for Community Developmental Disability Providers for the Department of Behavioral Health and Developmental Disabilities for FY18 to include this requirement. The Revision was posted on June 1, 2017 with an effective date of July 1, 2017.

Support Coordinators interviewed during the fieldwork for this Report indicated that they were aware of this requirement and, with one individual exception, had begun to be notified of incidents.

The actions taken to comply with this Provision will be monitored for the next Report to the Court.

**29.** The State shall provide to the Department of Justice copies of the waiver assurances that the State submits to the Center for Medicare Services ("CMS"). Quality reviews, which are used to report waiver assurances as required by CMS, shall include, at a minimum, (a) data derived from face-to-face interviews of the individual, and, as indicated and available, relevant professional staff and other people involved in the individual's life, (b) assessments, and (c) clinical records. Quality reviews shall be conducted on a sample of individuals and providers in each region. The sampling shall be informed by data from DBHDD's incident management system, mortality reviews, and other indicators overseen by the Office of Health and Wellness. At least annually, the State shall consider these quality reviews, and shall either develop and implement quality improvement initiatives or continue implementation of existing quality improvement initiatives, as determined by the State from its assessment of the quality reviews.

DBHDD did provide notice that its most recent COMP waiver application with performance measures was approved by the Centers for Medicare and Medicaid Services (CMS) on February 24, 2017 with the effective date of April 1, 2016. Thus, DCH/DBHDD would expect to receive a Request for Evidence Report from CMS roughly eighteen months prior to the expiration of the waiver, or approximately October 1, 2019.

Further clarification is requested from the Parties' as to any additional actions expected for compliance with this Provision.

## EXTENSION AGREEMENT PROVISIONS RELATED TO INDIVIDUALS WITH SERIOUS AND PERSISTENT MENTAL ILLNESS

For purposes of Paragraphs 31 to 40, the "Target Population" includes the approximately 9,000 individuals with SPMI who are currently being served in State Hospitals, who are frequently readmitted to the State Hospitals, who are frequently seen in emergency rooms, who are chronically homeless, and/or who are being released from jails or prisons. The Target Population also includes individuals with SPMI and forensic status in the care of DBHDD in the State Hospitals, if the relevant court finds that community services are appropriate, and individuals with SPMI and a co-occurring condition, such as substance abuse disorders or traumatic brain injuries. (Extension Agreement Paragraph 30.)

With full cooperation from DBHDD, during this reporting period, the Independent Reviewer and her three consultants, Ms. Knisley, Dr. Gouse and Dr. Rollins, implemented their proposed plans to further review whether all members of the Target Population have access to Supported Housing, as needed or desired by the individual. The additional review of this question was prompted by ongoing findings that there were gaps in the assessment of need for individuals at risk of homelessness, individuals with repeated admissions to the State Hospitals, individuals with repeated contact with emergency rooms, individuals with forensic status who could be discharged with appropriate supports, and individuals with SPMI being released from jails and prisons.

At this time, these ongoing concerns are not abated. As discussed more fully in the attached reports by Ms. Knisley and Dr. Gouse, serious impediments remain in access to housing for the most vulnerable individuals in the Target Population. Their reports should be reviewed for a fuller understanding of the information that was provided and analyzed for this Report; set out below are some findings and conclusions that are discussed more fully in the attached reports. Additional clarification of certain findings is included in the narrative below in response to questions from the Parties.

As discussed with the Commissioner prior to the release of this Report, there is scant evidence to demonstrate that any significant changes have occurred within the last five months. The data provided by DBHDD do not reflect any increased opportunities for access to Supported Housing for these individuals. The number of individuals who have accessed Supported Housing from psychiatric hospitals, emergency rooms, jails and prisons remains very low. This finding is particularly troubling because there are reasonable strategies that can be employed to alter this situation. [7]

---

[7] On August 17, 2017, DBHDD provided preliminary information about proposed plans for expanded outreach. There has not been time to fully examine these plans.

**Prior Residential Status by Percentage of Individuals in Housing in FY 17**

| Categories | R 1 | R 2 | R 3 | R 4 | R 5 | R 6 | 7 Yr. Average |
|---|---|---|---|---|---|---|---|
| Homeless | 61% | 38% | 73% | 51% | 42% | 47% | 55% |
| Residential | 6% | 13% | 6% | 7% | 8% | 25% | 9% |
| PCH or GRH | 2% | 5% | 4% | 2% | 4% | 7% | 4% |
| Hospital | 3% | 26% | 9% | 10% | 9% | 4% | 10% |
| CSU or CA | 1% | 1% | 0% | 0% | 3% | 0% | 1% |
| Rent Burdened | 1% | 2% | 0% | 3% | 2% | 1% | 1% |
| Family or friends | 22% | 11% | 5% | 19% | 17% | 6% | 13% |
| Jail or Prison | 2% | 3% | 2% | 7% | 13% | 6% | 5% |
| Incomplete | 2% | 1% | 0% | 2% | 2% | 3% | 1% |
| Total (by #) | 704 | 667 | 1297 | 733 | 870 | 442 | 4,713[8] |

In addition to reviewing access to housing, the work for this Report focused on determining whether an individual is assessed and linked in a timely manner to appropriate community-based mental health and other supports, based on his/her interest and level of need. In particular, an effort was made to determine whether discharge planning from GRHA is sufficiently timely and comprehensive to enable linkage to Supported Housing and to minimize readmission or placement in transitory settings, such as shelters or other temporary housing sites.

Findings from the examination of multiple discharge documents continued to identify recurrent weaknesses in the discharge planning process, such as a lack of intensity in efforts to build trusting relationships that could lead to improved outcomes in housing and increased cooperation with individualized treatment interventions. The review of discharge records indicated that the period for discharge planning is relatively brief for many hospitalized individuals and does not permit reliable linkages to such community resources as Supported Housing and ACT.

Both the State Hospital and ACT Teams described challenges in coordinating care and discharge planning for individuals leaving the State Hospital. Dr. Gouse and Dr. Rollins reviewed the cases of numerous individuals who have had multiple admissions to GRHA, including following up with community providers in some cases to determine the outcome after the last hospitalization. It seemed clear from these reviews that individuals coming out of GRHA and into a transitional housing situation were readmitted around 30% of the time; this is too high and could be ameliorated with better linkage to Supported Housing and ACT, where appropriate. Those released to hotels, motels and shelters were more often lost to follow-up nearly immediately; this is unacceptable. For those who did not show up in the State

---

[8] This number (4713) is higher than number reported of individuals placed in housing (4054) but less than the number for "notice to proceed" (4848). All numbers are taken from DBHDD on the Georgia Housing Voucher and Bridge Funding Program Summary.

Hospital again in the recent months, it is not known whether they are experiencing another negative outcome, such as street homelessness or incarceration. Clearly, in most cases, lack of a permanent, stable housing situation upon discharge was a serious challenge to maintaining recovery in the community. For an individual known to the community provider, outreach after elopement may still be an issue, but the individual is typically easier to "find."

ACT Teams described many cases of good coordination and communication with GRHA staff but there were some incidents reported of finding out that an individual was being discharged very close to the discharge date and time.  This typically renders the ACT Team unable to complete all needed assessment and linkage activities prior to discharge; as a result, it is less likely that the individuals to be discharged will receive the community services they need. State Hospital staff report referral to ACT services but often are unclear whether the individual is actually accepted and enrolled in ACT.  In a few cases where there was inquiry about a particular individual, a Team indicated that the person might be on a wait list for ACT since the Team had completed its maximum intake of six clients for the month (a DACTS standard). The DACTS maximum of six intakes each month was designed to allow Teams enough time to assess and genuinely engage new clients with high level needs, such as those transitioning from hospitalization, homelessness, incarceration, and other common sources of ACT referral. As the number of intakes rises above six each month, those services become more difficult to offer. The ACT model was designed for slow, planned and methodical intake procedures (as well as slow, planned and methodical discharge, as discussed in earlier sections of this Report.)

ACT Teams report that it is helpful when the State Hospital applies for SSI and Medicaid as soon as someone is admitted.  The Medical Director reported that as the usual practice. However, according to DBHDD, delays in the receipt of benefits occur because of the time required for processing the claims by the Social Security Administration offices. The lack of income upon discharge is reported as a barrier to obtaining housing with a Georgia Housing Voucher because, although the individual may have the first and last months' rent covered through Bridge Funding, most providers will not take the risk that the individual will be able to pay the second month's rent because SSI benefits may not have been approved by then. SSI takes 90-120 days for approval.

Turnover with State Hospital social work staff was reported to be very high by all parties, so that relationships have to be constantly built between community providers and new faces at the Hospital who may not understand all of the procedures or be able to consistently implement them. GRHA leadership contends that community providers with a dedicated hospital liaison help to improve coordination.

The examination of discharge planning at GRHA has led to several considerations that may, in fact, be applicable to other State Hospitals:

- Community providers should be encouraged to use a dedicated liaison with the State Hospitals. The liaison would perform the majority of coordination of care tasks for a single individual and would then link in the appropriate team from the provider agency, when needed. (In its response to the draft Report, DBHDD stated that it has instructed providers to designate a team member as hospital liaison and as jail liaison; not necessarily the same team member.)

- There should be some flexibility in the policies governing the use of Bridge Funding for initial rent when an individual's income via SSI is still pending.

- Based on fidelity reports, some ACT Teams appear to be dipping into lower frequency of contact with their clients. DBHDD should work with ACT Teams to remind them that all clients, especially those discharged from the Hospital (and especially a resistant client) may need daily (sometimes twice daily) contacts and creative engagement around their own personal goals in order to be retained in services.  Once weekly contact with these individuals would be far too low; contact should be based on the needs of the individual. (In its response to the draft Report, DBHDD stated that four out of twenty-two ACT Teams scored a rating of 2 on frequency of contact; those four Teams were required to develop and comply with a Corrective Action Plan.)

- Stakeholders in the mental health community raised the lack of ACT Teams with language and cultural competence to work with non-English speaking clients as a continuing concern. The Independent Reviewer will examine this issue for her next Report, as it would impact access to services by non-English speaking members of the Target Population.

Finally, as discussed more fully in the attached reports, given the wait-listing of some individuals referred for ACT, who clearly meet criteria, combined with the need to examine and probably increase ACT lengths of stay (which will increase team caseloads/census), it is questionable whether the saturation of ACT Teams in Region 3 is sufficient to meet the needs of the population. For instance, if Teams are able to retain a higher percentage of ACT clients each year who could benefit from ACT (e.g., graduating closer to 5-10% of their caseloads each year, compared to the current 18-37% each year) and demand for ACT services remains high, then ACT census numbers for existing Region 3 Teams will increase and eventually reach their maximum limits.

During FY17, Dr. Gouse also examined, in all of the State Hospitals, the discharge planning process for certain individuals with forensic status. Forensic clients with a legal status of IST/CC (Incompetent to Stand Trial/Civilly Committed) or NGRI (Not Guilty by Reason of Insanity) were the focus of her review. Her initial report is attached; additional inquiry is planned for FY18.

Her report explains why the discharge planning for forensic clients can be more complicated. It also identifies the strengths and weaknesses of existing State Hospital processes, including risk assessments and treatment planning. The extent to which some community resources are available, including housing, continues to be a factor delaying discharges. She found that forensic apartments are not only underutilized but lack an effective referral strategy.

Her sources informed her that staff vacancies and staff turnover are likely impacting timely discharge, although to what degree is unclear. For example, at Central State Hospital, the Positive Behavioral Support (PBS) Team has been disbanded due to staff departures. Since many of the forensic clients at this Hospital present with behavioral challenges (and often are transferred from other State Hospitals because of significant behavioral issues), it is likely that the absence of this specialized clinical team will affect preparation for discharge.

The focus on discharge planning for forensic clients is both appropriate and necessary because the Settlement Agreement definition of the Target Population includes "individuals with SPMI and forensic status in the care of DBHDD in the State Hospitals, if the relevant court finds that community services are appropriate…"; adequate and timely discharge planning will facilitate courts being able to make informed decisions that can lead to placement in the community.

Dr. Gouse's report on discharge planning for forensic individuals includes several recommendations for consideration by DBHDD's Office of Forensic Services.

In addition, the work done to date by the Independent Reviewer and her three consultants has indicated that DBHDD should consider the following actions to measure outcomes, as it continues to work to comply with Provisions 38 and 40. These actions were raised in the Independent Reviewer's last Report but there is no indication that they have been addressed.

- DBHDD should ensure and document efforts that all individuals from the State Hospitals with SPMI are being offered the choice and the support to access integrated community settings instead of congregate or temporary settings such as nursing homes, motels, hotels, shelters, or other venues for people who are homeless.

- DBHDD should ensure and document that the 30-day and 180-day readmission rates to its State Hospitals have decreased over time and have been minimized. (DBHDD measures these readmission rates as a Key Performance Indicator but more information/analysis is still required regarding remedial actions on a systemic basis.)

- DBHDD should ensure and document that those in a State Hospital who are in need of supported housing, ACT, or other community mental health services are promptly assessed and linked to supported housing, ACT or other needed community mental health services prior to discharge. This may require expediting the identification of and linkage to community services earlier in the discharge planning process. This earlier engagement will be especially important for individuals who have experienced difficulty in forming trusting relationships.

- DBHDD should document that all individuals with SPMI who need supported housing are offered that choice; this includes people referred from State Hospitals, hospital emergency rooms, jails, prisons, homeless shelters and other such settings. In order to accomplish this, DBHDD should document its comprehensive and effective outreach and in-reach efforts to find all individuals included in the above definition of the Target Population.

**Specific Provisions**

**31.** Bridge Funding and the Georgia Housing Voucher Program ("GHVP") are specific types of housing assistance that may include the provision of security deposits, household necessities, living expenses, and other supports during the time needed for a person to become eligible and receive federal disability or other supplemental income.

DBHDD has consistently defined these resources as described above. Where appropriate, individuals have transferred from the Georgia Housing Voucher Program to other sources of funding. DBHDD's expertise in this regard has helped to maximize the use of housing resources.

**32.** By June 30, 2016, the State shall provide Bridge Funding for at least an additional 300 individuals in the Target Population.

DBHDD complied with this requirement in a timely manner and exceeded the numerical obligation.

**33.** By June 30, 2017, the State shall provide Bridge Funding for at least an additional 300 individuals in the Target Population.

Bridge Funding was provided to 1,094 participants in FY17, which is a 13% increase over FY16 and well above the requirement in the Extension Agreement of "an additional 300 individuals in the Target Population by June 30, 2017." The average "bridge" cost per participant is $2,521.54. Furnishings and first and last month rent account for 45% of this cost and provider fees account for 21%. The remaining funds (33%) were allocated for household items, food, transportation, medication,

moving expenses, utility and security deposits and other expenses.   Expenses in categories in remaining funds saw a 6% increase in the past year.

**34.** By June 30, 2016, the State shall provide GHVP vouchers for an additional 358 individuals in the Target Population.

DBHDD complied with this requirement in a timely manner and exceeded the numerical obligation.

**35.** By June 30, 2017, the State shall provide GHVP vouchers for at least an additional 275 individuals in the Target Population.

The Settlement and Extension Agreements require the State to provide Supported Housing to all members of the Target Population in need of Supported Housing; the Settlement and Extension Agreements estimate this number to be about 9,000 people. In addition, the Settlement Agreement specifies that 2,000 individuals who are otherwise ineligible for housing benefits be provided with Supported Housing. Below is a chart depicting DBHDD's progress on providing GHVP vouchers since June 30, 2015.

Individuals are continuously looking for and vacating housing. Housing compliance is measured by:  1.) those individuals who had a "notice to proceed"[9] to look for housing and  are in "active search"; 2.) those individuals with signed leases; and 3.) those individuals who moved into a rental unit.  The number of individuals with a notice to proceed on June 30, 2017 was 360 and the number of individuals with a signed lease on June 30, 2017 was 2,432.  The total number of units that had been filled since the inception of the program was 4,342; an increase of 861 individuals who moved into housing over the previous year.

| GHVP Assistance | June 30, 2015 | June 30, 2016 | June 30, 2017 |
|---|---|---|---|
| Individuals with a Notice to Proceed | 236 | 321 | 360 |
| Individuals with a signed lease | 1,623 | 1,924 | 2,432 |
| Total # of Individuals placed in housing with a GHV[10] | 2,428 | 3,020 | 4,054 |

The Parties are working together on an agreed-upon approach on how the State will assess for and link to Supported Housing for all members of the Target Population. The Independent Reviewer will report on this approach and its implementation in her next Report.

---

[9] Term used by DBHDD to indicate individuals who are approved to search for housing.
[10] Total number of individuals who have received a voucher and moved into housing with a GHV including those who have moved in but then exited housing since program inception in 2011.

**36.** Supported Housing is assistance, including psychosocial supports, provided to persons with SPMI to assist them in attaining and maintaining safe and affordable housing and support their integration into the community. Supported Housing includes integrated permanent housing with tenancy rights, linked with flexible community-based services that are available to consumers when they need them, but are not mandated as a condition of tenancy. Supported Housing is available to anyone in the Target Population, even if he or she is not receiving services through DBHDD.

DBHDD has consistently complied with this definition of Supported Housing. However, at this time, it is not evident that Supported Housing is available to anyone in the Target Population, even if he/she is not receiving services through DBHDD.

**37.** Supported Housing includes scattered-site housing as well as apartments clustered in a single building. Under this Extension Agreement, the State shall continue to provide at least 50% of Supported Housing units in scattered-site housing, which requires that no more than 20% of units in one building, or no more than two units in one building (whichever is greater), may be used to provide Supported Housing.

The Settlement Agreement requires that Supported Housing include scattered-site housing as well as apartments clustered in a single building.

"By July 1, 2015, 50% of Supported Housing units shall be provided in scattered-site housing, which requires that no more than 30% of the units in one building, or no more than two units in one building (whichever is greater), may be used to provide Supported Housing under this Agreement. Personal care homes shall not qualify as scattered site housing."[11]

DBHDD reported on June 15, 2017 that 87% of housing was scattered site (2,029/2323), 37% above the minimum standard. Further evidence for scattered site is in the DBHDD report on total numbers of locations and property owners involved in the program. New 811 PRA, HCV (preference) programs are scattered site as well. Personal care homes have never been used for GHVP. A May 2016 Scattered Site Survey provided by DBHDD identified 90% of the units to be scattered site. (There have been numerous site visits conducted by the Independent Reviewer and Ms. Knisley in order to confirm DBHDD's use of scattered-site housing.)

The State continues to be in compliance with the scattered site requirement.

**38.** Under this Extension Agreement, by June 30, 2018, the State will have capacity to provide Supported Housing to any of the individuals in the Target Population who have an assessed need for such support.

---

[11] Georgia Settlement Agreement, Section III.B.2.c.i.(B)

Based on all information available to the Independent Reviewer and her consultants, without substantial change to DBHDD's current approach, it is difficult to see how the Agreement's requirements for access to Supported Housing for all members of the Target Population can be met in the time remaining for implementation of the Agreement. There continues to be inadequate outreach to jails, prisons, shelters and emergency rooms and the lack of a targeted approach to assist those with frequent admissions to State Hospitals obtain Supported Housing.

> **39.** Between the Effective Date of this Extension Agreement and June 30, 2018, the State shall continue to build capacity to provide Supported Housing by implementing a Memorandum of Agreement between DBHDD and the Georgia Department of Community Affairs, which includes the following components:

DBHDD has a signed Memorandum of Agreement with the DCA.

> **39.a.** A unified referral strategy (including education and outreach to providers, stakeholders, and individuals in the Target Population) regarding housing options at the point of referral;

The first task is to establish a unified referral strategy between the agencies regarding access to housing options at the point of the referral.  The goals of the process are: (1) to make the Georgia Housing Voucher Program (GHVP) housing of last resort; (2) reduce the processing times and waiting times in the various systems; (3) track and measure progress; and (4) customize online referral mechanisms and features and screens for programs.

The two agencies have been in continuous discussion and are poised to rollout the DCA-DBHDD Joint Referral Process on October 1, 2017.  DCA was tasked with supplementing DBHDD housing trainings and Transition Coordinators.  In June and July 2017, DCA taught full day trainings in Macon, Savannah and Marietta.  One hundred and eighty one individuals attended.  The training was focused on advocacy with landlords, fair housing and an overview of federal programs.  The training also covered the DCA-DBHDD MOA and shift to using GHVP vouchers after other options have been ruled out.  This training was considered a pre-requisite to two trainings to be held in August and September 2017 covering HCV and eligibility review on each housing program offered or managed by DCA.

The basics of the process are for: 1) DBHDD and provider agencies to complete the individual supported housing assessment online; 2) make housing referral to DCA online; 3) DCA to decipher matches and to match an individual with an 811 PRA unit then the DCA HCV with last match being to a GHVP.  This process has the benefit of utilizing federal resources before State resources, thus maximizing capacity.  This was one of the original Settlement Agreement goals.  The timeframe, from start to GHVP issuance, if a GHV has to be used, could be as short as five weeks.  This can

happen if necessary information is available.  It is important to continue to work on shortening the timeframe to reduce continued homelessness or losing touch with individuals who are continuously moving around.  Service providers also will be asked to request Shelter Plus Care, VASH or HOPWA resources.  Discussions are underway regarding these resources.

> **39.b.** A statewide determination of need for Supported Housing, including developing a tool to assess need, forming an advisory committee to oversee the needs assessment, developing a curriculum to train assessors, training and certifying assessors, and analyzing and reporting statewide data;

The Extension Agreement spells out basic requirements for the determination of need, including developing a tool to assess need, forming an advisory committee to oversee the needs assessment, developing a curriculum to train assessors, training and certifying assessors, and analyzing and reporting statewide data.

Both this review and previous reviews of this process indicate that the process is in place.  However, it falls short of identifying need because of a lack of systemic outreach to all members of the Target Population, including those individuals with SPMI in jails, prison, shelters, and emergency rooms.

> **39.c.** Maximization of the Georgia Housing Voucher Program;

As referenced previously, DCA and DBHDD are making progress on maximizing the GHVP, making it the option to be used for a subsidy when the individual does not qualify for another type of rental subsidy or none is available in the location where the individual desires to live.  Both agencies are to be commended for their work on this critically important requirement.  The sustainability and growth of the program is largely reliant on maximizing the GHVP.

> **39.d.** Housing choice voucher tenant selection preferences (granted by the U.S. Department of Housing and Urban Development);

 HUD has extended the preference through the life of the Agreement.  DCA is responsible for and will maintain contact with HUD on this issue as needed. DCA expects to shift a significant number of individuals onto HCV as their GHVP leases expire in the coming year.

> **39.e.** Effective utilization of available housing resources (such as Section 811 and public housing authorities);

Utilization of available resources has also been included in this review and will occur again in FY18.

> **39.f.** Coordination of available state resources and state agencies.

Greater focus should be on coordination with criminal justice organizations and hospitals, especially those with emergency rooms where a large number of the individuals in the Target Population are seen. This should be a priority for the coming year. The Parties' negotiations on an agreed-upon approach may address outstanding issues here.

Overall, it appears the two agencies have worked closely together to implement their Agreement. A liaison position has been created and filled to focus on these cross-agency tasks. This coming year will be pivotal as the two agencies implement the joint referral strategy and expand capacity.

> **40.** The State shall implement procedures that enable individuals with SPMI in the Target Population to be referred to Supported Housing if the need is identified at the time of discharge from a State Hospital, jail, prison, emergency room, or homeless shelter.

As referenced earlier in this Report, the procedures that are currently in place are not as effective as needed in order to ensure compliance with this Provision. These procedures continue to be under extensive review.

The following recommendations are offered for consideration:

1. GHVP and Bridge Subsidy Program: The State continues to meet its obligation for the Bridge Subsidy program. In FY16, a recommendation was made that reporting of prior residential status, housing stability re-engagement and turnover be used for all rental programs, be collected and reported using the same data points and definitions. The Extension Agreement is requiring that a unified referral strategy be adopted across rental programs, making it more feasible to collect and report these data. This recommendation is made again this year.

2. Capacity Building: The State is required to have capacity to provide Supported Housing to individuals in the Target Population who have an assessed need for such support. The State is making good progress on expanding housing capacity. There are both opportunities and challenges to expanding and maintaining capacity. DCA and DBHDD should continue to explore opportunities with local partners to build capacity. The DCA-DBHDD partnership requirement set forth in the Extension Agreement is on track and with plans underway that should enable the State to meet these requirements by the end of FY18. Executing the need referral process as required and maximizing the use of HCV Preference subsidies are significant undertakings and will be monitored in FY18.

3. Assessing Need and providing access to Supported Housing: The first and perhaps most immediate challenge is to ensure that referral arrangements are made for individuals whose need for Supported Housing can be assessed. In addition, for individuals who choose Supported Housing, supporting their

integration and providing assistance to them to attain housing is essential. This includes establishing the referral and needs assessment arrangements with all jails, prisons, homeless shelters, emergency rooms and for individuals frequently admitted to State hospitals.

The second challenge is making improvements in the needs assessment process to ensure the process can be done in a timely manner and making a referral from jails, prisons, emergency room or hospitals possible.

The third challenge is not relying on PATH to be the primary provider for referrals of individuals exiting State Hospitals, shelters and other locations. PATH is meant to be providing assertive outreach and support; early provider engagement is essential for PATH to be successful. A high priority for this approach will be the Atlanta metro region where more affordable, safe, decent rental capacity is needed. With additional permanent housing being made available, there will an opportunity for DBHDD to increase best practice "housing first" service capacity if the system can be improved.

In conclusion, this extension period provides the opportunity for the State to meet its housing choice and access obligations for the Target Population, furthering efforts underway to create more Supported Housing resources and building an even firmer Supported Housing foundation for the future. To be successful, though, in assisting this Target Population to live in the most integrated restorative settings possible, the State can't simply grow the system it has created, it must change it. The needs process is flawed and will need to be changed so that individuals in all the target sub-populations have access to housing.

Unless the changes referenced in this Report can occur quickly, it is unlikely the State can meet its obligations for Supported Housing. Findings will be included in the next Independent Reviewer's Report and will be critical to compliance with the Supported Housing provisions in the Extension Agreement.

## CONCLUDING COMMENTS AND RECOMMENDATIONS

There is no doubt that the State continues to make serious efforts to reform its community-based system of supports for individuals who are institutionalized or at risk of institutionalization. The Commissioners of both DBHDD and DCH, the signatories to the Settlement Agreement, have been consistent in stating their firm convictions that structural changes are required if the opportunities for meaningful community integration are to be realized for individuals included in the Target Populations. Over the years, the Governor and the Legislature have approved substantial levels of funding in order to effectuate the necessary services and supports.

There has been evidence of clear progress in establishing stronger transition processes and protocols. As a result, recent community placements for individuals with DD are better planned and, with few exceptions, more successfully accomplished.   There are positive outcomes for individuals who now live in community-based settings, even after years of institutional confinement.   It is expected that these outcomes will be enhanced as more opportunities for supported employment and meaningful community experiences are realized.

Individuals with DD and forensic histories have not been excluded from community residential settings. In fact, the inclusion of individuals with forensic histories has been one of the most commendable aspects of the State's transition efforts.

Although there is still important work to be done, the safeguards for individuals with DD who live in community settings are being strengthened. One of the most critical safeguards, Support Coordination, is being redesigned. The observations and interviews documented during the site visits demonstrate some very solid knowledge and performance competencies in the field. This is not uniform but there is evidence that it can be accomplished with time and enhanced oversight.

The Georgia Housing Voucher Program has been an exemplary program throughout the course of the Settlement Agreement. There are now 2432 individuals with SPMI who have signed leases, so they can live in their own homes with support. The measures for scattered sites in integrated apartment complexes or neighborhoods have exceeded the requirements of the Settlement Agreement.

The inter-agency collaboration related to the expansion of Supported Housing options has been evident since the beginning of the Settlement Agreement and is being reinforced through implementation of the Memorandum of Agreement.

This is not meant to be an exhaustive list. Rather, it is intended to reiterate some of the major shifts in policy and practice that have occurred under the aegis of the Settlement Agreement.

Nonetheless, there are a host of outstanding issues of great concern yet to be resolved. Over 350 people with DD remain in State Hospitals who can and should be moved to the community. Individuals with complex conditions, both health and behavioral, too often receive inadequate community services to meet their needs. This is true in spite of the presence of Intensive Support Coordinators, the ICST, and quality assurance initiatives and technical assistance provided by DBHDD at the central and regional levels, all of which operate with ongoing challenges. People with SPMI in need of Supported Housing are not getting it, for a number of reasons, including inadequate assessment and linkage activities at the State Hospitals, hospital emergency rooms, jails, prisons, and for people who are chronically homeless. There are also ongoing problems with ACT services, including early graduation from the service before the individual's needs are addressed. All this, and yet the time envisioned for the completion of the State's obligations under the Settlement Agreement and its Extension is now less than ten months away. In discussions with the Parties and the Amici, it has been repeatedly emphasized that time truly is of the essence. Unless the next Report prepared for the Court can document clear evidence of progress related to the Provisions below, it is difficult to know how substantial compliance can be achieved by June 30, 2018.

As discussed in this Report, there remain critical shortcomings in the status of compliance efforts with regard to Settlement and Extension Agreement Provisions; this includes, but is not limited, to these Extension Agreement Provisions:

> **7.** Between July 1, 2016 and June 30, 2018, the State shall create and regularly update a planning list for prioritizing transitions of the remaining persons with DD in the care of State Hospitals for whom a community placement is the most integrated setting appropriate to his or her needs. **The State shall transition individuals on the list to the community at a reasonable pace.** The State shall provide COMP waivers to accomplish these transitions.

> **13.** The State shall operate a system that provides the needed services and supports to individuals with DD in the community through a network of contracted community providers overseen and monitored by the State or its agents. **To identify, assess, monitor, and stabilize individuals with DD in the community who face a heightened level of risk due to the complexity of their medical or behavioral needs and/or their community providers' inability to meet those needs, the State shall** maintain a High Risk Surveillance List as set forth in Paragraph 14, **provide statewide clinical oversight as set forth in Paragraph 15, and administer support coordination as set forth in Paragraph 16.**

> **15.a.** The State shall implement statewide clinical oversight that is available **in all regions** to minimize risks to individuals with DD in the community who face a heightened level of risk due to the complexity of their medical or behavioral needs, as indicated by one or more of the circumstances listed in

Paragraph 14.b. (i)-(iv) above. This includes multidisciplinary assessment, monitoring, training, technical assistance, and mobile response to contracted providers and support coordinators who provide care and treatment to individuals with DD in the community.

**16.a.** No later than July 1, 2016, the State shall revise and implement the roles and responsibilities of support coordinators, and the State shall oversee and monitor that support coordinators develop individual support plans, monitor the implementation of the plans, recognize the individual's needs and risks (if any), promote community integration, and respond by referring, directly linking, or advocating for resources to assist the individual in gaining access to needed services and supports.

**16.c.** At least annually, the State shall consider the data collected by support coordinators in the tool and assess the performance of the support coordination agencies in each of the areas set forth in Paragraph 16.a.

**16.e.** The caseload for support coordinators shall be a maximum of 40 individuals. The caseload for intensive support coordinators shall be a maximum of 20 individuals.

**17.a.** Crisis respite homes provide short-term crisis services in a residential setting of no more than four people.

**18.** Within six months of the Effective Date of this Extension Agreement, the State shall develop and implement a strategic plan for provider recruitment and development that is based on the needs of individuals with DD in the State Hospitals and in the community. The plan shall identify the service capacity needed to support individuals with DD and complex needs in community settings. The plan shall take into account services and supports that promote successful transitions and community integration. **The State shall use the plan to identify and recruit providers who can support individuals with DD and complex needs in community settings.**

**20.** The State shall implement an **effective** process for reporting, investigating, and addressing deaths and critical incidents involving alleged criminal acts, abuse or neglect, negligent or deficient conduct by a community provider, or serious injuries to an individual.

**24.** The State shall collect and review its data regarding deaths of individuals with DD in the community to identify systemic, regional, and provider-level trends, if any. The State shall consider its mortality data, publicly available national mortality data, and recommendations from the CMRC. The State shall develop and implement quality improvement initiatives, including those to reduce mortality rates for individuals with DD in the community, as determined by the State from its assessment of mortality data and trends.

**36.** Supported Housing is assistance, including psychosocial supports, provided to persons with SPMI to assist them in attaining and maintaining safe and affordable housing and support their integration into the community. Supported Housing includes integrated permanent housing with tenancy rights, linked with flexible community-based services that are available to consumers when they need them, but are not mandated as a condition of tenancy. **Supported Housing is available to anyone in the Target Population, even if he or she is not receiving services through DBHDD.**

**38.** Under this Extension Agreement, by June 30, 2018, the State will have capacity to provide Supported Housing to any of the individuals in the Target Population who have an assessed need for such support.

**40.** The State shall implement procedures that enable individuals with SPMI in the Target Population to be referred to Supported Housing **if the need is identified at the time of discharge from a State Hospital, jail, prison, emergency room, or homeless shelter.**

The recommendations summarized below were included in the Independent Reviewer's previous Report to the Court. Based on information gathered, through multiple sources, it continues to be strongly recommended that the State concentrate additional efforts and resources to accomplish the following prior to the next Report to the Court:

1) Develop and implement a plan to place all persons with DD into community settings from Gracewood and any other institutional setting; the current pace of placement will not enable such placement within the timeframe envisioned in the Extension.

2) In collaboration with the Department of Justice and the Independent Reviewer, with input from the Amici, examine the process for the High Risk Surveillance List.. The State needs to ensure the effectiveness of its High Risk Surveillance List program with evidence that poor outcomes have decreased over time and have been minimized.

3) Ensure the effectiveness of the State's Intensive Support Coordination system with evidence that poor outcomes have decreased over time and have been minimized as a result of Intensive Support Coordination involvement.

4) Ensure the effectiveness of the State's Integrated Clinical Support System with evidence that poor outcomes have decreased over time and have been minimized as a result of Integrated Clinical Support System involvement. Timeframes should be established for the completion of all requested

assessments and clinical interventions. There should be stronger oversight of implementation.

5) Ensure that people with DD are participating in day activities in the most integrated community setting that supports each person's growth and development; day activities include employment in the community whenever appropriate.  The Transition Fidelity Committee should require more detail about the day program settings and supports planned for individuals with DD leaving the State Hospitals.

6) Ensure that there is <u>informed</u> consent for the administration of psychotropic medications. There were findings in the review of individuals with DD that informed consent is not present. This violation of acceptable practice has been cited every year that the Settlement Agreement has been in effect. It needs to be resolved.

7) If the Provisions regarding Housing with Supports for individuals with SPMI are to reach compliance, there must be a detailed examination of the lack of timely referrals from State Hospitals, emergency rooms, jails and prisons. Without prompt and additional remedial actions, it is not clear that the State can comply with the requirements of Provisions 36, 38 and 40 requiring access to Housing with Supports for all members of the Target Population.

8) Ensure that each ACT Team is providing effective ACT services at or near each Team's capacity whenever needed in that Region.  The State should assess and outline a plan to address the need for additional ACT Teams in Regions where ACT utilization is at or near ACT capacity and there are high readmission rates to State Hospitals in that Region.  The State should continue to ensure the effectiveness of its ACT program with evidence that poor outcomes have decreased over time and have been minimized.  As part of its review of fidelity to the Dartmouth Assertive Community Treatment (DACT) model, the Department should examine the turnover in the caseloads of the ACT Teams to determine whether there are resource constraints that are causing the high turnover rates and whether individuals terminated from ACT continue to receive the supports essential for their stabilization and well-being.

9) DBHDD should review and revise the protocols and practices related to discharge planning so that individuals leaving the State Hospital have sufficient time and opportunity to be linked to Supported Housing and any other necessary community-based resources. This is especially important in the greater Atlanta metropolitan area with its high level of demand for mental health services.

10) DBHDD should ensure and document the effectiveness of its mortality review program with evidence that preventable deaths have decreased over time

and have been minimized as a result of the implementation of measures to address individual or systemic recommendations from the Mortality Review Committee.

The purpose of these recommendations is to ensure a strong focus on <u>documented outcomes.</u> Such focus will confirm the State's ability to fully assess need and to design and implement supports that maximize skill development/retention, ensure health and safety and enable meaningful participation in integrated community-based settings.

Submitted By:

_____/s/_____

Elizabeth Jones, Independent Reviewer
September 25, 2017

**ATTACHMENT ONE: CONSULTANT REPORTS**