# EXHIBIT A

**REPORT OF THE INDEPENDENT REVIEWER**

**In The Matter Of**

**<u>United States v. Georgia</u>**

**Civil Action No. 1:10-CV-249-CAP**

**Individuals with DD at Heightened Risk**

October 4, 2021

**Introductory Comments**

For the first time since the onset of the pandemic, it has been possible to return to Georgia in order to complete fieldwork and on-site observation. However, the timing and scope of the site visits has remained limited. As a result, for this report to the Court, a carefully considered decision was made to concentrate monitoring efforts on those individuals with a developmental disability (DD) who have been determined to be at heightened risk due to medical, behavioral, or legal issues.

Three groups of individuals were selected for review: 1) individuals included on the High Risk Surveillance List; 2) individuals included on the Statewide Clinical Oversight List; and 3) individuals who have experienced lengthy stays in crisis respite homes.

A total of 34 men and women were reviewed for this report. The importance of the Settlement and Extension Agreements' obligations regarding people with DD at heightened risk and the findings from this set of reviews will lead to a similar set of reviews for the next report in Spring 2022.

The specific findings related to each person in the current sample have been shared with the Parties. The Department of Behavioral Health and Developmental Disabilities (DBHDD), the agency responsible for the services and supports to people included in the Agreements' targeted populations, was given the opportunity to discuss with the Independent Reviewer and her nurse consultants each of the individual reviews prior to the filing of this report with the Court.

<u>Requirements of the Settlement Agreement and its Extension Agreement</u>

The Extension Agreement, in particular, is focused on providing needed services and supports to vulnerable people with DD in the community. It has specific requirements related to: a) the safe and effective transition from a State Hospital to a community placement, b) the monitoring of individuals at heightened risk in the community, c) the clinical and programmatic interventions to be provided in a timely manner whenever risk is identified, and d) the investigation of deaths and serious reportable incidents and the implementation of corrective actions in response to deficiency findings related to mortality, along with implementation of quality improvement initiatives to reduce mortality rates for individuals with DD.

For this report, the emphasis was on the following Paragraphs included in the Extension Agreement:

Paragraph 13:  The State shall operate a system that provides the needed services and supports to individuals with DD in the community through a network of contracted community providers overseen and monitored by the State or its agents. To identify, assess, monitor, and stabilize individuals in the community who face a heightened level of risk due to the complexity of their medical or behavioral needs and/or their community providers' inability to meet those needs, the State shall maintain a High Risk Surveillance

1

List (the "List") as set forth in Paragraph 14, provide statewide clinical oversight as set forth in Paragraph 15, and administer support coordination as set forth in Paragraph 16.

Paragraph 14: The State shall maintain a High Risk Surveillance List that includes all individuals with DD who have transitioned from the State Hospitals to the community during the term of the Settlement Agreement and this Extension Agreement.

Paragraph 14.c. For each individual on the List designated as "High Risk," the State shall conduct the needed oversight and intervention in a timely manner (as outlined in detail in the Extension Agreement) until the risk is resolved.

Paragraph 15.a. The State shall implement statewide clinical oversight that is available in all regions in a timely manner to minimize risks to individuals with DD in the community who face a heightened level of risk due to the complexity of their medical or behavioral needs, as indicated by one or more of the circumstances set out in more detail in the Extension Agreement. This includes multidisciplinary assessment, monitoring, training, technical assistance, and mobile response to contracted providers and support coordinators who provide care and treatment to individuals with DD in the community.

Paragraph 17. a. Crisis respite homes are to provide **short-term** crisis services in a residential setting of no more than four people.

Although Support Coordinators were contacted for the majority of the individual reviews, a comprehensive assessment of support coordination, as set forth in Paragraph 16, was not undertaken.

As discussed in the narrative below, there are troubling findings about the care, treatment and protection from harm documented for certain individuals reviewed for this report. These findings are presented with the sincere desire to assist the State to reach compliance with its obligations and to successfully implement the Parties' stated intent that "the principle of self-determination is honored and that the goals of community integration, appropriate planning and services to support individuals at risk of institutionalization are achieved." (SA, I. K.)

## Summary of Findings

The State has not met the obligations of Paragraph 13. Serious deficits in the identification of risk, the implementation of preventive and remedial interventions, and the intensity of monitoring and oversight were documented through on-site observations, interviews with staff, support coordinators and families, and the review of clinical records and reports.

The efforts required to conduct a thorough independent review of individuals at risk for this report were complicated by a number of unanticipated factors:

1. Although the High Risk Surveillance List, as well as the Statewide Clinical Oversight List, and associated protocols, were completed in compliance with the 2017 timeline in the Extension Agreement, there has been no training on these protocols since 2017. As a result, none of the staff interviewed in a residential setting or in the crisis homes knew about the protocols, the Lists, or whether the individuals under their responsibility were designated with heightened risk. Only one Support Coordinator knew of the Lists or the protocol. As a result of this knowledge gap in the field, there was no understanding of the reporting requirements or sequential actions required by the Agreements.

2. Reporting of critical incidents was not consistent with the requirements of the Extension Agreement. For example, according to the Agreement, in an "emergency," providers are to notify the Support Coordinator, the field office, and the Office of Health and Wellness. In practice, however, staff at the residence simply completed a Critical Incident Report (CIR) and someone else submitted it within 24 hours per the parameters of DBHDD policy. Furthermore, although staff in provider agencies typically understood the requirement to contact the Support Coordinator, they were not aware that they were also to notify the Field Office or the Office of Health and Wellness. The notification of those two Offices was reported to happen electronically when the CIR was filed. Since the staff who complete the CIR do not file it directly, they were generally unaware of when it was filed. Moreover, they were unaware of any immediate next steps or any corrective actions that would be implemented unless informed promptly by their supervisor. These gaps in communication and notification are counter to the letter and spirit of the Extension Agreement.

3. With limited exceptions, staff working directly with the individuals at risk did not know who is assigned to the residence from the Field Office or the Office of Health and Wellness. It was incumbent upon the Support Coordinators to notify these Offices when assistance was required. However, according to the Support Coordinators interviewed for this report, nurses from the Field Office or the Office of Health and Wellness seldom complete in-person assessments of individuals in the community residences. If there are questions that arise from a CIR, they email the Support Coordinator to obtain information but they do not conduct an assessment.

4. The typical documentation maintained in the community residences did not include notes regarding the involvement of the Field Office or the Office of Health and Wellness. This information should be noted in the records at the residences. As a result, there is little or no evidence in the residences that the sequential steps and actions required by Paragraphs 14 and 15 were, in fact, implemented in a timely or comprehensive manner. Therefore, in order to make any conclusive determination about these responses, future monitoring will include requests for interviews with and documentation from the Field Office and the Office of Health and Wellness. It is not possible to evaluate this set of requirements by reviewing only the documentation kept by the provider agency staff or the Support Coordinator.

5. Throughout the course of the Agreements, it has been recommended that DBHDD ensure that the individual's records are transferred with him/her when provider agencies are changed. During this review, one man, who experienced abuse, was transferred from one residence to another without any of his records or assessments. This was particularly unfortunate because he arrived at his new residence with anecdotal reports of weight loss that could not be verified. It is generally accepted practice that an individual's records and belongings are secured by the state agency before releasing them to the new provider. The records belong to the person.

Despite the frustrating procedural and process problems referenced above, the individual reviews by the two nurse consultants and the Board Certified Behavior Analyst (BCBA) retained by the Independent Reviewer were able to evaluate the health or behavioral status and clinical oversight of 14 people on the High Risk Surveillance List; 8 people on the Statewide Clinical Oversight List; and 12 people with lengths of stay greater than 30 days in a crisis respite home. A summary of the findings for each person is included below.

High Risk Surveillance (HRS) List

All of the individuals who were transitioned from a State Hospital under the terms of the Agreements are included in the HRS List. DBHDD considers all of these people to be at heightened risk. For example, the List relied on for this report, referencing May 2021, included 442 individuals. However, only a much smaller set of incidents related to these individuals is actually highlighted in each of the monthly reports provided by DBHDD. (The May 2021 List highlighted incidents for only 37 individuals.) Individuals included in the highlighted subset are categorized separately by their medical or behavioral issues. Individuals who may have both medical and behavioral issues are not identified in both categories. Such separation is unwarranted and misguided because an individual's medical and behavioral concerns often intersect and must be looked at together when developing the clinical interventions required for proper treatment and the resolution of risks.

As stated above, the May 2021 HRS List was used to select the individuals reviewed for this report. None of these men and women were known to the Independent Reviewer or her nurse consultants. There were no preconceived ideas or expectations about their living situation, their staffing or their clinical supports.

The information summarized below is drawn from the Monitoring Questionnaires completed for each person. The nurse consultants conducting the reviews evaluated the interventions addressing emergencies or an individual's deteriorating health status in order to assess compliance with the obligations of both EA 13 and 14.c. In certain cases, the provider agency was working diligently and appropriately to address health-related risks, but even in those instances, additional resources were required and were not available through DBHDD. In those instances, there is a different finding for EA 13 and EA 14.c.

**Table 1**

**Summary of Individual Findings**
**High Risk Surveillance List**

| Name | Compliance with EA13 | Compliance with EA14c | Compliance with EA15c | Summary of Findings |
|---|---|---|---|---|
| PC | Yes | Yes | NA | After PC and all of his housemates were infected with the flu, PC was taken to the ER for treatment of dehydration despite efforts by residential staff. Nursing support in place. BSP in effect and being updated now. |
| RC | Yes | Yes | NA | RC is nonverbal. Positive communication strategies have been developed by staff so he can indicate needs. His insulin dependent diabetes is stable. |
| AC | Yes | Yes | NA | AC's behavioral risks have been addressed. Her seizures are properly monitored. |
| JD | No | No | NA | The current provider indicated that when JD came to this home from a previous provider, all of his belongings were in one small garbage bag. The clothing was stained and his one pair of shoes could not be worn. He complained of headaches and toothaches. He had not received dental care for several years and it was determined that he needed his teeth extracted, which was done. Until moving into his present home, it does not appear that his needs were met. In addition, he continues to be verbally aggressive/abusive towards his Host Home providers and his housemate. Yet, he does not have a BSP. |

| | | | | |
|---|---|---|---|---|
| MF | No | No | NA | There was a poor transition to his new host home on 3/5/21. Nursing assessment completed on 3/10/21 recommended nursing services. The Host Home provider stated that nursing services were not initiated until three months later (6/21). Last dental exam was in 11/19 and did not include prophylactic care. Although a BSP was reported to have been in effect with the previous provider, it did not transfer to this Host Home. A new BSP was only received by the Host Home provider on 8/5/21—five months after MF's transfer to his current residence. |
| EH | Yes | Yes | NA | There is strong provider support for EH. Proactive clinical services have been implemented to address his health risks. |
| GH | No | Yes | NA | There is serious behavioral risk with his declining health and aspiration risk. His provider is attentive but the extent of monitoring from DBHDD appears to be inadequate. Although documentation of nursing oversight was provided by DBHDD, there were no details provided regarding outcomes. Poor oral hygiene was identified on 6/9/21 but nursing note simply states that GH is "behind" for a dental exam. There was no entry regarding the hospitalization on 5/7/20 due to a bowel blockage. Ongoing risks of glaucoma, rectal bleeding and aspiration were identified but not fully addressed. |

| | | | | |
|---|---|---|---|---|
| SH | Yes | Yes | NA | SH's fall risks have been addressed. |
| BJ | No | No | NA | BJ is at heightened risk with 4 of 5 "Fatal Five+" medical conditions. He was hospitalized for 35 days in 7/20 with serious weight loss and decubiti. Questions remain regarding oversight by DBHDD while hospitalized from 7/13/20 to 8/20/20. His last dental assessment was 9/13/18. |
| LJ | No | No | NA | Abuse was substantiated at his previous placement. DBHDD took 14 months to move LJ to a new placement where his needs could be met. Just after the site visit for this report, he was hospitalized for a urinary tract infection and refusal to eat. He was moved to hospice care on 9/17/21. LJ died on 10/2/21. |
| IK | No | No | NA | IK has been declining for 6 months with repeated falls. Records provided by DBHDD after the site visit do not document clinical oversight. Written plans of care note oversight of neurologic condition and mobility, but there are no actual notes that document the registered nurse's findings, planned actions and collaboration with the medical team, including the PCP's notation that the falls may warrant a cardiac evaluation. There is no written documentation of information shared with the PCP, neurologist or cardiologist. |
| JN | Yes | Yes | NA | There was evidence of good |

| | | | | |
|---|---|---|---|---|
| | | | | follow-up with clinical supports to address her Fatal Five+ symptoms. |
| JT | Yes | Yes | NA | This appears to be a supportive home for JT. The behavioral interventions appear to be effective. JT has stable health. |
| RW | No | No | NA | At the time of our site visit, RW had lived in this home for almost four months. During that time, he has had three major incidents that resulted in police and/or the fire department being called; one incident resulted in injury to staff. The incident reports indicated that there was no BSP available. On 8/25/21, six weeks after the last incident, the Support Coordinator received a revised BSP. With the level of intensity of RW's behavior, it appears that there have not been adequate resources available to ensure that assessments and changes in behavioral strategies are done in a timely manner and are readily available to the staff for consistent implementation. |

<u>Statewide Clinical Oversight (SCO) List</u>

The SCO List is comprised of individuals who are receiving community-based services under the HCBS Waivers. They did not transition from a State Hospital under the terms of the Agreements. Individuals on this List are categorized by medical, behavioral, or legal incidents. The SCO List is issued monthly. Typically, the List is lengthy, with more than 50 pages of names, but only a much smaller subset of incidents for these individuals is highlighted for review.

The same methods as described above for the HRS List were used to select and assess the men and women identified with medical incidents on the SCO List issued in May 2021. None of these individuals were known to the Independent Reviewer or her nurse consultants. There were no preconceived ideas or expectations about their living conditions, their staffing, or their clinical supports.

There were no differences noted in the implementation of intervention strategies or the documentation of information from those used for individuals on the HRS List. As referenced above, none of the residential staff were familiar with either List.

**Table 2**

**Summary of Individual Findings**
**Statewide Clinical Oversight List**

| Name | Compliance with EA13 | Compliance with EA14c | Compliance with EA15c | Summary of Findings |
|---|---|---|---|---|
| LC | Yes | NA | Yes | LC has very positive supports. Her health issues have been addressed. She is employed at Wendy's and has a very active life. |
| JC | Yes | NA | Yes | JC's health was stabilized with support from appropriate medical practitioners. No issues of concern were identified. |
| NH | No | NA | No | NH's host home is excellent but lacks timely assistance from DBHDD. Clinical oversight was documented as provided by DBHDD on 8/8/18, 7/2/20 and 1/8/21. NH's chemotherapy was discontinued in 6/21 due to serious side effects; a malignant lymph node was removed in 7/21. Nursing support was only initiated on 6/25/21. |
| LK | Yes | NA | Yes | LK died the day before the site visit. She lived with her family. There were multiple risks documented in her records. The HSRR was completed timely. The Support Coordinator attempted to support the family but they were guarded and were not receptive to her visits. Details related to LK's death are not fully |

| | | | | |
|---|---|---|---|---|
| | | | | known. |
| GM | No | NA | No | GM experienced serious neglect during his hospitalization/nursing home stays. There was inadequate oversight by DBHDD despite attempts and requests by provider staff. Documentation forwarded by DBHDD following our site visit did not include a plan of care to address his loss of mobility and independence as a result of the neglect he experienced. There is no evidence that any attempt has been made for an evaluation to determine if his bilateral knee and ankle contractions can be corrected, and if not, then to provide him with an appropriately fitted wheelchair that will allow him independence in mobility. |
| TN | No | NA | No | TN requires reassessment of his gastric tube. There is continued risk from pulling out the tube. DBHDD assistance is needed to help the provider obtain clinical resources. The documentation provided by DBHDD only notes that TN failed two swallowing studies. The nature of the studies was not described. Given that TN is able to drink thickened liquids and eat mashed potatoes, a non-instrumental swallowing assessment (as described by the American Speech-Language Hearing Association) should have been considered and recommended. |
| CT | Yes | NA | Yes | There was evidence of strong support in the host home. One:one staffing has been |

| | | | | approved by DBHDD due to her decline from dementia. |
|---|---|---|---|---|
| MW | No | NA | Yes | Appropriate clinical oversight was not provided by DBHDD despite lengthy hospitalization for COVID-19, leading to serious adverse health consequences that had nothing to do with the virus. The residential provider has been attempting to address injuries from lack of care in the hospital. |

**Discussion of Findings**

This initial review of 23 individuals selected from the HRS and SCO Lists raises a number of questions regarding the clinical resources and interventions available and/or implemented to prevent/minimize health risks and address adverse outcomes.

Based on the findings documented in each review, the following concerns should be analyzed and addressed:

1. Residential providers expressed that they needed, but were not getting, both additional clinical resources, including those in areas of specialization, as well as timely assistance in securing such resources. Paragraphs 15.e. and f. of the Extension Agreement required that the State shall have medical and clinical staff available to consult with community health practitioners, including primary care physicians, dentists, hospitals, emergency rooms, or other clinical specialists, who are treating individuals with DD in the community who face a heightened risk due to the complexity of their medical or behavioral needs and/or to provide assistance to community providers and Support Coordinators who report difficulty accessing or receiving services from community health practitioners. There are not yet sufficient resources statewide to meet this obligation. The model of clinical support developed with practitioners from Southwestern State Hospital has merit, but it has not been replicated elsewhere in the state. The broader availability of such knowledge, expertise and responsiveness would greatly strengthen community-based capacity in other areas of the state.

2. As reported, residential staff do not know about the HRS List, the SCO List, the action or notification requirements of the Extension Agreement, or the protocols to be implemented in emergencies or situations of deteriorating health. They do not know that the person under their responsibility has been determined to be of heightened risk according to the requirements of the Extension Agreement. This lack of awareness and understanding should be addressed. Any concerns about the availability of

clinical guidance from the Field Offices or the Office of Health and Wellness should be considered and resolved.

3. DBHDD should ensure that the HRST score is documented for every individual, especially those at heightened risk. The current HRST score could not be located in the records for eight (36%) of the individuals reviewed.

4. One residential provider failed to safely and responsibly transition an individual to another community provider. The lack of adequate preparation and the withholding of important documents, including health records, created stress on the new provider agency and imperiled the individual in an unacceptable manner.

5. The staff of the residential agencies who provide effective, individualized and responsive interventions to protect the health and safety of the men and women with heightened risk under their care and responsibility should be recognized and commended. Of particular note, the host home providers interviewed for this report demonstrated exceptional understanding and commitment.

6. Extended hospitalization or nursing home stays present serious risk for individuals with DD, especially if they are unable to speak for themselves. Although the pandemic has certainly created challenges for oversight, nonetheless, strategies and resources need to be implemented to prevent the risk of harm and to stop the risk if it begins to occur. Two of the men in this sample were seriously compromised, and have not fully recovered, as a result of their confinement in a hospital and/or nursing home. Although the residential providers attempted to safeguard these men to the best of their ability, additional resources, including someone to stay at the person's bedside, were needed but were not provided.

7. DBHDD should conduct its own investigation of any individual with DD alleged to have experienced poor quality care while placed in a nursing home or community hospital. As referenced in the review of one individual, the investigation completed by the Department of Community Health, a signatory to these Agreements and the agency responsible for the oversight of these facilities, lacked due diligence by failing to interview the complainant, neglecting to consider the health-related consequences endured by the victim, and omitting any investigation of the responsible hospital, despite the inclusion of this facility in the initial complaint.

Crisis Respite Homes

The Settlement Agreement required the development of 12 Crisis Respite Homes (CRHs) of four beds each. The State complied with that obligation. There are 12 homes with a total of 48 crisis beds located across Georgia. The Extension Agreement clarified that each setting should support individuals only on a short-term basis. In addition, Paragraph 17.b. of the Extension Agreement requires that the individuals living in CRHs shall receive additional clinical oversight and intervention, as set forth in Paragraph 15 (the SCO section).

The use of the CRHs for placements greater than 30 days is reported by DBHDD on a monthly basis. The Independent Reviewer and her consultant have monitored this information from the outset. Prior reports by the Independent Reviewer to the Court have emphasized the State's ongoing failure to comply with the expectation of short-term placements. For example, the report to the Court dated September 18, 2020 stated:

> As discussed in previous reports, the barriers to discharge from a CRH continue to be formidable for many of the individuals on the monthly list. These barriers continue to include behavioral management issues and the insufficient number of qualified residential providers with the skills and resources to support individuals with challenging behaviors, often the result of trauma, the lack of stability and the absence of meaningful relationships. Ongoing discussions with advocates, family members, Support Coordinators, clinical professionals and residential providers confirm the inadequacy of supports in the current system.

There has been scant change in these circumstances since the last report. The monthly list submitted in July 2021 documents that 31 crisis beds (65%) are occupied by people with lengths of stay greater than 30 days. In fact, the 12 men and women reviewed for this report (39% of the extended stay group) have CRH admission dates that go as far back as 2018. Two of the men have been readmitted to a CRH after intervention from law enforcement, so their total time in a CRH is significantly longer than is reflected in their present stay.

Attention is again focused on this problem because it demands resolution. All of the people selected for review were evaluated to assess the strength of their behavioral programming. Either the Independent Reviewer (11 visits) or her nurse consultant (one visit) conducted a site visit to each individual's CRH in order to speak directly with staff about the difficulties with placement.[1]

DBHDD provided information about its attempts to secure placements in more integrated community residences. In addition, providers shared, from their perspective, why they declined to become involved. The reasons included: staffing shortages; the lack of additional capacity; the low rate of wages in a competitive market; the maladaptive behaviors of the individuals referred; the lack of support from DBHDD, phrased as "You are on your own;" and the criticism that the mobile crisis teams see the person when called but do not resolve the underlying issues.

The analysis of Behavior Support Plans (BSPs) by the Independent Reviewer's consultant and the numerous reports of critical incidents confirm that placement in a CRH alone does not sufficiently address the underlying and recurring issues associated with the individuals' maladaptive behavior. Police are still called to assist; property is damaged; self-injurious behavior, including pica, continues to occur; aggression is provoked between housemates.

---

[1] One individual currently hospitalized in a State Hospital was also reviewed but is not included in this analysis.

The behavioral consultant retained by the Independent Reviewer to examine the BSPs concluded that:

· All of the individuals reviewed clearly demonstrated a need for formal behavioral programming; however, it was evident that not all individuals who needed access to behavioral programming were currently receiving necessary behavioral supports and services.

· Overall, the majority of BSPs were found to be inadequate. More specifically, only two of the BSPs reviewed had more than half of the minimal elements of generally accepted practice. Overall, behavioral programming did not meet standards of generally accepted practice for most of the individuals reviewed.

More creative and individualized strategies are essential if there is to be a sustainable solution to the longstanding inability to treat and relocate individuals with heightened behavioral risks to more stable and permanent community housing with supports. It is recommended:

1. DBHDD should consider offering financial and other incentives to qualified provider agencies in order to obtain integrated, individualized community placements for those men and women who have been confined to a CRH for extended periods. These incentives should be authorized in order to expand the capacity of the community-based system to work with individuals demonstrating challenging behaviors, such as elopement, pica and aggression. Non-financial incentives could include educational opportunities and other training opportunities that enhance skills and possibly lead to credentialing or certification in a related field.

2. DBHDD should consider expanding the scope of responsibility of selected agencies now managing the CRHs in order to develop more independent apartment settings for those individuals who require familiar staff and a "place of their own." As was done in the early years of the Agreements, Georgia Housing Vouchers could be approved as a rental subsidy for individuals with a dual diagnosis.

3. DBHDD should continue to offer and expand opportunities for training in the development of individualized behavioral plans and supports. Staff in residential settings, including the CRHs, should be asked what could make a difference in their ability to work with people with challenging behaviors.

4. DBHDD should query providers regarding any concerns about the effectiveness of mobile crisis team response and the level of support they require from DBHDD itself.

5. DBHDD should consider replicating statewide the integrated team approach utilized by the clinical staff located on the grounds of Southwestern State Hospital.

## Concluding Comments

The work completed for this report documents for the Court a series of issues that are known but not yet sufficiently addressed. These issues relate to procedure and substance. The Agreements' obligations related to all individuals with DD at heightened risk are dependent on the quality and availability of accessible clinical resources and supports, knowledgeable staff at all levels of responsibility, timely and adequate response to identify and prevent risks, and individualized strategies to remedy any risks that may occur.

The State recently announced its plan to retain a highly experienced consultant to assist it in addressing risk-related factors and strategies for people with DD. It is hoped that the information provided in the Monitoring Questionnaires and in this report will be helpful to that important effort.

As always, the opportunity to discuss this report's findings is important to ensuring accuracy. The Parties were provided a draft copy of this report and their comments and suggestions were carefully considered.

The Commissioner of DBHDD and her staff, the counsel for the Department of Justice and the State, advocates, families and community providers were accessible and generous in their assistance and guidance throughout the fact-finding completed for this report. This cooperation and collaboration is acknowledged and greatly appreciated.


Submitted by:

_____/s/_____
Elizabeth Jones, Independent Reviewer

With consultation from:

Marisa C. Brown, MSN, RN
Julene Hollenbach, RN, BSN, NE-BC
Patrick Heick, PhD, BCBA-D, LABA

**SUMMARY OF DEMOGRAPHICS**

<u>High Risk Surveillance List</u>

1. Number of Individuals: 14

1a. Number of Individuals per Region

       Region 2: 7
       Region 3: 7

2. Age Ranges

       21-30:  0
       31-40:  3
       41-50:  1
       51-60:  5
       61-70:  3
       71-80:  2
       81-90:  0
       91+:    0

3. Gender

       Male:    10
       Female: 4

4. Number of Residential Providers: 12

5. Type of Residence

       Family/Own Home:    0
       Host Home:          2
       Supported Apartment: 0
       Group Home  (CLA): 12
       Crisis Respite Home:  0

<u>Statewide Clinical Oversight List</u>

1. Number of Individuals: 8

1a. Number of Individuals per Region

      Region 1: 1
      Region 2: 6
      Region 3: 1

2. Age Ranges

      21-30:  2
      31-40:  1
      41-50:  1
      51-60:  2
      61-70:  1
      71-80:  1
      81-90:  0
      91+:    0

3. Gender

      Male:    4
      Female: 4

4. Number of Residential Providers: 7

5. Type of Residence

      Family/Own Home:   1
      Host Home:         2
      Supported Apartment:0
      Group Home  (CLA): 5
      Crisis Respite Home:  0

1. Number of Individuals: 12

1a. Number of Individuals per Region

       Region 2: 3
       Region 3: 0
       Region 4: 3
       Region 5: 3
       Region 6: 3

2. Age Ranges

       21-30:  6
       31-40:  5
       41-50:  1
       51-60:  0
       61-70:  0
       71-80:  0
       81-90:  0
       91+:    0

3. Gender

       Male:    8
       Female: 4

4. Number of Residential Providers: 2

5. Type of Residence

       Family/Own Home:    0
       Host Home:          0
       Supported Apartment: 0
       Group Home  (CLA): 0
       Crisis Respite Home:  11
       Jail:               1

**ATTACHMENT ONE**

**REVIEW OF BEHAVIORAL PROGRAMMING**

Patrick Heick, PhD, BCBA-D, LABA
August 25, 2021

**Introduction**

The following *Summary* was prepared in response to the Independent Reviewer's request to review the behavioral services of a sample of twelve individuals with a developmental disability living in crisis respite homes for more than thirty days. These reviews compared the behavioral programming and supports that are currently reported to be in place with generally accepted standards and practice recommendations regarding the components of effective behavioral programming and supports. These components include: (1) level of need (i.e., based on behaviors that are dangerous to self or others, disrupt the environment, and negatively impact his/her quality of life and ability to learn new skills and gain independence); (2) Functional Behavior Assessment (FBA); (3) Behavioral Support Plan (BSP), including targeted behaviors for decrease and increase (e.g., functionally equivalent replacement behaviors); and (4) ongoing data collection, including regular summary and analysis. (However, it should be noted that it is not intended to offer these components as reflective of an exhaustive listing of essential elements of behavioral programming and supports.)

In order to obtain the information required for this *Summary,* several fact-finding steps were completed. First, as noted in Attachment 2, documentation was requested from the Department of Behavioral Health and Developmental Disabilities (DBHDD). Second, the Independent Reviewer or, in one case, a nurse consultant met the individuals at the respective crisis home and spoke with staff on site. (One individual, who is now confined to a County jail, was spoken with via a Zoom meeting in the presence of her attorney.) Third, interviews were then conducted by telephone with the assigned clinicians. Finally, a Monitoring Questionnaire was completed for each individual in the sample. Specific questions included in the Monitoring Questionnaire that relied on documentation (e.g., FBA, BSP) were answered only if the actual document (or evidence thereof) was provided for review. All Monitoring Questionnaires have been provided to the Parties.

Findings related to the quality of the behavioral programming described here were generally organized and summarized according to the framework set forth below.

- Demographic information.  Minimal elements included birthdate, diagnostic information regarding medical, mental and behavioral health, legal status, date of initial plan and revisions, authoring clinician's name and credentials.
- History and rationale.  Minimal elements included historical information, reason and rationale, and known history of previous services/interventions and their impact.
- Person centered information. Minimal elements included the individual's communication modality and identified preferences (potential reinforcers).
- Functional Behavior Assessment.  Minimal elements included when and where the FBA was conducted, methods used and associated results.  Emphasis was placed on the use of descriptive methods as well as the FBA conducted in the current setting.

- Hypothesized functions of behavior.  Minimal elements included identified function(s) for each behavior targeted for decrease, with emphasis placed on the use of generally accepted functions of operant behavior.
- Behaviors targeted for decrease. Minimal elements included identified targeted behaviors for decrease, an objective operational definition for each behavior, method of measurement used to track each behavior, and ongoing data collection and analysis.
- Replacement behaviors (behaviors targeted for increase).  Minimal elements included identified functionally equivalent replacement behaviors targeted for acquisition, an objective operational definition for each replacement behavior/behavior targeted for increase, method of measurement used to track each behavior, and ongoing data collection and analysis.
- Antecedent interventions.  Minimal elements included proactive and/or preventative strategies to minimize the likelihood of target behaviors for decrease and/or promote the likelihood of target behaviors for increase, including specific strategies used to teach replacement behaviors.
- Consequence interventions.  Minimal elements included evidence-based strategies targeting behaviors for decrease and increase (e.g., use of differential reinforcement) and strategies that are least restrictive, most effective, and promote the acquisition of replacement behaviors and behaviors for increase, including the use of adequate reinforcement (e.g., identification of potential reinforcers, schedules of reinforcement).
- Appropriate signatures and plan for training.  Minimal elements included informed consent, signatures and associated dates, and the proposed plan to train staff or others who will implement the BSP. Emphasis was placed on the use of a behavioral skills model or similar strategies for staff training.  Although the Monitoring Questionnaire did not specifically examine receipt of informed consent as evidenced by signatures of the individual or legal guardian, it was nonetheless included in the current review.

## Summary of Findings

1. Due to the unavailability of requested documentation or the provision of reportedly outdated documentation, the current study was unable to fully examine the nature of the behavioral supports and services that were currently in place for some of the individuals sampled.  Consequently, for those individuals, the findings of the current study are limited and incomplete.

2. Based on a review of the completed individuals' service records and other provided documentation, as well as the completed Monitoring Questionnaires, nearly all the individuals sampled demonstrated significant maladaptive behaviors that had unsafe and/or disruptive consequences to themselves and their households, including negative impacts on their overall quality of life including the ability to access their communities, to become more independent and to learn and exercise more skills.  More specifically, of those sampled, all engaged in behaviors that could result in injury to self or others and nearly all engaged in behaviors that were disruptive to the

environment. In addition, most of the individuals engaged in behaviors that impeded his or her ability to access a wide range of environments. Closer examination of negative outcomes revealed that most of the individuals had one or more contacts with the police, as well as one or more emergency room visits or unexpected medical hospitalizations. One individual was currently in jail. In addition, over half of those sampled had an unauthorized departure, as well as one or more psychiatric hospitalizations. Consequently, these behaviors and outcomes are a strong indication that these individuals would likely benefit from formal behavioral programming or other therapeutic supports.

3. Although it was found that all sampled individuals would likely benefit from behavioral programming given their identified needs, evidence was not provided that all individuals were receiving behavioral programming through the implementation of comprehensive BSPs. For example, a verbal report regarding one individual indicated that a BSP was in place; however, this BSP was not provided following the document request and, therefore, could not be included in the current review. As noted previously, the identified number of BSPs was determined using receipt of the actual BSP. Consequently, the current finding likely underestimates the actual number of BSPs given that not all reported BSPs were provided for review and included in the analysis.

4. The current review noted that nearly all individuals had BSPs. However, not all BSPs were current (i.e., implemented or updated within the last twelve months), designed for the setting in which it was currently implemented, and/or developed by a Board Certified Behavior Analyst (BCBA). The BCBA is the nationally accepted certification for practitioners of applied behavior analysis. This certification is granted by the Behavior Analyst Certification Board (BACB), a nonprofit corporation established to develop, promote, and implement a national and international certification program for behavior analyst practitioners. In addition, many of the BSPs provided for this review were judged to be incomplete, inadequate, or outdated. More specifically, only the first page of a BSP was provided for one individual, very brief two- or three-page BSPs were provided for four other individuals, and an outdated BSP was provided for an additional individual.

5. As noted above, nearly all the sampled individuals had BSPs. However, evidence that an FBA was completed was only provided for seven of the eleven individuals (64%) with BSPs. More specifically, evidence that an FBA was completed was not provided for four individuals with confirmed BSPs. Generally accepted practice involves the completion of a comprehensive FBA to identify potential underlying function(s) of target behaviors and to inform the selection of function-based interventions when developing a BSP. Consequently, not completing an FBA to inform the development of a BSP limits the probability of developing an effective BSP.

6. Closer examination revealed that, of the seven FBAs, two were outdated and two were completed in prior settings. In addition, although all of FBAs included direct

methods of assessment as well as identified potential antecedents and consequences, not all identified hypothesized function(s) of target behaviors were included.

7. Upon closer examination of the BSPs (See Figures 1-3), it was noted that prescribed behavioral programming appeared inadequate for the majority of reviewed BSPs. For example, although demographic and person-centered information was found for eight (73%) of the eleven individuals with BSPs, adequate historical information, including descriptions of previous services and interventions (and their effectiveness), was only found for three (27%) of the individuals (See Figure 1). In addition, of the eleven individuals with BSPs, only five (45%) had adequate FBAs completed and only five (45%) had adequately identified function(s) for each target behavior for decrease (see Figure 1). Similar inadequacies were found regarding how target behaviors for decrease and increase were identified, defined, measured, and monitored. More specifically, behaviors for decrease were adequately identified, defined, and monitored over time for only three (27%) of the individuals with BSPs (see Figure 2). Unfortunately, none (0%) of the BSPs reviewed adequately identified, defined, and monitored functionally equivalent replacement behaviors over time. And, although a majority of BSPs contained some antecedent- and consequence-based strategies, very few contained all the minimal elements within each of these content areas. That is, only two (18%) and one (9%) of the individuals had BSPs with adequate antecedent and consequence interventions, respectively (see Figure 2). Nearly all the BSPs failed to include adequate preventative strategies as well as antecedent-based teaching strategies targeting the acquisition of functionally equivalent replacement behaviors or target behaviors for increase. Lastly, only one (9%) of the BSPs prescribed a specific training plan utilizing an evidence-based model of training (e.g., behavioral skills training). Evidence that informed consent had been obtained through appropriate signatures and corresponding dates was not evident for any of the individuals reviewed (See Figure 3).

## Conclusion

1. Although all of the individuals reviewed clearly demonstrated a need for formal behavioral programming, based on the number of adequate BSPs currently being implemented in the crisis homes, it was evident that not all sampled individuals who needed access to behavioral programming were currently receiving necessary behavioral supports and services.

2. Overall, the majority of BSPs were found to be inadequate. More specifically, only two of the BSPs reviewed had more than half of the minimal elements of generally accepted practice. Overall, behavioral programming did not meet standards of generally accepted practice for most of the individuals reviewed.

Submitted By: _____/s/_____
Patrick Heick, PhD, BCBA-D, LABA
August 25, 2021

# Attachment 1

<u>Data Summaries:</u>

**Figure 1**

| BSP Content Area | Demographic Information | History and Rationale | Person Centered Information | Functional Behavior Assessment | Hypothesized Functions of Behavior |
|---|---|---|---|---|---|
| Total # with Minimal Elements | 8 | 3 | 8 | 5 | 5 |
| Percentage | 73% | 27% | 73% | 45% | 45% |

**Figure 2**

| BSP Content Area | Behaviors Targeted for Decrease | Replacement Behaviors | Antecedent Interventions | Consequence Interventions |
|---|---|---|---|---|
| Total # with Minimal Elements | 3 | 0 | 2 | 1 |
| Percentage | 27% | 0% | 18% | 9% |

**Figure 3**

| BSP Content Area | Appropriate Signatures | Plan for Training |
|---|---|---|
| Total # with Minimal Elements | 0 | 1 |
| Percentage | 0% | 9% |

## Attachment 2

### Information Request for Dr. Heick's Reviews

Requested Documents:

- Psychological, Medical, and/or Psychiatric assessments
- Behavior Support Plan (BSP) or similar document
- Crisis or Safety Plan or similar document
- Functional Behavioral Assessment (FBA) or related document
- Blank daily or weekly data sheet (where direct support staff record data)
- Behavior summaries/reviews by Behavior Analyst or Behavior Specialist
  - Graphic data (last three months)
- Individual Support Plan
- Documentation related to any <u>significant or critical incidents</u> (e.g., elopement, individual injury, 911 or police contact, ER visit, hospitalization, etc.) over the past 12 months
  - This may include, for example, admission and/or discharge documentation from Emergency Rooms, Critical Incident Reports or Investigative Reports.
- List of all providers contacted regarding residential services and the response.

Requested Contact information (name, email address, telephone number):

- Support Coordinator
- Behavior Analyst or Behavior Specialist
- On-site Crisis Residence Supervisor

EJ/6-11-21

PH/6_18_21