REPORT OF THE INDEPENDENT REVIEWER

In The Matter Of

<u>United States v. Georgia</u>

Civil Action No. 1:10-CV-249-CAP

Individuals with DD at Heightened Risk

June 17, 2022



## Introductory Comments

Although there was an unanticipated delay due to the Omicron variant, the overall relaxation of restrictions related to Covid-19 permitted expanded fieldwork to be conducted for this report. It has always been both necessary and important to speak directly with community-based providers, including families, who are supporting individuals with a developmental disability (DD) at heightened risk and to observe the person with DD in his/her residential setting. People with DD at heightened risk include those with health and/or behavioral challenges who are dependent on others, including the Department of Behavioral Health and Developmental Disabilities (DBHDD), for timely individualized interventions to prevent or ameliorate jeopardy to their health, safety, and participation in typical community-based activities. The Extension Agreement (EA), in large part, was designed to enable and sustain the development of systems of care for these individuals so that they could have meaningful lives in a setting with non-disabled people. Any actual or potential obstacles require analysis and discussion among all stakeholders so that viable solutions can be implemented and sustained.

Certain Paragraphs of the EA are central to evaluating the services and supports for vulnerable people with DD in the community. These important Paragraphs include the following requirements:

> Paragraph 13: The State shall operate a system that provides the needed services and supports to individuals with DD in the community through a network of contracted community providers overseen and monitored by the State or its agents. To identify, assess, monitor, and stabilize individuals with DD in the community who face a heightened level of risk due to the complexity of their medical or behavioral needs and/or their community providers' inability to meet those needs, the State shall maintain a High Risk Surveillance List (the "List") as set forth in Paragraph 14, provide statewide clinical oversight as set forth in Paragraph 15, and administer support coordination as set forth in Paragraph 16.

> Paragraph 14: The State shall maintain a High Risk Surveillance List that includes all individuals with DD who have transitioned from the State Hospitals to the community during the term of the Settlement Agreement (SA) and this Extension Agreement.

> Paragraph 14.c.: For each individual on the List designated as "High Risk," the State shall conduct the needed oversight and intervention in a timely manner (as outlined in detail in the Extension Agreement) until the risk is resolved, especially when the individual is in decline ("deteriorating health") or crisis ("emergency").

> Paragraph 15.a.: The State shall implement statewide clinical oversight that is available in all regions in a timely manner (as outlined in detail in the EA) to minimize risks to individuals with DD in the community who face a heightened level of risk due to the complexity of their medical or behavioral needs, as indicated by one or more of the circumstances listed in Paragraph 14.b.(i)-(iv) and especially when the individual is in

> decline or crisis. This includes multidisciplinary assessment, monitoring, training, technical assistance, and mobile response, by a team of clinicians, to contracted providers and support coordinators who provide care and treatment to individuals with DD in the community until the risk is resolved.
>
> Paragraph 16.d.: Support Coordinators are responsible for addressing any gaps in services or supports to minimize the health and safety risks to the individual.
>
> Paragraph 17. a.: Crisis respite homes are to provide short-term crisis services in a residential setting of no more than four people.
>
> Paragraph 18: The State is to implement a strategic plan to recruit and develop providers that is based on the needs of individuals with DD in the State Hospitals and in the community that promotes successful transitions and community integration. The State is to use the plan to identify and recruit providers who can support individuals with DD and complex needs in community settings.

The requirements for Support Coordination, as detailed in Paragraph 16, will be reviewed at the end of this Fiscal Year. However, since Support Coordinators were interviewed for most of the individual reviews conducted for this report, some preliminary observations are included.

The Independent Reviewer's nurse consultants completed site visits in March 2022. Their specific findings related to each of the people reviewed for this report have been shared with the Parties. DBHDD, the agency responsible for the services and supports to people included in the Agreements' target populations, was given the opportunity to provide additional information after the site visits to enable the nurse consultants to complete their reviews of certain individuals. When provided, this information was carefully considered by the Independent Reviewer's nurse consultants.

The 30 reviews completed for this report are centered on health-related issues and observations. Although a number of the men and women included in the sample are experiencing emotional/behavioral challenges, the primary focus of the site visits was to examine the supports provided for health and medical reasons.

Before discussing the findings reached for the individuals included in the sample, there is a systemic obstacle that must be highlighted at the onset.

It is important to underscore that the implementation of the Court-ordered Settlement Agreement and Extension Agreement ("Agreements") has been seriously impeded by the staffing shortages created not only by the pandemic itself but by the competitive labor market that has ensued. The compensation for direct support staff simply has not kept pace with the increased wages/benefits available in other job options, such as in the fast-food industry and with retail suppliers. Staff vacancies are evident throughout the State's entire community system and have created serious problems delivering needed services and supports to

2

individuals as well as delays in effecting transitions to less restrictive residential options, including placements from the State Hospitals and from crisis respite homes. Also, it has become increasingly difficult to identify community providers who will support individuals with complex needs. Although the State has worked to develop various strategies to address the need to raise staff salaries, none of these strategies have been implemented. Community providers have been working diligently to fulfill their responsibilities, but, as of March 25, 2022, there have been at least 11 residential closures prompting the subsequent transfers of at least 30 individuals with DD from one setting to another. (Twelve of these individuals (40%) changed provider agencies when their residence was closed; two individuals returned to their families pending another placement.) The full complement of 48 crisis beds required by the SA is not in place. As of April 27, 2022, five beds continue to be unusable due to staffing shortages; there is no projected date for restoring them. Unless remedial action is implemented immediately, the situation may worsen. Despite the efforts by community providers to safeguard the individuals in their care, there is a risk of harm that requires urgent attention.

As with all previous reports, these findings are presented with the sincere desire to assist the State to reach compliance with its obligation to provide services to individuals in the most integrated setting appropriate to meet the needs of qualified individuals with disabilities and to successfully implement the Parties' stated intent that "the principle of self-determination is honored and that the goals of community integration, appropriate planning and services to support individuals at risk of institutionalization are achieved." (SA, IK.)

## Findings

### Site Visit Reviews

Methodology

Thirty individuals with DD were selected for review. Selection occurred in one of four ways:

- DBHDD was asked to identify five people with DD considered to be "good examples of individuals with health risks where DBHDD (Support Coordinator, Field Office, Office of Health and Wellness and/or Central Office) intervened actively and successfully when the person went into decline or crisis, including events that may have led to a hospitalization or ER visit."[1] The State provided information to the Independent Reviewer on January 14, 2022. The four men (FC, FP, DC, RR) and one woman (JL) either live with family (2), in a host home (2) or in a group home (1) located in Regions 1, 5, or 6.

- The remaining 25 individuals were identified by the Independent Reviewer:

---

[1] Emails to the Settlement Agreement Coordinator dated December 29, 2021 and January 7, 2022.

3

- - Three individuals (EG, JS, and MS) were included because of concerns brought to the Independent Reviewer's attention. EG and JS are housemates living in a provider agency's residence in Region 3. MS was transitioned from a State Hospital on February 11, 2020. In November 2021, he was hospitalized for medical reasons in Region 2. He was reviewed in the hospital.
  - Five individuals (JG, BH, MO, AR, and OS) transitioned, between 2011 to 2013, from Southwestern State Hospital under the Settlement Agreement and were known to be medically fragile. They had been assessed preliminarily by the Independent Reviewer last summer and evaluation by a nurse consultant was deemed appropriate. Four individuals live in group homes in Region 4. After hospitalization in October 2021, MO was placed, by her family, in a nursing home. She was observed in the nursing home.
  - Seventeen people were randomly selected from a list provided by DBHDD that identified individuals who had an increase in their Health Care Level (HCL) score. At the time of their reviews, they were living in host homes (2), family homes (3), supported apartments (3), group homes (8) and a nursing home (1). These residential sites were in Regions 1 (10) or 4 (7).

In summary, about three-quarters of the total sample were either selected by the State or randomly selected from a State list - five people (17%) were chosen for review by DBHDD; the Independent Reviewer randomly selected 17 people (57%) from the DBHDD list and also selected eight people (26%) based on known or selected concerns.

As referenced in EA Paragraph 14, the State agreed to maintain a High Risk Surveillance List (HRSL) for anyone who transitioned from a State Hospital to the community under the terms of the Agreements. The HRSL for January 2022, the last available List prior to the Independent Reviewer's nurse reviews in March, included six of the individuals in the sample. Inexplicably, MS was not referenced in the tracking section of this List, despite his extended hospitalization for medical reasons. AR's change of address was referenced, but not his fragile medical status or recent hospitalization.

The Statewide Clinical Oversight (SCO) List for March 2022, the last List provided prior to the site visits, included six of the individuals in the sample. None of the five people identified by DBHDD were found on this List. Twelve of the people selected by the Independent Reviewer were not listed. For example, CR was not included despite serious health and behavioral concerns. JBe was not included despite multiple significant medical conditions and health risks.

During a conference call on April 11, 2022, DBHDD was provided an opportunity to respond to unanswered questions that arose during the March site visits. Unfortunately, the State's Regional Field Office nurses were not included in the conference call, even though the Independent Reviewer specifically requested their participation in advance when the Independent Reviewer submitted questions from the nurse consultants prior to the call on April 11. Written responses to some of the questions were provided by DBHDD on April 26, 2022.

4

Copies of the completed Monitoring Questionnaires for each individual have been provided to the Parties. If requested, the findings from these Questionnaires can be the subject of further discussion with the Parties.

Overall Conclusion

This overall conclusion is based on the work completed for this report, including the individual reviews summarized below.

Both the Regional Field Office staff and the Office of Health and Wellness staff failed to comply with DBHDD's own SCO Protocol, as required by the EA. In too many cases, the Regional Field Office staff failed to assist the community providers and/or the Support Coordinators with the coordination of healthcare services, communication with healthcare providers, and navigation of response to immediate needs. There was little evidence that the Regional Field Office staff participated in treatment planning when needed or provided technical assistance to develop strategies and plans for the mitigation of risk.

Similarly, the Office of Health and Wellness too often failed to provide clinical expertise, consultation or access to specialized therapy and other healthcare disciplines for assessment and treatment planning when needed. The Office of Health and Wellness also failed to engage in relationship-building with community practitioners to expand the availability of healthcare and dental services. The Office of Health and Wellness failed to provide mobile response to prioritized needs through coordination of Regional Field Office clinicians, community practitioners, other healthcare providers, and contracted specialized clinicians. The Office of Health and Wellness failed to provide continuous oversight of those identified at heightened risk--with continuous surveillance with escalation to clinical experts and Central Office leadership when needed.

As a result, the State often failed to provide SCO through a team of experienced clinicians, based on a multi-disciplinary assessment, along with needed monitoring, training, technical assistance, consultations, and mobile response. As highlighted in the individual examples below, the State often failed to provide a multi-level approach to follow up and respond to the unmet needs of the individual and sometimes failed to ensure that the system provided needed services and supports to individuals, especially as they experienced a decline or crisis.

Summary of Findings from the Individual Reviews

The 30 individual reviews are discussed in the order they were identified/selected for inclusion in this report:

- <u>Individuals Selected by DBHDD to Show Active and Successful System Intervention During a Decline or Crisis</u>. It is not clear why DBHDD identified these five people for review as most did not have a decline or crisis recently but did have unmet needs: 1) DC lacks dental care and, although approved, in-home nursing services have not been

5

provided consistently. As a result, DC's mother is pursuing a residential placement in a group home, a less individualized setting than a family home. 2) FC's host home sponsor has been diligent in seeking and administering appropriate care and dialysis treatment. But the Regional Field Office nurse did not complete an in-person nursing assessment as requested by the Support Coordinator and took a long time - 49 days - to develop a treatment plan. 3) Other than exposure to Covid-19, which tested negative, FP had no health-related or behavior-related incidents. His Support Coordinator is concerned that there are no contingency plans for another residence if needed, given the age (over 70 years) of the host home sponsor. 4) JL is losing weight under the supervision of her group home staff, but there was no evidence provided of involvement by the Regional Field Office or the Office of Health and Wellness. 5) RR lives in his family home. He has had four strokes; his health care needs have increased. Although the Regional Field Office nurse has periodic contact with RR's mother, approximately every six months, in-home supports are provided inconsistently due to staffing shortages.

- <u>Individuals Selected Due to Identified or Suspected Concerns.</u> The review of EG revealed many different problems. EG endured eight staff medication errors in a ten-month period. He has a behavior support plan, but it does not address his unconventional elimination behaviors that could place him at risk of arrest. EG developed a troubling cough due to the staff's failure to clean out his CPAP filter. Perhaps most significantly, EG's community provider successfully petitioned a local court to evict EG from his community residence. On June 14, 2022, the provider agency issued its final notice of eviction, scheduled for July 6, 2022. There has not been another provider identified by DBHDD. There was no evidence that DBHDD analyzed the problem(s) experienced by EG and by the provider agency and ensured that appropriate corrections were made. He requires a multidisciplinary assessment for his medical and behavioral needs. This assessment has not been requested.

  JS experienced several ER visits due to "malaise." His provider noted his declining function over several months; he was then diagnosed with renal failure. He was also hospitalized for a week due to a bowel obstruction. The provider agency tried to take appropriate action and is in the process of securing all recommended medical and specialty evaluations. The Support Coordinator monitors his condition; he was placed on a "high profile list" by the Support Coordinator's supervisor and is checked on weekly. Nonetheless, there was no evidence of a multi-level response, oversight or involvement from the Regional Field Office or the Office of Health and Wellness at the time of the site visit. The program manager for the residence was not aware of any of these resources until informed by the Independent Reviewer's nurse consultant. The Regional Field Office should have noticed his deteriorating health earlier and then taken steps to address his needs.

  The events impacting MS reveal multiple system failures. Although he has now been institutionalized in a nursing home due to the lack of an integrated community-based residence, MS was unnecessarily hospitalized for months - well beyond the time needed

6

to treat his acute illness - simply because the State failed to develop and implement a plan to support him in a community setting with appropriately individualized services. His guardian and his attorney worked diligently to avoid this nursing home placement but could not prevail without any alternative options. Furthermore, the prolonged hospitalization produced negative outcomes for MS. In addition to a severe pressure ulcer and suicidal ideation related to the extreme boredom and isolation at the hospital, MS suffered a bowel obstruction that required an ileostomy (requiring the use of a bag that collects human waste), which will now be permanent. The responses from the Office of Health and Wellness to the questions from the nurse consultant, who visited MS twice, were unsatisfactory. There was no evidence in its response that the State made any attempt to obtain full access to the information relevant to MS's care and ultimate discharge planning; the response does not include what strategic actions the State was taking to plan for a successful community placement. The response reveals no recognition that his extended hospitalization is a significant factor in his behavioral problems; there are no plans to do a functional assessment in advance of developing a proper behavior support plan.

- <u>Individuals Selected for Follow-Up Review.</u> The reviews of the five individuals placed from Southwestern State Hospital revealed the following: 1) AR was placed in a residence with more supports because of his deteriorating health. The most effective interventions occurred at the provider and Support Coordinator level, but the Regional Field Office nurse did call to obtain his health status after his hospitalization and ER visits. Other than these calls, however, it is not clear that the Regional Field Office or Office of Health and Wellness did anything of import to address his needs.  2) BH received appropriate health care and follow-up by residential staff after her ER visit for an elevated temperature and cough. Her provider has asked the Regional Field Office for help in accessing needed healthcare and dental care but, unfortunately, the Regional Field Office reportedly replied that it could not help with this. This would appear to be a violation of EA Paragraphs 12, 13, and 15f.  3) JG's immediate health-related needs were addressed in a timely manner and the Regional Field Office nurse conducted follow-up as expected. However, JG has five conditions[2] likely to result in a health decline or death, such that she has ongoing heightened risk. It is unclear what the Regional Field Office or the Office of Health and Wellness are doing to address this heightened risk. 4) MO was living in a group home until she was hospitalized for a urinary tract infection. During her hospitalization, an invasive feeding tube was inserted after she failed a swallowing test. As a result, her family placed her in a nursing home. It is not clear whether sufficient efforts were made by the Regional Field Office to question the results of the swallowing test or the need for a feeding tube, or to educate the family about alternative community-based options. MO was observed in the nursing home and was noted to be alone and inactive in a room smelling strongly of urine. 5) There are multiple questions about the adequacy of care and oversight provided to OS. She was

---

[2] The five top conditions related to preventable deaths in people with DD are aspiration, dehydration, seizures, constipation and sepsis.

steadily losing weight and suffered four falls in one year. She has the five conditions that can result in deteriorating health or death, yet it is not clear that any meaningful actions have been taken by the Regional Field Office or Office of Health and Wellness to address her needs or steady decline. There was no evidence of consultations, recommendations, training, or technical assistance. OS was seen in the ER for a cervical sprain and alveolar fracture after she was dropped while being lifted with a defective sling in her group home. The Regional Field Office nurse contacted the home to obtain information but did not conduct an in-person assessment to determine if all safety issues had been identified and all preventative measures implemented. There was no investigation of the incident.

- <u>Individuals Selected Randomly Based on Increased HCL Scores.</u>  Of the remaining 17 reviews, one gentleman, JP, is in a nursing home. The nurse consultant who reviewed JP concluded that his hospitalization and nursing home placement have resulted in deterioration of his mobility with no assessment as to the cause. Since December 2021, he has lost 5% of his body weight with no plan in place to ameliorate this situation. Reportedly, there has been no intervention from DBHDD about this serious concern. Moreover, while institutionalized, JP lost his community placement due to the residence's inability to accommodate his new mobility limitations. After considerable delay, some action is being taken by DBHDD to plan a community placement. Part of the delay stemmed from the lack of involvement by JP's public guardian. Only after a complaint by the Independent Reviewer's nurse consultant did the Support Coordinator take action to have the assigned public guardian replaced.

   MT did not have an emergency or deteriorating health. She was treated for a cyst. GD's HRST score was increased due to behavioral issues. He does not have any major health-related issues. JBo receives support for his chronic health issues (high blood pressure, bowel management and risk of choking.) He is at risk for falls. All support needs appear to be addressed. CG has not had any significant medical or behavioral incidents in the last year that resulted in a Critical Incident Report (CIR) or the updating of the HRST. The last HRST was completed in preparation for his ISP, not as the result of a significant medical event.

   DH lives with his 81-year-old father. He requires total care in all activities of daily life; he has excellent support from his community physician. However, the State is not meeting his needs because nursing services are not provided in his home, as approved. LPN services were approved on July 8, 2021 but have not been provided to date.

   Due to several October 2021 and November 2021 ER contacts and/or hospital admissions, it was reported that the Office of Health and Wellness started to become involved in monitoring KC's health status. The Regional Field Office nurse has called to obtain information regarding her UTIs and decubitus ulcer but has not done an in-person nursing assessment or made any recommendations, even though KC appears to

8

be in decline and will need close monitoring given that she will remain at heightened risk.

ED was seen in the ER for a seizure. She has LPN staffing in her group home and a Registered Nurse is on-call. The residential provider and Support Coordinator communicate with each other; it was reported that the Regional Field Office nurse maintains ongoing contact with the residence.

MR had a serious fall that resulted in a fracture that required surgical repair. Although a CIR was filed, it was reported that an investigation did not occur and that there was no contact from a Regional Field Office nurse. Additionally, MR's provider has requested funding for an additional staff person on the night shift (the time the fall occurred). The request was submitted two months prior to the site visit, but no response has been received.

JBe has multiple significant medical conditions and health risks. He was reviewed as the result of an ER visit and hospitalization due to Covid-19. The Regional Field Office was not involved but the Support Coordinator maintained ongoing communication with the home and the hospital. After he was discharged, she routinely communicated with the home, visited him, and provided assistance, as needed. JBe has, or is at risk of having, all five of the conditions most likely to result in health deterioration or death. He will remain at heightened risk. The nurse consultant concluded that he will need vigilant monitoring to ensure that his health needs are met; this will require more active involvement by the Regional Field Office staff.

The provider agency and Support Coordinator responded promptly and appropriately by following MB's bowel management protocol. No additional assistance was required by the Regional Field Office or Office of Health and Wellness. Nonetheless, MB is often aggressive and regularly engages in self-injurious behavior. In one 12-month period ending in April 2021, he was aggressive over 200 times and was self-injurious 863 times. He has a behavior support plan, but it obviously has not been effective. It is not clear whether the Regional Field Office staff and/or the Office of Health and Wellness staff have taken sufficiently meaningful actions to help address MB's serious behavior problems.

VD is in deteriorating health. He has had seven ER visits since August 2021; four resulted in a hospital admission. He also has three of the five conditions that are most likely to result in a health decline or death. Nonetheless, despite this, there were no documents or information provided that identified involvement by the Regional Field Office or the Office of Health and Wellness regarding his declining status or multiple medical events.

ML's case reveals multiple deficiencies in the State's DD system which have placed ML at serious risk, and which have actually harmed him. For example, during his transition from one community residence to another late last year, the new host home sponsor for

9

ML asserted that she did not receive all prescribed medications and other health information when she agreed to support him on an emergency basis. For example, ML arrived at the host home with only four or five medications, although he is prescribed over twenty medications. The host home provider was not told that he had diabetes. Without this critical information, he was given a regular diet and, as a result, became lethargic, constantly thirsty, urinating frequently, with an elevated pulse. He was hospitalized with a very elevated blood glucose level.  He has multiple health-related issues and problematic behaviors, including fecal smearing. After the site visit interview, the Support Coordinator stated that she intended to submit a request to DBHDD for a Clinical Review. (She has not made any previous requests for a review.) The Support Coordinator requested a Clinical Review on April 12, 2022. Since the site visit, the sponsor has issued a 30-day notice of discharge. It was reported that ML is expected to transfer to a group home due to his need for 24-hour supports. It is not clear that the Regional Field Office staff or the Office of Health and Wellness staff took any meaningful proactive steps to assist ML and his host home provider during his difficult transition, the events associated with his unrecognized diabetes, the behavioral incidents, or with regard to his increased service needs that are now imperiling his continued stay in a host home, a smaller setting than a group home.

<u>Discussion of Findings from Individual Reviews</u>

First, it is notable that both the HRSL and the SCO List did not include all individuals with significant health concerns. The exclusion of MS from the tracking section of the HRSL is particularly troubling given his high risks and his prolonged and unnecessary hospitalization. Individuals living in group homes seem more likely to be included on the SCO List. None of the people living in a host home were included on the March 2022 SCO List; only one person living in a family home was referenced on that List. The omissions are troubling given the numerous ongoing health-related concerns observed during those site visits. Both Lists were intended to be important safeguards for people at high risk, especially when in decline or crisis.

Second, host home sponsors, the caregivers in family homes, and many group home providers are not knowledgeable about all the potentially helpful technical assistance, consultation, and other resources to be made available to them as mandated by the EA. There is a heavy reliance on Support Coordinators for referrals to clinical specialists and other services. Although Support Coordinators may have attended training, years ago, on the SCO Protocol, they are not familiar with the response/action timelines or other important elements included in the EA.

Third, the provider agencies and Support Coordinators interviewed for this report are generally familiar with the process for reporting Critical Incidents. Those CIRs are electronically transmitted from the provider to the Support Coordinator, the Regional Field Office, and the Office of Health and Wellness. However, although Support Coordinators typically receive the CIRs, not all Support Coordinators automatically receive the investigation reports or the Corrective Action Plans. As a result, they do not always have information important to their monitoring of health and safety. In previous reports, DBHDD has been urged to address this

concern to ensure that all relevant information is provided to the Support Coordinators themselves, not just their agencies or supervisors.

Fourth, it was reported that the Regional Field Office does not get involved unless there is a Request for Clinical Review initiated by the Support Coordinator. As a threshold matter, this practice is inconsistent with the requirements of the EA, as the Regional Field Office must provide needed interventions for those with ongoing risks that remain unresolved. In addition, there were delays reported in the responses from the Regional Field Office. For example, it took 49 days for a nursing assessment to be completed by the Regional Field office nurse for FC after the Support Coordinator submitted the request. Moreover, there are two outstanding requests to the Regional Field Office for VD: 1) It was requested that behavioral services resume that had suddenly stopped in July 2021; and 2) because of the four ER visits resulting in hospitalizations from August 2021 to January 2022, a request was made for a thorough medical assessment. Neither of these requests were addressed at the time of the site visit. Additionally, resources to be assigned to the individual are not always available in a timely manner or at all. In-home support was identified and approved for RR, DC, and DH, but there has been either no support or insufficient support due to the lack of available staff.

Fifth, it was striking that there was not a single example of a multidisciplinary assessment documented for any of the individuals with complex medical needs as is required by EA 15a to minimize any potential jeopardy for all individuals at heightened risk. This failure to blend clinical expertise in addressing serious concerns related to health and, in some cases, behavior was a troubling finding from several reviews. For example:

- As referenced above, MS resided in a group home until November 2021, when he was admitted to a hospital. Despite a needlessly lengthy hospitalization that began with medical problems and evolved to include behavioral concerns, there has been no multidisciplinary review conducted. MS has not been discharged from Waiver funding, yet the resources set out in the EA—assessment, technical assistance, consultations—have not been mobilized on his behalf. Against his guardian and attorney's wishes, he has now been placed in a nursing home because there are no community providers available to support him, even in a temporary placement. DBHDD has failed to act on MS's behalf.
- AB has always lived in his family home. Since his mother died, he has lived on his own with in-home support services. His aide has worked with him for at least ten years. Mr. B. has self-injurious behavior (banging his head on the wall) and refuses to follow the prescribed schedule for taking his six medications. These behaviors put him at risk for falls and for not benefitting from the medications. To reduce these risks and allow AB to continue living in his own home, a multidisciplinary assessment is warranted. There was no evidence that it had been requested or even considered. Despite his many falls, his self-injurious behavior, and his non-compliance with medication schedules, there is no comprehensive approach in place to address his needs and risks by obtaining needed services and supports. There has been limited involvement by the Support Coordinator and virtually no involvement in his case by the Regional Field Office staff or the staff of

11

- the Office of Health and Wellness. The Office of Health and Wellness did not answer the nurse consultant's follow-up questions about measures to mitigate his fall risk and about the need for positive behavioral supports or how to overcome AB's resistance to them. Incredibly, despite the consequences, the Office of Health and Wellness appeared to endorse AB's failure to adhere to his prescribed medication schedule, asserting that it was within his rights to do so.
- In June 2020, SM was transferred from a nursing facility to a group home as an emergency placement. She is diagnosed with serious medical concerns and has psychiatric diagnoses as well. In the seven-month period ending in March 2022, SM had over seven ER visits and/or hospital admissions for various ailments, often serious. She was hospitalized with an infection when visited for this report. She was refusing to eat; a gastrostomy tube had been placed. Over the past seven months, SM has lost over 30 pounds; in February 2022, she weighed only 90 pounds. There was no documentation to indicate that the Regional Field Office or the Office of Health and Wellness had identified this issue and implemented a plan to address this risk. Although requested, DBHDD did not provide any documentation of technical assistance or follow-up actions that had been implemented.
- CR has medical diagnoses that require consistent oversight and treatment. She left her apartment to live with her mother. She was reviewed in her mother's home. Although CR has many strengths, she has been refusing to go to the doctor and rejecting her medications, including six cardiac-related medications. CR has behavioral diagnoses that are treated with psychiatric medications. In September 2021, a Request for Clinical Assessment of Behavior Support Needs (CABS) was completed over the telephone with the staff at her apartment. CR was not interviewed. The CABS recommendations included a referral for a nursing assessment. DBHDD stated that the nursing assessment was completed in October 2021, but it was not provided for review. CR's mother scheduled an appointment with the psychiatrist for March 28, 2022. Throughout all of this, there was no contact or assistance from the Regional Field Office or the Office of Health and Wellness. Clearly, a multidisciplinary assessment is needed, but it has not been completed.

The failure to implement a coordinated clinical approach for all individuals at high risk is contrary to the obligations agreed to in EA Paragraph 15.

Sixth, both Support Coordinators and residential providers identified a lack of needed clinical resources, especially in the rural areas of the state. They referenced that there are far too few behavioral specialists, stating that it can take a year to find someone to work with a person with significant behavioral challenges. For individuals with potentially dangerous behaviors, there appear to be no available providers. Dental resources are also difficult to obtain. Although the DD Foundation provides some dental services, there is a lengthy waiting list and there are strict criteria for acceptance, effectively denying or unduly delaying dental care for many in need.

At this time, the Independent Reviewer cannot recommend a finding of compliance with regard to EA Paragraphs 12, 13, 14, 15 or 16. Before any recommendation of compliance can be made

12

to the Court, each of the above concerns requires attention and resolution by DBHDD. There should be further discussion with the United States, the Amici, and the Independent Reviewer to discuss the obstacles preventing compliance with the EA's obligations.

It is also recommended that DBHDD retrain all providers and Support Coordinators on the requirements in the SCO Protocol related to reporting concerns and requesting assistance.

## Crisis Respite Homes

To comply with the SA, the State created 48 crisis respite beds statewide. The EA requires these resources to be short-term. (EA 17.a.) The State has never complied with this requirement as there have always been some individuals with placements exceeding 30 days; too many remain for months (or even years) in these crisis settings that are not designed for long-term stays.

On April 27, 2020, DBHDD reported that 13 crisis respite beds (27%) had been removed from use due to staffing shortages (five beds) and acuity (eight beds). As a result, only 35 beds are available for crisis respite. A significant number of beds have been unavailable for months now. DBHDD's most recent report (May 3, 2022) revealed that 30/35 (86%) individuals had stays greater than 30 days. At least one person has had an extended length of stay date for over four years, dating back to January 2018.

A large Atlanta hospital recently reported to the Independent Reviewer that at least a half-dozen people with DD have remained, without medical necessity, in the hospital for weeks (one man for over three months) because of the inadequacies of the State's DD system. The individuals typically arrive at the hospital in crisis, but there are no community crisis respite beds available for them. The individuals then remain at the hospital for weeks because there is inadequate capacity in the community system to address their longer-term needs.

The reasons for these lengthy placements in crisis homes and hospitals have not changed over the years. There have been and continue to be serious gaps in the community system. Provider capacity is inadequate and has been further negatively impacted by recent staffing shortages. At least five potential community transitions are now delayed because of difficulties in hiring staff. Furthermore, the choice of a community residence is seriously limited--and often there is no choice--because of the lack of available providers with the requisite expertise. In addition, proposed placements can be hours away from the person's family and original location. As a result, important social networks are interrupted and unavailable.

On May 12, 2022, DBHDD reported that there was one crisis bed being held for a pending admission from a jail. There are no other vacancies.

The importance of timely interventions and the presence of skilled crisis home staff are demonstrated in the circumstances documented for KH:

- KH went to jail on May 18, 2021. He was transferred to a crisis respite home on June 10, 2021. While incarcerated, KH developed significant swelling and inflammation of his right lower leg. The cause of the infection was unknown; his condition was not reported by the jail. As a result, it was not discovered until KH was released from jail to the crisis home provider. Appropriate treatment was provided but the course of recovery was lengthy. The crisis home provider initiated ongoing communication with the Support Coordinator and the Regional Field Office nurse regarding his health status. According to the documents reviewed, the Regional Field Office nurse completed a nursing assessment using phone calls and pictures sent by the provider but did not conduct an in-person assessment, due to the pandemic. KH's leg wound finally healed and he was discharged from a wound clinic on December 2, 2021. KH continues to reside in the crisis respite home. No community providers have been identified.

The lack of available crisis respite options has caused significant harm in at least one case. CH could not be released from jail because there were no available community residential alternatives, including crisis beds. Although the details are not yet fully known, her incarceration continued until she was hospitalized with sepsis. She died shortly thereafter. This case continues to be under review by the Independent Reviewer.

It is also of concern that three people who had crisis respite stays were transferred in 2021 to out-of-state institutions. WR stayed in a crisis respite home from April 1, 2019, until his admission to a Florida institution on March 22, 2021. HP was readmitted to a crisis respite home on July 14, 2019. He was institutionalized in Florida on February 21, 2022. AH was admitted to a crisis respite home on November 18, 2020. She was transferred to a Crisis Stabilization Unit (CSU) after threatening other residents. Aggression towards staff in the CSU led to her arrest and incarceration. Her attorney discussed her case with the Independent Reviewer. On July 28, 2021, a virtual meeting was held with AH while she was in jail. After her release from jail, she was institutionalized in Florida on November 2, 2021.

As of March 31, 2022, there are at least seven individuals with DD who have been transferred from Georgia's DD system to institutions in Florida. It appears that the State transferred these individuals because there was not sufficient capacity in the State's DD system to address their need for more intensive services in a community setting.

All of this means that the State continues to be out of compliance with EA Paragraph 17. The State has also failed to comply with EA Paragraph 18 to identify and recruit providers who can support individuals with DD and complex needs in community settings.

Considering the ongoing and worsening concerns that continue to impede timely and appropriate crisis respite interventions, it is recommended that the State meet with the Independent Reviewer and the United States to discuss how to develop and implement a plan to address outstanding issues.

### Additional individuals with DD at Heightened Risk

Preliminary work for the next report to the Court has begun with the review of individuals with DD who are incarcerated or are awaiting discharge from State Hospitals. It is anticipated that many, if not all, of these men and women will require community-based services with staff with the requisite expertise to work with individuals who are dually diagnosed or who are at risk of having encounters with law enforcement.

As of February 18, 2022, there were nine individuals on the NOW/COMP waiver who were known to be incarcerated.

As of March 10, 2022, there are 17 dually diagnosed men and women who are on the Active List for discharge from a State Hospital. These individuals have not had Waiver services in the past. There is an additional group of five individuals who were transitioned to the community under the Agreements between 2010 and now, with a Waiver, who returned to a State Hospital and are now ready for discharge. They retain their Waiver eligibility.

The State's ability to effectuate timely discharges to integrated community settings with appropriate services and supports depends on the availability of community-based provider agencies with sufficient staffing capacity and demonstrated knowledge and performance competencies.

As referenced above, EA Paragraph 18 requires the State to develop and implement a strategic plan for provider recruitment and development that is based on the needs of individuals with DD in the State Hospitals and in the community. "The plan shall identify the service capacity needed to support individuals with DD and complex needs in community settings. The plan shall take into account services and supports that promote successful transitions and community integration. The State shall use the plan to identify and recruit providers who can support individuals with DD and complex needs in community settings." The State has failed to take the steps needed to comply with this paragraph.

The State needs to fulfill its obligation regarding provider recruitment through an updated, comprehensive plan with specific measurable objectives. This renewed effort is especially important in light of the General Assembly's recent approval of 513 new Home and Community-Based Services Waivers. It will be extremely challenging to use those valuable resources without reducing staff shortages and expanding provider capacity.

<u>Concluding Comments</u>

This report has identified significant obstacles to compliance with the Agreements. The next report to the Court will review and analyze any actions the State will design and implement to address the individual and systemic concerns outlined in this report.

Each obligation of the Extension Agreement will be monitored for the next report. In particular, the requirements related to Support Coordination (EA 16) and to investigations, mortality reviews, risk management and Quality Reviews will be highlighted (EA 20-EA 29). The review of these obligations was deferred until more extensive fieldwork could be conducted and a more accurate assessment made in the post-pandemic period.

Each of the reports completed for the Court requires extensive assistance from the Parties and the numerous stakeholders invested in Georgia's system of support for people with DD. The work of the Settlement Agreement Coordinator and her Assistant has continued to be invaluable. The guidance of Counsel for the United States and for the State has been thoughtful and generously provided throughout these years. Discussions with DBHDD's leadership have been indispensable to fact-finding and analysis. The community providers, advocates, families, and men and women with DD who contributed candid insight and demonstrated unceasing commitment to a responsive and responsible community-based system contributed greatly to the Independent Reviewer's work; they are acknowledged with appreciation.

The Parties were given the opportunity to comment on a draft of this report. All comments and suggestions were carefully reviewed and considered.

Submitted By:     <u>/s/ Elizabeth Jones</u>
Elizabeth Jones
Independent Reviewer

With consultation from:

Marisa C. Brown, MSN, RN
Julene Hollenbach, RN, BSN, NE-BC