REPORT OF THE INDEPENDENT REVIEWER

In The Matter Of

United States v. Georgia

Civil Action No. 1: 10-CV-249-CAP

Supported Housing

June 17, 2022



Introductory Comments

As clearly recognized in the Settlement Agreement and the Extension Agreement (Agreements), stable housing with services and supports is a critical component for recovery from a serious and persistent mental illness (SPMI). This summary and the attached report by Martha Knisley, consultant to the Independent Reviewer, document our current findings related to the State's efforts to address the Agreements' obligations regarding Supported Housing. There continues to be notable progress, but there is a need for additional actions before the Independent Reviewer can recommend a compliance finding to the Court. It is hoped that these necessary actions, along with accompanying oversight, can be initiated prior to the filing of the next report after the end of this Fiscal Year.

The State has worked diligently to provide the data and detailed information requested for this report. There have been periodic conference calls with the leadership staff of the Department of Behavioral Health and Developmental Disabilities (DBHDD) and the Department of Community Affairs (DCA), as well as with community advocates, providers, and stakeholders who are invested in the development and implementation of strategies to promote stable housing with needed services and supports. Although there was one site visit to a jail completed for this report, more extensive fieldwork is planned for the months ahead.

Summary of Key Findings

First, the State has continued to take earnest efforts to procure needed resources for the provision of Supported Housing. The total FY22 budget for the Georgia Housing Voucher Program (GHVP) is $20,637,457 with $14,752,876 being expended for rental subsidies and $5,884,581 for Bridge funding. (As defined in the Agreements, Bridge funding is used for deposits, household necessities, living expenses, and other supports during the time needed for a person to become eligible and a recipient of federal disability or other supplemental income.) These funds do not appear to be strictly siloed, so the State suggests that the overall total is perhaps the most useful figure.

On May 12, 2022, the FY23 budget was signed into law by the Governor. The General Assembly passed a budget that includes an additional $3.38 million in funding for the GHVP.

Second, although there has not been a reliably consistent trend, the number of individuals in the target population with an active authorization for a GHVP in any given month has remained within the same range (1784 to 1913) over the first ten months of FY22. The current total, from April 2022, is 1,839 unduplicated individuals with GHVP vouchers and active leases.

1



Chart A

Number of Individuals with Active Authorizations for a GHVP

| Date | Count |
|---|---|
| 7/1/21 | 1784 |
| 8/1/21 | 1872 |
| 9/1/21 | 1841 |
| 10/1/21 | 1852 |
| 11/1/21 | 1889 |
| 12/1/21 | 1913 |
| 1/1/22 | 1858 |
| 2/1/22 | 1888 |
| 3/1/22 | 1853 |
| 4/1/22 | 1839 |

As discussed in Ms. Knisley's report, most of the GHVs have been awarded to people with SPMI who were homeless at the time of the referral for Supported Housing.

It continues to be of concern that other members of the Target Population are under-represented in the State's GHVP authorized figures. Data have been limited regarding the inclusion of people who are frequently seen in emergency rooms. The numbers of GHVP-eligible people being released from jail and prison are also low, despite a need articulated during many of the Independent Reviewer's site visits to jails.

It has been difficult to fully understand how the GHVP referral process within the State Hospital is implemented during discharge planning. Although 95 people in the State Hospitals were referred for a GHV, between July 1, 2021 and December 31, 2021, and 89 people were approved for and received a Voucher, only 18 people (less than 20%) were eventually housed.

In addition, an analysis of 25 discharges, all occurring in February 2022, from the five State Hospitals was completed for this report. Based on the information received from the discharge summaries, no one was referred to Supported Housing. As Ms. Knisley indicates, outcome data from other states confirm that discharging an individual with SPMI directly to Supported Housing from a state hospital dramatically reduces the readmission rate, therefore enabling individuals to live a more stable life in the community. In spite of this, the State discharged all 25 people to non-Supported Housing settings, including transitional residences, group homes, crisis apartments, congregate personal care homes, and hotels/motels.

Placement in non-Supported Housing settings does not seem to be working for certain individuals who are frequently readmitted to the State Hospitals. This group of 25 people included five people with ten or more admissions to the State Hospitals. They were discharged as follows: 1) BH, with ten admissions, went to a group home as did SC who has had 28 admissions; 2) JM went to a family home without relatives. He has had 13 admissions; 3) RV, with 22 admissions, went to an unspecified transitional residence; and 4) CH, with 44 admissions, went to live with relatives.

Although DBHDD has provided some information about its work with jails, these initiatives are still in the early stages of implementation. Very recently, DBHDD provided information that, on April 16, 2022, an individual discharged from Rutledge State Prison, in Columbus, was moved directly into a GHVP-funded unit in Douglas County as part of the State's new Re-Entry Transitional GHVP Housing pilot. This is the first such placement and, hopefully, represents the beginning of a shift for this sub-group of people in the Target Population. There are no outcome data to report at this time. However, it is clear from the numerous site visits made to jails throughout Georgia that stronger and more extensive ties need to be established to ensure that people with SPMI who are being discharged from a jail are assisted with obtaining housing with supports. During a site visit to a jail in preparation for this report, it became clear that neither the physician at the jail nor the deputy sheriff had been informed about the referral process for obtaining a GHV. Four women in jail with SPMI were interviewed during this site visit. Three of the women had past admissions to a State Hospital, and all were unstably housed prior to incarceration. They were eager to rebuild their lives with housing, mental health services and employment--they just need the State's help to do it. Each of these women had compelling stories highlighting the need for the GHVP and other supports envisioned for them under the Agreements.

The broadening and strengthening of outreach to the under-represented members of the Target Population must be a priority. Fortunately, there are resources in place and efforts underway that can be used to facilitate implementation of effective and timely strategies for outreach. DBHDD's Housing Support Program is now in place in five of the State's six Regions. Options for selecting an agency in Region 6, the remaining outlier, are being explored. This Program has tremendous potential; it is built upon evidence-based practices. It seeks to ensure that <u>all</u> GHVP enrollees will receive basic housing supports to assist with their access to housing and to promote housing stability. The leadership staff of the Division of Behavioral Health are working closely with a nationally recognized expert to provide training in the principles and strategies of the Housing First model and on how to conduct fidelity monitoring. At this time, over 1100 individuals with GHVs (63%) are impacted by this Program. It is expected that outcome data and specific examples of this Program's impact will be available for the next report to the Court. DBHDD is to be commended for this initiative and the excellent work that had led to its initial stages of implementation. In addition, it is important to note that DBHDD's attention to the retention of stable housing under the GHVP has resulted in a departure rate of 8.7% over the last year. This rate is within the parameters of best practice and is another example of the progress being made.

## Concluding Comments

As described in this summary and in Ms. Knisley's report, the State has taken some significant steps to address its Agreement obligations related to Supported Housing. Although additional strategies must be developed to strengthen the implementation of procedures that enable individuals with SPMI in the Target Population to be referred to Supported Housing, there is good reason to anticipate further progress towards compliance with the obligations of the Agreements.

As required, the Parties were provided with a draft copy of this report and were given an opportunity to comment on its findings. All comments/recommendations were carefully considered, and changes were made as appropriate. The continued collaboration with the attorneys for both the Department of Justice and the State is both acknowledged and appreciated. The cooperation and assistance of the leadership of DBHDD and DCA have been most helpful. Recognition must also be extended to the Settlement Agreement Coordinator and her Assistant. They have always been especially responsive. There also continues to be invaluable support from the stakeholders who are so committed to the full and timely implementation of the Agreements and to the principles upon which they are built.

Submitted By:     */s/ Elizabeth Jones*
Elizabeth Jones
Independent Reviewer

With consultation from:

Martha Knisley
Beth Gouse, Ph.D.

ATTACHMENT A

**REVIEW OF SUPPORTED HOUSING OBLIGATIONS**

Submitted by:   Martha B. Knisley
April 15, 2022

# Introduction

This is a brief report on the progress of the Department of Behavioral Health and Developmental Disabilities (DBHDD) and the Department of Community Affairs (DCA) in meeting its Supported Housing obligations for individuals in the "Target Population." This report covers these obligations in the five sections below.

The first section is broad, covering the State's obligations to provide Supported Housing to individuals in the Target Population with a focus on referrals and access to Supported Housing. It also includes reference to the State's procedures that enable referrals of individuals with Serious and Persistent Mental Illness (SPMI) in the Target Population to Supported Housing when they have a need for Supported Housing at the time of discharge from a State Hospital, jail, prison, emergency room or homeless shelter.

The second section covers requirements for providing housing supports, including bridge assistance, as part of the Georgia Housing Voucher Program (GHVP).

The third section covers the scattered housing requirements.

The fourth section covers the State's obligations for providing psychosocial supports, tenancy rights and flexible supports, even if an individual is not receiving services through DBHDD.

The fifth and final section covers the State's obligations to build capacity to provide Supported Housing through a Memorandum of Agreement between DBHDD and DCA.

# Section One: Requirements and Findings

The State is required to provide Supported Housing to any of the 9,000 persons in the Target Population with a need for such support. The "Target Population" includes individuals with SPMI who are currently being served in State Hospitals, who are frequently re-admitted to the State Hospitals, who are frequently seen in emergency rooms, who are chronically homeless and/or who are being released from jails or prisons. The Target Population also includes individuals with SPMI and forensic status in the care of DBHDD in the State Hospitals, if the relevant court finds that community services are appropriate, and individuals with SPMI and a co-occurring condition, such as substance abuse disorders or traumatic brain injuries (SA III.B.1, III.B.2.c.i. and ii.).

The State is required to implement procedures that enable individuals with SPMI in the Target Population to be referred to Supported Housing if the need is identified at the time of discharge from a State Hospital, jail, prison, emergency room, or homeless shelter (SA III.B.2.c.i. and ii.).

After reviewing and analyzing the data and supporting information provided by DBHDD, it is again concluded that the State cannot be recommended for a finding of Compliance with the above obligations. This conclusion is based on the following facts and observations:

First, from July 1 to December 31, 2021, as in prior years, the State had not reported on the number of individuals frequently seen in emergency rooms who were referred to and received Supported Housing. **Figure 1** summarizes the information provided on individuals included in the Target Population.

**Figure 1: Target Population Referral/ Housed between July 1 and December 31, 2021[1]**

| Residence when surveyed | # of referrals | # receiving vouchers | # housed |
|---|---|---|---|
| State Hospital | 95 | 89 | 18 |
| Homeless, not in a shelter | 613 | 451 | 146 |
| Homeless Shelter | 246 | 180 | 52 |
| Jail | 26 | 22 | 3 |
| Prison | 4 | 2 | 0 |
| **Total** | **984** | **744** | **219** |

In January 2022, the State began to provide some data on the number of individuals who reached housing and had a history of frequent admissions to an emergency room (11%). The data related to this sub-group of the Target Population requires expansion and more detailed analysis by both DBHDD and the Independent Reviewer.

Second, as depicted in **Figure 1**, the State has continued to assist only a very few individuals released from jails and prisons to access Supported Housing.

Although the State is funding some noteworthy criminal justice related projects, it has not yet provided any outcome data from these initiatives. These data could be collected, at least in part, with relatively little effort. There are potential partners in jails across the state who are known to be more than willing to work with DBHDD and local community mental health agencies to collaborate on developing a timely, accurate referral process. Although there has been some effort to reach out to prisons, including the assignment of peer mentors, DBHDD has reported difficulty with gaining access to these correctional facilities. Since DBHDD and the Department of Corrections are both state agencies, an expanded Memorandum of Agreement may be necessary to permit greater access.

DBHDD's assessment processes for Supported Housing can be expedited because jails and emergency rooms already have credible diagnostic information about the individual's mental health status as well as information on his/her housing needs.

Third, the State should put increased emphasis on developing an effective high utilizer program to advance compliance efforts. High utilizer programs are common today, as identified and evaluated by the Center for Healthcare Strategies[2], utilized by numerous other healthcare organizations and numerous state and local programs. Hospitals across the country have established protocols for identifying high utilizers of emergency rooms and this information

---

[1] Information extracted from DBHDD chart entitled "Residence when Surveyed" submitted to the Independent Reviewer on 2/22/22.
[2] Hasselman D. , Super-Utilizer Summit: Common Themes from Innovative Complex Care Management Programs. Center for Health Care Strategies, Inc. 2013: https://www.chcs.org/media/FINAL_Super-Utilizer_Report.pdf

could be used to plan more effective assertive engagement[3] and access to Supported Housing and community services. Identifying individuals who are high utilizers also becomes a tool for shifting to effective alternative payment models that focus on assertive engagement. Since assertive engagement is an ongoing process, individuals do not need to be identified only at the point they are exiting an emergency room. Local systems have established a range of options for establishing eligibility for referrals and services for individuals designated as high utilizers. For example, Atlanta area hospitals have begun addressing high utilizer issues through the Atlanta Regional Collaborative for Health Improvement (ARCHI) and through Atlanta regional hospital systems to improve behavioral health connections. In the past year, it appears that DBHDD has begun to work more closely with local hospitals in the greater Atlanta area to identify and support individuals with SPMI who are frequently seen in emergency rooms. These are important partnerships and, along with the ARCHI initiative referenced above, could lead to referrals for underserved groups in the Target Population if access improvements also materialize and result in more eligible individuals to gain and keep housing.

Additionally, there are lessons from other states that can be useful when designing new strategies to expedite access to Supported Housing. Other states have adopted measures to expedite referrals and to offer assertive engagement funds for staffing that follows Housing First principles in a manner similar to programs reported by the Center for Healthcare Strategies. [4]

Fourth, the State needs to continue working on efforts to improve its identification, referral, eligibility review, and housing linkage processes to identify everyone who may need Supported Housing, get them reviewed promptly, and then linked/housed as soon as possible. The State has taken steps to initiate a process to establish eligibility more quickly after identifying an individual as potentially in need of Supported Housing; this is referred to as the "referral and conversion" process. This includes establishing an on-line portal for the entire GHVP process and centralizing communication channels for issues related to the use of the platform. This is a significant improvement, and it has reduced the time between eligibility referral and conversion from 22.91 days in FY21 to 9.55 days in the first six months of FY22. This demonstrates the State's ability to track and use data to make needed improvements.

This has been a major initiative for DBHDD. It is clear from DBHDD's reports that its housing staff are improving DBHDD's ability to manage processes better with accurate and reliable data.

The percentage of individuals housed, after approval for a GHV, has increased from 38% in FY19 to 49% in FY21, but not enough time has elapsed to determine the rate for FY22. However, there is enough information available for DBHDD to report that 341 individuals were approved to search for housing in the first six months of FY22. For individuals who had already signed a lease at the time DBHDD issued its report, the median time from the issuance of a voucher to the start of an individual's lease was 86 days.

---

[3] Assertive engagement is a term often used but not always defined. It generally indicates a persistent and active approach to an interaction and is best understood as the process whereby a worker uses their interpersonal skills and creativity effectively to make the environments and circumstances that service users encounter more conducive to change than they might otherwise be. Its roots in psychiatry come from Assertive Community Treatment (ACT) and became more refined and successful as an engagement tool by "Housing First" ACT teams.
[4] For example, New Jersey and North Carolina have adopted these measures.

In FY21, the State made progress in its operations and its collaborative efforts to improve its referral system. The State took advantage of supplemental block grant funding allocated to states as a part of federal COVID relief funding. DBHDD allocated $6.15 million in one-time and multi-year funding to re-entry collaboratives in four communities targeting individuals with serious mental illness: 1) Pre-Trial and Jail In-reach Case Managers, 2) Atlanta Policing Alternatives and Diversion Initiative, 3) the Georgia Justice Project and 4) the Trans Housing Coalition in Atlanta. These are promising collaboratives that are just beginning to come up to full speed. Based on the data presented on access to Supported Housing for individuals with SPMI from jails and prisons, however, it does not appear that these projects have yet had a direct impact on members of the Target Population.

These collaborative efforts should extend statewide to ensure that all individuals in the Target Population with a need for Supported Housing are identified in a timely manner so to qualify for and locate Supported Housing and, where appropriate, to access federal programs that fund affordable and/or Supported Housing, as required in the Agreements. As referenced in earlier reports, the State should analyze need, consult with stakeholders to review the definitions for qualifying for Supported Housing, especially for individuals frequently re-admitted to State Hospitals, who are frequent users of emergency rooms, and/or are released from jails and prisons, to ensure that eligibility requirements are not too restrictive for individuals with SPMI in need of Supported Housing.

In its reporting, DBHDD documented the current residence for 1,389 unduplicated individuals surveyed for eligibility for Supported Housing. However, only 9% of those surveyed were in a State Hospital or were being released from a jail or prison. Another 62% were surveyed when homeless at the time of their referral. DBHDD reported that 354 individuals were residing, at the time of the survey, in one of at least eight other types of residences or facilities, including private residences, clustered housing, Crisis Stabilization Units, group or personal care homes, or were referrals from friends and family. Without further information, these individuals cannot be counted as part of the Target Population and their data cannot be counted towards compliance with the Agreements.

The State also indicated that individuals are more readily reached by the DBHDD system to gain access to Supported Housing when screened outside of an institutional setting. This is neither consistent with practice in other states nor is it consistent with the requirements in the Agreements. States have recognized consistently that unless Supported Housing is provided at discharge, individuals often have no place to go other than unstable housing or another institution.

DBHDD reported percentages of individuals from the target groups that, when combined, total 142%. Thus, the State is counting some people in more than one category, making it impossible to determine whether the State is meeting the requirements in the Agreements. In February 2022, DBHDD referenced that there is an overlap between groups, and, for this reason, they cannot identify a simple number from each category "because people have intersections and fall into multiple categories." It is true that individuals may cycle through institutions and homelessness over time, particularly when arrangements for Supported Housing are not consistent with

10

effective, timely discharge and Housing First practice. Nonetheless, counting an individual more than once obfuscates the true count of individuals in each category of the Target Population who are referred for Supported Housing and makes a compliance finding ever elusive.

Individuals with SPMI often have a history of being served in multiple locations over time, cycling through homelessness, jail or prison, emergency rooms and hospitals. This chronological cycling is expensive and, more importantly, adds to the instability many individuals in the Target Population experience in their lives. The aim of the obligations in both Agreements is to assist individuals to live a more stable life in the community. Outcome data from other states confirm that discharging an individual with SPMI directly to Supported Housing from a state hospital dramatically reduces the readmission rate, therefore enabling individuals to live a more stable life in the community.

In the earlier years of the Agreements, from 2012 through 2020, DBHDD routinely reported the numbers of individuals in the Target Population who were provided Georgia Housing Vouchers (GHVs), except for individuals who are frequently seen in emergency rooms. It is highly recommended that additional effort be made by DBHDD to completely and accurately report all the data required for a recommended finding of Compliance with the applicable provisions of the Agreements.

## Section Two: GHVP Requirements

DBHDD has oversight and management responsibility for the GHVP. DBHDD provides state-funded rental assistance and bridge assistance, as required in the Agreements. Below is a chart **(Figure 2)** depicting the historical trend of the number of individuals provided Supported Housing using a GHV, based on DBHDD's reports:

**Figure 2: GHVP Provided to Individuals in the Target Population FY 2016-FY 2022**

| FY 2015 | FY 2016 | FY 2017 | FY 2018 | FY 2019 | FY 2020 | FY 2021 | July 1-Dec. 31, 2021 |
|---|---|---|---|---|---|---|---|
| 1623 | 1924 | 2432 | 2453 | 1908 | 1615 | 1814 | 1833 |

DBHDD reported that 36 individuals with a GHV separated from housing from July 1, 2021 to December 31, 2021. During this same period, 341 housing slots were approved and 300 individuals received Bridge funds. This signals that a number of individuals were probably in the process of seeking housing at the end of December 2021.

The number of housing slots filled in the GHVP in the first six months of FY22 was 129 less than in the same period in FY21. It is too early in FY22 to determine the efficiency rate for calculating the conversion rate of issuing a GHV to individuals moving into housing after receiving a Voucher; final numbers won't be known for at least two more months.

As reported in FY21, the State has begun identifying major factors impacting the availability of housing units for the GHVP and made policy changes to help increase the availability of housing. These changes include:

1) DBHDD updated its payment standard in high population density areas by adopting a "Small Area Fair Market Rents" category, thus creating more opportunities to attract landlords and property owners. With a rapidly changing rental market, owners and landlords now can raise rents beyond the current Fair Market Rental Payment Standards in local areas. Georgia has a deficit of 193,726 rental units for individuals living at or below 30% of the Area Median Income; there are 116,395 units contributing to that deficit in the Atlanta metropolitan area[5]. This number is likely to increase in the 2022 GAP report, especially if property managers continue to market to individuals who can afford to pay rent above the current Fair Market Rent Standard.

2) DBHDD, in partnership with DCA, created a "Landlord Risk Mitigation" fund to cover damages or the cost of moving, which over time will likely help retain housing owners in the GHVP. DBHDD is allowing providers to "master lease" rental units to individuals. This is an effective tool as long as the individual retains tenancy rights, as required by the Agreements.

4) The State shifted its Unified Referral Process to a process referred to as "resource of first resort with requirements for future transition to alternate housing resources if/when available and appropriate." The State reported this enabled them to fill units more quickly. However, data in Section 4 below reveal the State is missing opportunities to utilize federal funds for rental assistance. Other states continue to improve their Unified Referral Processes to enable them to better utilize a fuller array of housing resources.

5) DBHDD recently reported working with CORT furniture to improve access to furniture resources. DBHDD is also exploring creating marketing materials for the GHVP with housing providers and is looking for more opportunities to incentivize housing organizations to participate in the GHVP.

## Section Three: Scattered Site Housing Requirements

The State must meet an "integrated" housing requirement that at least half of the Supported Housing units connected to the Agreements be either scattered-site housing or apartments clustered in a single building with no more than 20 percent of the units in one building occupied by individuals in the Target Population (SA III.B.2.c.i. (A)). The Settlement Agreement requires that 60 percent of Supported Housing be two-bedroom units and the other 40 percent be one-bedroom units (SA III.B.2.c.i.(B)). Due to the ongoing COVID pandemic, it was not possible to conduct an on-site review of this requirement prior to the submission of this report. It is hoped that an on-site review can be completed for the next report to the Court.

---

[5] *The GAP: A Shortage of Affordable Homes.* The National Low Income Housing Coalition, Washington D.C. (March 2021)

**Section Four: Supported Housing Assistance**

The Agreements require that individuals get assistance, including psychosocial supports, to assist them in attaining and maintaining safe and affordable housing and support their integration into the community. This includes getting permanent housing with tenancy rights, linked to flexible community-based services that are available when individuals need them, but are not mandated as a condition of tenancy. Supported Housing is to be available to an individual even if he/she is not receiving services through DBHDD. DBHDD has struggled over time to meet these housing supports and requirements in an effective manner.

However, over the past two and a half years, the State has embarked on an initiative called the Housing Support Program to ensure all GHVP enrollees will have basic housing supports to promote housing stability and success while living in the community. This initiative is showing great promise.

This initiative began with a cooperative arrangement with Step Up, an organization originally from California, and Pathways to Housing, a nationally recognized organization delivering and developing "Housing First"[6] ACT services. These organizations are delivering Housing First services in Fulton and Dekalb counties. DBHDD recently awarded seven contracts for the Housing Support Program in Regions 1, 2, 3 (three contracts), 4 and 5. DBHDD reports that it is exploring options in Region 6. When a provider agency is selected in Region 6, there will be statewide coverage.

The Pathways Housing First Institute is providing training, consultation, technical assistance, and assistance with developing a GHVP program manual. DBHDD has initiated an internal work group to oversee this initiative.

DBHDD reports that providers are working through challenges with this initiative. One challenge for providers is building caseloads, while at the same time assisting individuals to secure and remain stably housed. This is predictable for start-ups of this nature. Finding affordable, safe, decent housing units is a challenge for providers in this initiative, particularly in urban and suburban markets where rents are rapidly increasing, but their housing placement numbers reveal they are having some success.

DBHDD reports that the providers in Regions 1 and 2 are still ramping up their staffing. DBHDD also reports that providers are working through the predictable challenges with care coordination and re-engagement of individuals who often leave the program and then re-appear. Nonetheless, providers are pursuing working relationships with property managers and other community partners. These working relationships are essential to effective Housing First programs. At the end of December 2021, 1,062 individuals were "on caseloads" and 869 individuals were living in Supported Housing. DBHDD also reports that providers are working towards transferring their tenants from the GHVP to Housing Choice Vouchers.

---

[6] "Housing First" is a highly successful supported housing model with four core principles with established interventions: 1) individuals get immediate access to permanent housing with no housing readiness requirements; 2) a rights-based, client-centered approach that emphasizes client choice in terms of housing and supports; 3) focused on an individual's recovery, it is individualized; and 4) provided with a focus on community integration.

The number of referrals and housing placements reflects the success that the Supported Housing providers are having in assisting individuals who are chronically homeless move into housing. (The homeless sub-group benefits from the efforts of a host of non-DBHDD organizations that are focused solely on homeless initiatives.) But the State's numbers of referrals and housing placements for individuals in other Target Populations remain low. Fortunately, Pathways, the State's Technical Assistance provider, and Viewpoint, one of the Housing Support Program providers, both have extensive and valuable experience taking referrals from the other Target Population sub-groups. Without a doubt, both agencies could be an important resource to DBHDD to improve referrals at the time when individuals are discharged from jails, prisons, and State Hospitals. Viewpoint already has experience in its service area assisting individuals incarcerated in local jails. Other Housing Support Program providers may have similar experience. Other states have demonstrated success with discharges from state hospitals, prisons, and jail directly into Supported Housing and may also have recommendations. Utilizing Housing Support Program providers to develop effective approaches could be highly beneficial and help the State to meet its Agreement obligations.

### Section Five: Capacity

The Extension Agreement includes a provision (EA 39) that the State shall continue to build capacity to provide Supported Housing by implementing a Memorandum of Agreement (MOA) between DBHDD and DCA. The MOA must include the following components:

a. A unified referral strategy (including education and outreach to providers, stakeholders, and individuals in the Target Population) regarding housing options at the point of referral;
b. A statewide determination of need for Supported Housing, including developing a tool to assess need, forming an advisory committee to oversee the needs assessment, developing a curriculum to train assessors, certifying assessors, and analyzing statewide data;
c. Maximization of the GHVP;
d. Housing Choice Voucher (HCV) selection preferences (approved by the US Department of Housing and Urban Development);
e. Effective utilization of available resources (such as Section 811 and public housing authorities); and,
f. Coordination of available state resources and state agencies.

The State took steps to meet these requirements, including convening the Supportive Housing Advisory Committee on Residential Experience (SHARE), ensuring coordination among state agencies, and retaining the HCV preference. Recent data suggest the HCV preference was used more often in the earlier years of the Agreements but is not being increased now. Before the next report to the Court is submitted, it will be important to assess the role of the Advisory Committee to oversee the needs assessment and the development of the curriculum to train and certify assessors and to analyze statewide data, as required in EA 39 (b).

The State has routinely provided data on the ongoing work between DCA and DBHDD to utilize housing resources other than state funded GHVs. This is important work as it demonstrates

14

Georgia's ability to utilize the federal funds allocated and awarded to state and local communities on behalf of individuals with disabilities.

DBHDD and DCA continue to utilize the Balance of State preference approved by HUD for individuals in the Target Population deemed eligible for a HUD Housing Choice Voucher (Section 8). There is a long waiting list for access to these vouchers, even with a preference, because these vouchers do not turn over often. Nonetheless, states with preferences must monitor waiting lists closely and update waiting lists on a regular basis to ensure that individuals with preferences get access to vouchers. In FY21, only 21 individuals accessed housing using this preference. There is an average of only 40 individuals per fiscal year or 363 individuals overall since HUD approved this preference in FY13. This should be re-visited to ensure that the selection preference is being fully utilized for members of the Target Population.

Likewise, Georgia was awarded an allocation of project-based vouchers in HUD's 811 program for individuals with disabilities. It was reported that only 42 individuals were living in a unit funded with 811 PRA funds, an increase of only two people since March 2020. Although DCA was awarded funding for 484 units, the five-year cumulative total of individuals from the Target Population accessing one of these units is only 73.

Georgia's Balance of State PHA (DCA) and five local PHAs were awarded over 300 Mainstream Vouchers for individuals with disabilities between 2017 and 2020. DCA reports 88 individuals in the Target Population were utilizing those vouchers on December 31, 2021.

As reported previously, the State tried, but no longer utilizes, a unified strategy at the point of referral. The State's attempt to do this was not effective. The process took too long, was not clear, and often did not give individuals any choice of units that were accessible to them and/or located close to where their behavioral health provider was located. Instead of creating the envisioned simpler assessment of need, the process became more complicated and less timely. However, DBHDD still attempts to utilize resources other than GHVs and works with DCA to move individuals from GHVs to Housing Choice Vouchers.

Key personnel at DCA are demonstrating a clear focus on maximizing the availability of the Balance of State "preference" HCVs, Low Income Housing Tax Credit units and HUD 811. The agency recognizes the challenges with using HUD 811 and is taking positive steps to maximize the use of those funds for the Target Population. In addition, DCA recently took a proactive step to secure a Waiver from HUD to increase the Fair Market Rent standard to pay higher rents for individuals with extremely low incomes who are searching for housing in a market where rent prices are soaring.

## **Conclusion**

There are encouraging signs that the State is moving forward to meet the Supported Housing requirements of the Agreements. However, the State still needs to take decisive action in four critical areas. First, the State must be able to clearly demonstrate that all individuals in need of Supported Housing within <u>all</u> the sub-groups of the Target Population are being referred to

Supported Housing utilizing an effective and timely referral process. Second, the State must demonstrate that it is consistently providing GHVs for those Target Population individuals in need of Supported Housing and then ensure that they are actually housed shortly thereafter. Third, the State must demonstrate that it has the capacity to provide Supported Housing to any individuals in the Target Population who have a need for such support. Fourth, the State must effectively implement a housing support system statewide to ensure individuals have access to housing supports, regardless of where they reside.

In part, the State is falling short of having the capacity to serve those in need of Supported Housing because of the growing lack of affordable housing units in Georgia. But this problem also exists because the referral and eligibility process is not effective in identifying those in need of Supported Housing and because individuals need more effective assistance to sustain their housing. With service system improvements, the State certainly can increase the number of individuals living in Supported Housing consistent with the identified need, although the availability of housing may continue to stymie efforts unless there are assertive actions taken to increase the supply of integrated community-based options.

Submitted by: _____/s/_____
Martha Knisley