**IN THE UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF GEORGIA – ATLANTA DIVISION**

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| v. | ) | CIVIL ACTION NO. |
| | ) | 1:10-CV-249-CAP |
| THE STATE OF GEORGIA, et al., | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

**MEMORANDUM IN SUPPORT OF JOINT MOTION TO REMOVE
DISCRETE AGREEMENT PROVISIONS FROM ACTIVE MONITORING**

The Parties and the Independent Reviewer have been working together to facilitate the State's compliance with the remedial agreements in this case.  The agreements require adequate and appropriate community services and supports to enable people with Serious and Persistent Mental Illness (SPMI) and people with Developmental Disabilities (DD) to avoid needless institutionalization and to live successfully in community settings.  Although additional work remains to be done, there have been notable accomplishments.

In this joint submission, the Parties recognize some of these accomplishments by highlighting numerous provisions of the 2010 Settlement Agreement (the "SA") and the 2016 Extension Agreement (the "EA") where the Parties and the Independent Reviewer agree that the State has achieved substantial compliance.

The Parties and the Independent Reviewer agree that these provisions do not require active monitoring at this time. The Parties may file a similar joint motion later this year, identifying additional provisions that do not require active monitoring.

## I.    **LEGAL BACKGROUND**

There are two settlement agreements currently in effect in this case. On October 29, 2010, the Court adopted the SA, entered it as an order of the Court, and retained jurisdiction to enforce it. Order, No. 1:10-CV-249, ECF No. 115.[1]

A few years later, the Parties reached accord on a second settlement with additional remedial requirements. On May 18, 2016, the Parties filed this proposed agreement via a joint motion to extend the SA. ECF No. 258. The Court granted the Parties' joint motion and retained jurisdiction to enforce the EA. Order, ECF No. 259, May 27, 2016.

Each agreement includes remedial provisions related to the Americans with Disabilities Act (ADA), 42 U.S.C. §§ 12131-12134 (Part A), as well as the Supreme Court's ADA opinion in *Olmstead v. L.C.*, 527 U.S. 581 (1999), both of which require that individuals with disabilities receive services in the most integrated setting appropriate to their needs. Combined, the SA and the EA require the State to

---

[1] The SA created an independent monitoring officer with the title of "Independent Reviewer"; the Parties selected Elizabeth Jones to serve as Independent Reviewer, a post she still holds today.

expand and enhance community housing and community services for people with disabilities to reduce reliance on the State Hospitals to meet their individual needs.

The two agreements in this case each cover two groups of people – those with SPMI and those with DD.  The DD Target Population includes "individuals with a primary diagnosis of a developmental disability who are currently hospitalized in the State Hospitals and those who are at risk of hospitalization in the State Hospitals."  SA § III.A.2.a.

The SPMI Target Population includes the "approximately 9,000 individuals … with SPMI who are currently being served in the State Hospitals, who are frequently readmitted to the State Hospitals, who are frequently seen in Emergency Rooms, who are chronically homeless, and/or who are being released from jails or prisons."  SA § III.B.1.a.; EA § 30 (similar language).  The SPMI Target Population includes people with co-occurring substance use disorders and those with traumatic brain injuries.  SA § III.B.1.d.; EA § 30.  Individuals dually-diagnosed with both DD and SPMI can simultaneously belong to both Target Populations.

Both Target Populations include people on forensic status[2] "if the relevant court finds that community [placement/service] is appropriate."  SA §§ III.A.3.b.,

---

[2] This group includes people under the jurisdiction of criminal courts who have been:  adjudicated not guilty by reason of insanity; determined to be incompetent to stand trial; and/or those who have not yet been evaluated for competency.

III.B.1.b.; EA § 30 (similar language for the SPMI Target Population).  For

individuals on forensic status, eligibility for discharge to community settings will

ultimately depend on the determination of an independent court and not the State.

## II.    REDUCED STATE RELIANCE ON INSTITUTIONAL SETTINGS

Overall, the State has made progress in reducing its reliance on institutions to

serve people with disabilities.  When this Court entered the SA on October 29, 2010,

there were seven State Hospitals in Georgia's system, most serving both people with

DD and people with mental illness:

- Central State Hospital (CSH), with the Craig Nursing Center in Milledgeville;
- East Central Regional Hospital (ECRH), with Gracewood in Augusta;
- Georgia Regional Hospital at Atlanta (GRHA);
- Georgia Regional Hospital at Savannah (GRHS);
- Northwest Georgia Regional Hospital (NWGRH) in Rome;
- Southwestern State Hospital (SWSH) in Thomasville; and
- West Central Georgia Regional Hospital (WCGRH) in Columbus.

In October 2010, these seven institutions had a combined total of 2,436 beds and

served 2,603 unduplicated people that month, with an average daily census of 1,821.

As a result of the reforms put in place per the two remedial agreements, the

State has reduced its reliance on institutions to meet people's needs.  The total

number of State institutional beds has declined by 57 percent – from 2,436 beds in

October 2010 to 1,044 beds on September 2, 2024.  More importantly, State data

reveals that State Hospital utilization has been cut in half since the entry of the SA –

the total number of unduplicated consumers served in State Hospitals in August 2024 was about 55 percent lower than in October 2010 (from 2,603 to 1,168) and the average daily census was about 44 percent lower (from 1,821 to 1,026).

As the State shifted towards meeting the needs of people with disabilities in the community, not only did the State reduce State Hospital capacity/utilization, it closed entire institutions.  On June 30, 2011, the State closed NWGRH (268 beds in October 2010), and on December 31, 2013, the State closed SWSH (246 beds in October 2010), leaving five State Hospitals across the system.  On May 31, 2015, the State also closed Craig Nursing Center (205 beds in 2010) on the CSH campus.[3]

## III.   AGREEMENT PROVISIONS IN SUBSTANTIAL COMPLIANCE THAT DO NOT REQUIRE ACTIVE MONITORING

As we discuss in greater detail below, the Parties and the Independent Reviewer agree that the State is in substantial compliance with the following provisions of the SA and EA, which address changes in State Hospital admission criteria for people with DD, increases in the number of people who can receive various community services, and expansion of community services:

---

[3] The State projects that it may need to add forensic beds on the GRHA campus over the next few years to serve people who would otherwise be housed in jails, awaiting mental health evaluation and/or treatment.  The State also plans to expand its community-based competency restoration program.

| SA § | III.A.1.b. | Legal Changes on DD State Hospital Admissions; |
|---|---|---|
| | III.A.2.b.i.(A)(B)(C)(D) | Community Waivers and Family Supports; |
| | III.B.2.a.i.(E)(G)(H) | ACT; |
| | III.B.2.a.ii.(B)(C) | CST; |
| | III.B.2.c.i.(C) | Bridge Funding; |
| | III.B.2.c.ii.(C) | Bridge Funding; |
| | III.B.2.d. | Supported Employment; and |
| EA § | 6 | Community COMP Waivers; |
| | 19 | Community COMP and NOW Waivers; |
| | 32 | Bridge Funding; |
| | 33 | Bridge Funding. |

The Parties and the Independent Reviewer also agree that the State is in substantial compliance with the third and fourth sentences of SA § III.A.2.b.i.(E) (Waivers and Family Supports).

The Parties and the Independent Reviewer agree that these provisions do not require active monitoring at this time, meaning that the Independent Reviewer need not conduct the factual investigation and verification of data and documentation activities set forth in SA § VI.B.  Indeed, removing these items from active monitoring will allow the Independent Reviewer to focus monitoring efforts on areas where compliance has remained elusive while reducing the cost of monitoring.

The joint motion does not ask the Court to terminate any of these SA/EA provisions or the Court's orders associated with them.  The State agrees to maintain compliance with these provisions.

In 2016, the Independent Reviewer reported favorably on the State's efforts to comply with the following additional provisions of the SA:  §§ III.A.2.c.i(A), III.A.2.c.ii(B)(1-3), III.A.3.a, III.A.4.a, III.A.4.b, III.B.1.c, III.B.2.a.iii(D), III.B.2.a.iv(C), III.B.2.b.i(B)(1-3), III.B.2.b.ii(B)(1-3), III.B.2.b.iii(A), III.B.2.b.iv(A)(B), III.B.2.b.v(A)(B)(1-3), III.B.2.b.vi(C)(1-3), III.B.2.c.ii(A)(B)(C), III.C.3.a.b, and IV.C; in general, these provisions are related to crisis services, case management, peer support services, and other oversight and quality items.  The State is in the process of providing the United States and the Independent Reviewer with data and information related to the State's current compliance with these provisions.  The Parties expect to update the Court on their status later this year.

A. Institutional Admission Limits Based on DD Diagnoses

*Agreement Requirements.*  The SA requires the State to address inconsistencies in existing regulatory or statutory language that permitted the admission of people with DD to a State Hospital due to a primary diagnosis of a developmental disability.  SA § III.A.1.b. ("The State will make any necessary changes to administrative regulations and take best efforts to amend any statutes that may require such admissions.")

*Past and Current Status.*  To address this SA provision, in 2011, the Georgia Legislature passed House Bill 324, which amended Chapter 4 of Title 37, to repeal

statutes that facilitated the admission of people with DD to State Hospitals.  The repealed statutes had given broad discretion to third parties to pursue institutionalization, as well as wide latitude to readily admit people to State Hospitals, largely on the basis that they had a diagnosis of DD.  The statutory changes became effective, July 1, 2011.

Due in part to these statutory changes, the State, since the entry of the SA, has eliminated 1,037 of 1,142 State DD institutional beds; this represents more than a 90-percent reduction in DD institutional bed capacity.  More importantly, utilization has dropped by 80 percent:  in October 2010, the State served 997 individuals with any diagnosis of DD in a State Hospital; on August 31, 2024, the State institutional DD total was down to 196.[4]  In April 2024, the State served in the community 16,280 people with DD; the comparable figure in 2010 was 10,797 – an increase of about 50 percent.

State data reveals that dozens of individuals dually-diagnosed with mental illness and DD continue to be admitted to State Hospitals each year, typically for mental health reasons during a crisis.  The State reports that since 2012, all but two

---

[4] Of the 196 individuals with any diagnosis of DD who still lived in a State Hospital on August 31, 2024, the State reports that 19 have been identified as appropriate for community placement on the State's Active Transition list, and that 68 were on forensic status.

individuals with any diagnosis of DD were admitted:  1) on forensic status by criminal court order; or 2) because a licensed clinician (for voluntary admissions and involuntary admissions shorter than seven business days) or a court (for involuntary admissions longer than seven business days) determined the person has mental illness and is in need of involuntary treatment for mental illness within a hospital setting because the person either presents a "substantial risk of imminent harm to that person or others, as manifested by either recent overt acts or recent expressed threats of violence," or is "so unable to care" for their own physical health and safety as to "create an imminently life-endangering crisis."  Ga. Code Ann. § 37-3-1 (9.1, 2); DBHDD Policy 03-502.

The United States and the Independent Reviewer expect fewer individuals with DD to have contact with State Hospitals once the State achieves substantial compliance with all of the DD provisions in the SA and the EA.  The United States and the Independent Reviewer expect the State to continue to expand and enhance community services and to implement effective measures to minimize contact with State Hospitals for people with DD, especially those in decline or crisis.

*Conclusion*.  The Parties and the Independent Reviewer agree that the State is in substantial compliance with SA § III.A.1.b. (statutory changes on DD institutional admission criteria).  The Parties and the Independent Reviewer agree

though that SA § III.A.1.a. (which prohibits admission of people with a primary diagnosis of DD to any State Hospital) should remain subject to active monitoring.

B. <u>DD Community Waivers to Transition Individuals from State Hospitals</u>

*Agreement Requirements.*  The SA requires the State to create 750 home and community-based service Waiver slots[5] and to move 600 people with DD to appropriate community settings from the State Hospitals; the SA also requires the State to attempt to move any remaining people with DD to appropriate community settings from the State Hospitals.  SA § III.A.2.b.i.  Georgia offers two community Waiver options – the New Options Waiver (NOW) and the Comprehensive Supports Waiver (COMP).[6]  SA § II.G.  The EA requires the State to create and use 25 COMP Waivers in addition to the Waiver figures set out in the SA.  EA § 6.

---

[5] Many Medicaid-funded community services are called "Waiver" services because the Centers for Medicare & Medicaid Services (CMS) is authorized to waive certain federal Medicaid program requirements in order to enable people who would otherwise be served in institutions to receive home and community-based services instead.  These home and community-based waiver provisions permit jurisdictions to create a discrete Waiver program of Medicaid services for a targeted group of people, most often in a community setting.  Waiver services typically include those that support daily living, such as dressing, bathing, toileting, and eating, as well as health services, such as nursing and therapy.  Waiver programs usually cap the number of people who can receive services under that program; the term "Waiver slots" here refers to the authorization for people to receive services in the program.
[6] NOW provides supports primarily to individuals who need less intensive services and do not need 24-hour care; it was designed for people with disabilities who live with family members or in their own home.  The COMP Waiver was designed for people who need a full range of out-of-home services or intensive in-home services;

*Past and Current Status*.  Since the entry of the SA, the State has funded sufficient community Waiver capacity whenever needed to transition people with DD from a State Hospital to a community setting.  From the entry of the SA in October 2010 through March 31, 2024, the State has created, and then used, Waivers to move a total of 692 individuals from State Hospitals to the community; this includes the 25 COMP Waivers required by the EA.

The current FY25 State budget includes funding to create 100 additional Waivers, some of which will be available to address the needs of members of the DD Target Population who may need to transition to the community from one of the State Hospitals.  This includes the 19 individuals on the Active Transition list, as well as others in the DD Target Population who do not oppose receiving services in a community setting.

*Conclusion*.  The Parties and the Independent Reviewer agree that the State is in substantial compliance with the first two sentences each in SA § III.A.2.b.i.(A) (B) (C) and (D) (creation and use of community Waivers), as well as EA § 6

---

it is also used for people who are transitioning out of institutions to community settings.  In FY24, the average annual cost for someone on NOW was about $15,000, while the average annual cost on the COMP Waiver was about $81,700. CMS approved the State's COMP renewal application in August 2022, and its NOW renewal in June 2023.  Recently, CMS approved the State's request to amend its Waivers to increase provider reimbursement rates for both the NOW and the COMP Waivers, with an effective date of July 1, 2024.

(creation and use of 25 COMP Waivers); we all agree that these provisions are

appropriate to remove from active monitoring.  The Parties and the Independent

Reviewer agree that the first two sentences of SA § III.A.2.b.i.(E) should remain

subject to active monitoring; that SA item provides that "… the State shall attempt

to move any of the remaining individuals with developmental disabilities from the

State Hospitals to the community" and that "[t]he State shall create up to 150

waivers to accomplish this transition."  This provision is still necessary to

accommodate those in the DD Target Population in a State Hospital who may seek

services in a community setting.

   C. <u>DD Community Waivers to Prevent Institutionalization</u>

    *Agreement Requirements*.  To benefit those people with DD who are at risk of

admission to a State Hospital, the SA requires the State to provide 400 Waivers to

prevent unnecessary institutionalization.  SA § III.A.2.b.i.  The EA requires the

State to create an additional 375 COMP and 300 more NOW Waivers for people

with DD on the waitlist to prevent their unnecessary admission to an institution.  EA

§ 19.  This results in a total of 1,075 new Waivers to be used to support people with

DD in the community to prevent their unnecessary institutionalization.

    *Past and Current Status*.  By May 7, 2012, the State created and utilized the

400 Waivers required by the SA.  By June 3, 2017, the State created and utilized the

300 NOW Waivers required by the EA, and by August 23, 2017, it created and utilized the 375 COMP Waivers required by the EA. Given this, the Parties and the Independent Reviewer agree that the State has created and utilized all 1,075 Waivers required by the two agreements.

In fact, the State has far exceeded SA/EA Waiver benchmarks. As of June 30, 2024, State data reveals that since October 1, 2010 – the month the Court entered the SA – a total of 19,461 individuals in the DD Target Population have accessed Waiver services in the community to prevent institutionalization – 9,618 on the COMP Waiver and 9,843 on NOW; the State reports that everyone who received a COMP or NOW Waiver was at imminent risk of institutionalization. The 19,461 preventative Waivers are in addition to the 692 Waivers, referenced above, used to move people from the State Hospitals.[7]

In spite of all this, there are still many people with DD across the state who have applied for, and been found pre-eligible to receive, community Waiver services, but have yet to receive them. The State has put these individuals waiting for Waiver services on what it calls the "DD Planning List." The State has split the overall list into NOW and COMP Waiver sub-lists, based on initial needs

---

[7] The figures above are cumulative Waiver totals. The State reports that as of June 30, 2024, DBHDD was currently serving over 13,000 individuals on a Waiver – 9,322 on COMP and 4,232 on NOW.

assessments/scores and on the amount and type of services needed; the vast majority are awaiting NOW Waiver services.  As of March 31, 2024, there were 7,356 individuals (5,081 adults) waiting for DD services.  As of April 30, 2024, there were 419 individuals on the list with high unmet needs.  The Parties and the Independent Reviewer will continue to work together to address outstanding issues in this area.

*Conclusion*.  The Parties and the Independent Reviewer agree that the State is in substantial compliance with the third sentences in each of SA § III.A.2.b.i.(B) (C) (D) and (E) (preventative Waivers), as well as EA § 19 (additional NOW/COMP Waivers), and that these items are appropriate to remove from active monitoring.

D. <u>DD Family Supports</u>

*Agreement Requirements*.  The SA requires the State to provide family supports to 2,350 families of people with DD.  SA § III.A.2.b.i.  Family supports are defined as an array of goods and services aimed at providing families with the individualized supports needed to prevent institutionalization to care for a family member with DD at home.  SA § II.F.  They are distinct from Waiver services.

*Past and Current Status*.  The State offered family supports, through its FSS program, before entry of the SA in October 2010.  In FY11, the State was providing FSS to 2,822 families.

The current FSS program primarily serves those whose needs can be met with a small amount of flexible funding.  There is a $3,000 annual cap per eligible individual on what a family can receive through FSS; in FY23, the annual average cap for respite family supports increased to $4,935.  Commonly used FSS supports include specialized medical supplies, incontinence supplies, and social integration/community access services.  There are 28 FSS providers throughout the state; there are at least four FSS providers in each of the State's six service regions. State data reveals that from FY11 to today, the State has provided thousands of families with FSS to help people with DD remain at home.  In FY24, the State provided FSS to 6,067 unduplicated families of people with DD – this is FSS to 3,245 more families than in FY11, and is more than is required in the SA.

*Conclusion*.  The Parties and the Independent Reviewer agree that the State is in substantial compliance with the family supports provisions in the last sentences in SA § III.A.2.b.i.(A) (B) (C) (D) and (E), and we all agree that these provisions are appropriate to remove from active monitoring.

E. Assertive Community Treatment

*Agreement Requirements*.  The SA requires the State to provide various intensive services, including Assertive Community Treatment (ACT), for people

with SPMI.[8]  The State is to provide at least 22 ACT teams.  SA § III.B.2.a.i.(H).

All of the ACT teams are to be multidisciplinary (with a team leader, a nurse, and a

peer specialist), with 7-10 team members serving individuals at a 1:10 ratio.  SA §

III.B.2.a.i.(A)(F).  The ACT teams are to provide comprehensive, individualized,

customized, and flexible treatment, support, and rehabilitation to individuals where

they live and work.  SA § III.B.2.a.i.(A).  The teams are to operate at all hours of

every day (24/7), and with fidelity to the Dartmouth Assertive Community

Treatment (DACT) model.[9]  SA § III.B.2.a.i.(E)(G).  The teams are to provide many

services critical to an individual's ability to live successfully in the community,

including:  case management, psychiatry, employment and housing assistance,

substance use services, and crisis services.  SA § III.B.2.a.i.(A)(B)(C) and (D).

*Past and Current Status*.  At the time of the entry of the SA in October of

2010, the State offered only limited ACT services and none of the ACT teams

operated with fidelity to an evidence-based model.  The State did not collect data on

---

[8] ACT provides comprehensive community-based treatment, support, and rehabilitation services for people with serious mental illness.  It is a recovery-oriented, and highly intensive service that offers access to a variety of interventions at all hours of every day, to enable people with serious mental illness to live successfully in the community.  ACT is especially appropriate for individuals who experience the most challenging symptoms of serious mental illness and have the greatest level of functional impairment.

[9] Adhering to fidelity parameters in an evidence-based model, like DACT, helps to ensure that ACT services are adequate and of sufficient quality to be effective.

ACT services or their effectiveness.  The State estimates that in January 2012, it was

providing non-fidelity ACT services to about 890 people.

As of late August 2024, as required by the SA, State data reveals that it funds

22 ACT teams, all of which operate with fidelity to the Dartmouth evidence-based

model.  There are at least three fidelity ACT teams in each of the six regions

throughout the state, with seven teams in the metro-Atlanta region.  All 22 ACT

teams operate 24/7.  State data reveals that on August 31, 2024, the 22 fidelity ACT

teams served a total of 1,402 individuals; the total unduplicated count of individuals

served on ACT teams throughout FY23 was 2,015.[10]  As of August 31, 2024, the

census size of the fidelity ACT teams ranged from 47-76 people, with an average

size of about 64 people per team; almost all teams were operating within a staff to

served person ratio at or higher than the 1:10 ratio set out in the SA.[11]

Several years ago, the State produced a number of internal ACT Effectiveness

Studies.  One concluded that receipt of ACT services decreased the average number

of inpatient admissions, as well as the average number of days in inpatient services.

---

[10] The State funds a handful of additional teams that do not operate with fidelity to an
evidence-based model; these other teams serve an additional 230-300 people.
[11] Many teams have unused capacity with the ability to serve dozens of additional
people.  As of August 31, 2024, the State's overall ACT network had the ability to
serve about 600 more individuals than it was presently serving.  The State commits
to address this issue going forward.

Another internal study concluded that the decrease in inpatient admissions was maintained even after discharge from ACT.  Individuals currently enrolled with ACT are often achieving positive outcomes – many resume taking medications as prescribed, many return to work, and many avoid contact with hospitals and law enforcement.  State data from August 2024 reveals that only about seven percent of those on ACT had a psychiatric inpatient admission and that the 90-day psychiatric inpatient readmission rate was low.

As of August 31, 2024, all 22 of the ACT teams operated with fidelity to the Dartmouth model – 18 of the 22 ACT teams scored at "good" implementation levels on the Dartmouth Assertive Community Treatment Scale (DACTS), while four teams scored at the "fair" implementation level; the scores of those four teams were very close to good fidelity.[12]

The State's ACT teams achieved positive fidelity scores despite staffing concerns on many of the teams.  State data from August 2024 reveals that:  at least eight teams had no peer specialist, at least six teams had no substance use disorder

---

[12] Georgia's ACT fidelity monitoring, per DACTS, measures each team's current practices based upon clinical reviews and a review of administrative documents, interviews with individuals and staff, as well as observation of team meetings and practices.  In June 2023, the Independent Reviewer's Evidence-Based Practice (EBP) consultant reviewed a handful of ACT teams and independently assessed the integrity of the State's ACT fidelity review process, concluding that the State conducted proper ACT fidelity reviews and that the overall process was sound.

specialist, at least two teams had no psychiatrist, at least two teams had no

vocational specialist, and at least four teams did not have the minimum seven FTE

ACT team members.  Given this, the Parties and the Independent Reviewer agree

that SA § III.B.2.a.i.(A-D) and (F), that reference staffing requirements, should

remain subject to active monitoring.

*Conclusion*.  The Parties and the Independent Reviewer agree that the State is

in substantial compliance with SA § III.B.2.a.i.(E) (G) and (H) (24/7 operation,

fidelity adherence, number of teams), and that these provisions are appropriate to

remove from active monitoring.  The Parties and the Independent Reviewer will

continue to work together as the State addresses outstanding staffing issues related

to SA § III.B.2.a.i.(A-D) (F).

F.  Community Support Teams

*Agreement Requirements*.  The State is to provide at least eight Community

Support Teams (CSTs)[13] in areas with lower population density, in professional

workforce shortage areas, or to complement existing ACT services.  SA §

---

[13] Like ACT, CSTs address the intensive needs of individuals with serious mental
illness who are difficult to engage in treatment and have a history of inpatient
hospital or crisis admissions for mental health reasons.  CSTs provide intensive
services to those with serious mental illness who are:  discharged from a hospital
after multiple or extended stays; or have multiple discharges from crisis centers,
correctional facilities, or other institutional settings.

III.B.2.a.ii.  The CSTs are to have at least three team members (a nurse, a certified peer specialist, and a paraprofessional), provide services in individuals' homes, and ensure that community resources are in place to enable individuals to remain in the community.  SA § III.B.2.a.ii.  CSTs are to have a staff to served person ratio of 1:20 in rural areas and 1:30 in urban areas.  SA § III.B.2.a.ii.(B).

*Past and Current Status*.  Upon entry of the SA in October of 2010, the State did not have any CSTs.  Today, the State funds 10 CSTs in primarily rural locations throughout the state.  The State reports positive outcomes associated with its CSTs, with a low recidivism rate back to State Hospitals for those getting CST services.

State data reveals that there is at least one CST in every region, except for Region 3, which is urban/suburban, and alternatively serves members of the Target Population through seven ACT teams.  All CSTs operate 24/7.  On April 11, 2024, the current CST census total was 274 people.  The number of people served per team ranged from 11 to 42, with a 10-team average of about 27 people.

As of April 11, 2024, State data reveals that all 10 of the CSTs satisfied the 1:20 staff to served person ratio set out in the SA for rural teams.  As of April 11, 2024, all but one of the CSTs utilized three FTE staff as required by the SA; the outlier utilized 2.5 staff and maintained a rich ratio of 1:10 staff to persons served. As required by the SA, each of the 10 CSTs employed a paraprofessional, but only

seven CSTs employed a certified peer specialist and only one team had access to a full-time nurse; seven CSTs employed half-time nursing, and one CST had no nurse.

*Conclusion*.  The Parties and the Independent Reviewer agree that the State is in substantial compliance with SA § III.B.2.a.ii.(B) (C) (ratios and number of teams), and that these provisions are appropriate to remove from active monitoring. The Parties and the Independent Reviewer will continue to work together as the State addresses outstanding staffing issues related to SA § III.B.2.a.ii.(A).

G. Supported Employment

*Agreement Requirements*.  The SA requires the State to provide Supported Employment (SE) services[14] to 550 individuals with SPMI.  Congregate program enrollment does not count as SE.  SE is to be operated with fidelity to an evidence-based model.  SA § III.B.2.d.

*Past and Current Status*.  At the time of the entry of the SA in October 2010, the State did not offer SE services with fidelity to an evidence-based model.  In 2012, the State began to implement the Individual Placement and Support (IPS)

---

[14] SE services provide job development, placement, and training to assist people who, due to the severity of their disabilities, need support to locate, choose, obtain, learn, and maintain a job.  The State reports that its program focuses on impacting those individuals who have recently lost employment or been underemployed or unemployed on a frequent or long-term basis.

model of SE, along with fidelity monitoring and tracking; the Parties and the

Independent Reviewer agree that IPS is an evidence-based SE model.

Today, hundreds of individuals are receiving fidelity SE services throughout

the state.  The State provides SE services to members of the SPMI Target

Population through 19 community providers; there are SE providers in each of the

six regions.  The providers maintain rich staff to served person ratios to foster

individual attention and more intense individual effort.  All SE services are provided

consistent with IPS fidelity requirements.[15]  The State reports that in each of the last

three fiscal years, over 900 unduplicated individuals with SPMI in the Target

Population received fidelity SE services - 1,014 in FY24.[16]  The State certifies these

totals do not include anyone receiving employment services in congregate programs.

The State does not have an accurate figure regarding the historical total of

unduplicated people provided fidelity SE services since the entry of the SA in

October 2010, but it estimates that the cumulative total is over 10,000 people.

Regardless, the State has surpassed the 550 requirement set out in the SA.  The

unduplicated SE census of 1,014 in FY24 alone, is almost double the SA metric.

---

[15] In June 2023, the Independent Reviewer's EBP consultant reviewed a sample of
the State's IPS fidelity reviews and concluded that they were appropriate and
offered good feedback when needed.
[16] In FY24, the State provided SE services to an additional 1,188 individuals with
serious mental illness who do not fall within Target Population parameters.

Case 1:10-cv-00249-TCB   Document 394-1   Filed 09/30/24   Page 23 of 29

*Conclusion*.  The Parties and the Independent Reviewer agree that the State is in substantial compliance with SA § III.B.2.d., and that this provision is appropriate to be removed from active monitoring.

H. Bridge Funding

*Agreement Requirements*.  The SA requires the State to provide Bridge Funding for up to 1,800 individuals with SPMI in the Target Population.  SA § III.B.2.c.ii.(C).  Bridge Funding is to include money for security deposits, household necessities, living expenses, and other supports during the time the person is becoming eligible for federal disability or other supplemental income.  SA § III.B.2.c.i.(C).; *see also* EA § 31.  The EA requires the State to provide Bridge Funding for an additional 600 individuals, for a grand total of 2,400 individuals with SPMI in the Target Population.  EA §§ 32, 33.

*Past and Current Status*.  Georgia's Bridge program provides money, typically on a short-term basis, to support individuals moving into Supported Housing.  Bridge provides funding for the first month's rent, utilities, deposits, and household items.  The current average Bridge subsidy is about $3,900 per person.

The State first offered Bridge funding on August 1, 2011.  Since then, the State has far exceeded the requirements set out in the SA and the EA regarding the number of individuals to be provided with Bridge funding.  From August 1, 2011 to

March 2018, the State provided Bridge funding to approximately 4,850 individuals.
The State is unable to verify if this is an unduplicated count of unique individuals.
From April 2018 to March 31, 2024, the State provided Bridge funding to 3,220
unique, unduplicated individuals; all these individuals are people with SPMI in the
Target Population.  The unduplicated count of 3,220 unique individuals alone
exceeds the SA/EA requirements of 2,400 total Bridge subsidies.  Adding in the
thousands who received Bridge funding prior to 2018, underscores that the State is
in substantial compliance with SA/EA requirements related to Bridge.

   *Conclusion*.  The Parties and the Independent Reviewer agree the State is in
substantial compliance with SA §§ III.B.2.c.i.(C) and III.B.2.c.ii.(C), as well as EA
§§ 32 and 33, and that these items are appropriate to remove from active monitoring.

## IV.   OUTSTANDING COMPLIANCE AREAS

   Important provisions are to remain in active oversight, such as those that
prohibit State Hospital admissions of people with a primary diagnosis of DD, and
require the State to:  attempt to move the remaining residents with a primary
diagnosis of DD from the State Hospitals to the community, provide needed services
to people with DD in the community who face a heightened level of risk, provide
support coordination to Waiver participants and case management to people with

SPMI in the community, provide Supported Housing to people with SPMI, and provide community-focused crisis services for all Target Population members.

In recent years, the Parties and the Independent Reviewer have focused time and attention on unresolved issues related to Supported Housing affecting the SPMI group, *see, e.g.*, SA § III.B.2.c and EA §§ 36-40, as well as the need to provide services and supports in a timely manner to people with DD in decline or crisis, *see, e.g.*, EA §§ 12-18. The United States and the Independent Reviewer recognize that the State has been working to address outstanding issues. The Parties and the Independent Reviewer will continue to work together as the State addresses outstanding issues in these areas.

To discipline future efforts to achieve substantial compliance with the remaining provisions of the SA and the EA, the Parties, in collaboration with the Independent Reviewer, will develop an implementation plan with deadlines. The Parties and the Independent Reviewer hope to report on successful resolution of compliance issues in future submissions.

## V. <u>CONCLUSION</u>

For the reasons set forth in this joint memorandum, the Parties ask the Court to grant the Parties' joint motion.

Respectfully submitted, this 30th day of September, 2024.

FOR THE UNITED STATES:

RYAN K. BUCHANAN
United States Attorney
Northern District of Georgia

*/s/ Aileen Bell Hughes*
AILEEN BELL HUGHES
Deputy Chief, Public Integrity &
Civil Rights Section
United States Attorney's Office
Georgia Bar No. 375505
Northern District of Georgia
600 United States Courthouse
75 Ted Turner Drive, SW
Atlanta, GA  30303
Phone: (404) 581-6000
Fax: (404) 581-4667
Email: aileen.bell.hughes@usdoj.gov

REGAN RUSH
Acting Chief

BENJAMIN O. TAYLOE, JR.
Deputy Chief

*/s/ Richard J. Farano*
RICHARD J. FARANO (D.C. Bar 424225)
Senior Trial Attorney
U.S. Department of Justice
Civil Rights Division
Special Litigation Section
150 M Street, NE, Suite 10.133
Washington, DC  20530
Phone: (202) 598-9256 Fax: (202) 514-0212
Email:  richard.farano@usdoj.gov

FOR THE STATE OF GEORGIA:

CHRISTOPHER M. CARR
Attorney General
Georgia Bar No. 112505

BRYAN K. WEBB
Deputy Attorney General
Georgia Bar No. 743580

SHALEN S. NELSON
Senior Assistant Attorney General
Georgia Bar No. 636575
State Law Department
40 Capitol Square, SW
Atlanta, GA  30334
Phone: (404) 656-3357 Fax: (404) 463-1062

*/s/ Josh Belinfante*
JOSH BELINFANTE
Special Assistant Attorney General
Georgia Bar No. 047399
Robbins Alloy Belinfante Littlefield LLC
500 14th Street, NW
Atlanta, GA  30318
Phone: (678) 701-9381 Fax: (404) 856-3255
Email: josh.belinfante@robbinsfirm.com

## CERTIFICATE OF COMPLIANCE

I hereby certify, pursuant to Local Rules 5.1 and 7.1D, that the foregoing brief has been prepared using Times New Roman, 14 point font.

*/s/ Aileen Bell Hughes*
Aileen Bell Hughes

## CERTIFICATE OF SERVICE

I hereby certify that on September 30, 2024, a copy of the foregoing document was filed electronically with the Clerk of Court and served on all parties of record by operation of the Court's CM/ECF system.

/s/ Aileen Bell Hughes
Aileen Bell Hughes