**IN THE UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF GEORGIA – ATLANTA DIVISION**

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| v. | ) | CIVIL ACTION NO. |
| | ) | 1:10-CV-249-ELR |
| THE STATE OF GEORGIA, et al., | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

**MEMORANDUM IN SUPPORT OF JOINT MOTION
TO TERMINATE MENTAL-HEALTH RELATED PROVISIONS**

Pursuant to Sections VII.B and VII.E of the 2010 Settlement Agreement (SA), ECF No. 115, Oct. 29, 2010, and Paragraph 49 of the 2016 Extension of Settlement Agreement (EA), ECF No. 258-1, May 18, 2016 (collectively, the "Agreements"), the Parties jointly and respectfully request that this Court enter an order that (1) terminates all mental-health related provisions of the Agreements; and (2) revises provisions regarding supported housing for individuals with severe and persistent mental illness ("SPMI"). A proposed order is attached as "Exhibit 1."

The Parties have discussed this joint motion at length and in good faith, including with the Independent Reviewer. Each submits that the relief sought in this Joint Motion to Terminate Mental-Health Related Provisions (Joint Motion) is consistent with the Agreements and the Americans with Disabilities Act, 42 U.S.C.

§ 12101, *et seq.*, and are in the best interest of those served by the Georgia Department of Behavioral Health and Developmental Disabilities (DBHDD).  In addition, the relief is consistent with Executive Order 14321, in that the State is empowered to identify individuals who need institutional levels of care and serve them in its State Hospitals, while serving in integrated settings individuals who are appropriate for, and choose, such settings.  Further, the Parties agree that the entry of an order containing the revised provisions described in this Joint Motion represent a court-enforceable modification of the Agreements, as provided for under Section VII.E of the SA.  Consequently, the Parties request that the terms of the proposed order be entered as set forth below and in the attached proposed order.  Should this Court seek to materially modify any provision of the attached proposed order, the Parties request a hearing before the Court to address any potential changes.

## **BACKGROUND**

On September 30, 2024, the Parties filed a Joint Motion to Remove Discrete Provisions from Active Monitoring for about a dozen provisions in SA and EA, where the Parties and the Independent Reviewer agreed that the State had achieved substantial compliance.  J. Mot. To Remove, ECF No. 394.  The Court promptly adopted and issued the Parties' proposed order.  Order, Sept. 30, 2024, ECF No. 395 (Sept. 30, 2024 Order).

2

As detailed further below, the State has vastly expanded its community mental health services for people with SPMI.  The Parties and Independent Reviewer agree that the State has achieved substantial compliance with all of the SA and EA provisions related to SPMI services, and that the Parties' differing interpretations of some of the provisions regarding Supported Housing warrant revised terms, which the Parties address separately below.  Indeed, by meeting and exceeding the rigorous standards of the SA and EA, the State has proven its commitment to providing robust, accessible, and dignified mental health services for Georgia's most vulnerable citizens. The State is to be commended for its achievements in serving people with SPMI.

The State's accomplishments warrant the relief sought in the Joint Motion, which, taken together, would terminate all provisions set forth in Section III(B) of the SA, and Paragraphs 30-40 of the EA.  The Joint Motion also proposes, as an integral part of the relief sought, that the State provide certain supported housing at a compromised level that would not require the State to add more than 541 housing vouchers above those currently available.

As additional background, and although not a part of the relief in this case, the State notifies this Court that it intends to meet at least annually with advocates, including the Amici, to discuss what, if any, funding DBHDD should request from

the Governor and the General Assembly for additional Supported Housing units. This discussion will be held during a meeting of the Behavioral Health Coordinating Council (BHCC). The recommendations from the discussion with the advocacy community members, including recommendations regarding Supported Housing, will be formally conveyed to the Governor and the General Assembly as part of the BHCC's annual report.

## REQUESTS FOR RELIEF

The Parties seek termination of the mental-health related provisions of the Agreements pursuant to three provisions of the Agreements. First, Section VII.B of the SA, which provides that "the State shall be relieved of [any] portion of the [SA]" whenever the Parties and Independent Reviewer agree that the State has achieved substantial compliance with any portion of the SA. ECF No. 112 at 41.[1] Second, Paragraph 49 of the EA explains that the "State shall be relieved of [any] provision of the [EA]" where the Parties and the Independent Reviewer agree that the State has achieved substantial compliance. ECF No. 258-1 at 16. Third, Section VII.E of the SA requires Court approval of any modification of the SA. ECF No. 112 at 42. As

---

[1] The Court adopted the SA with unrelated modifications. Order, Oct. 29, 2010, ECF No. 115.

4

with Paragraph 45 of the EA, the Parties agree that the revisions they seek of the Agreements are court-enforceable and requested pursuant to Section VII.E of the SA.

Accordingly, the Parties recognize that terminating the behavioral-health replated provisions of the Agreement does not require Court approval. Nevertheless, the Parties represent that the agreement to terminate portions of the Agreement are contingent upon an order modifying the same, the Parties seek a judicial order entering the relief sought by the Joint Motion.

## I.     PROVISIONS IN THE AGREEMENTS THAT MAY BE TERMINATED DUE TO THE STATE'S SUBSTANTIAL COMPLIANCE

The Joint Motion seeks the termination of the following provisions of the Agreements: (1) the definition of "Target Population," SA § III.B.1; (2) the Mental Health *Olmstead* List, SA § III.B.1.c; (3) "Intensive Services for Individuals with SPMI," SA § III.B.2.a; (4) "Crisis Services for Individuals with SPMI," SA § III.B.2.b; (5) "Housing Supports for Individuals with SPMI, SA § III.B.2.c; (6) "Supported Employment," SA § III.B.2.d; (7) "Peer Support Services," SA § III.B.2.e; (8) "Bridge Funding and Georgia Housing Voucher Program," EA ¶¶ 31-35; and (9) "Supported Housing," EA ¶¶ 36-40.

The Court previously released several of these provisions from active monitoring because they were already in substantial compliance. Sept. 30, 2024

Order.   The Parties now seek termination of those provisions, which are discussed in more detail below.

<u>SA § III.B.1. Target Population and Mental Health *Olmstead* List.</u>

The SA defines the characteristics of the Target Population of people with mental illness in the community, provides that individuals with SPMI and forensic status shall be included in the target population, if the relevant court finds that community services are appropriate, requires the State to provide community services to eligible individuals on its Mental Health *Olmstead* List, and requires that the State shall include in the Target Population any individual who satisfies one of the eligibility criteria and has a co-occurring condition, such as substance abuse disorders or traumatic brain injuries.  SA § III.B.1.

The State does not exclude eligible people from the Target Population, and it has discharged to community settings everyone on its Mental Health *Olmstead* List. *See* Declaration of Independent Reviewer Elizabeth Jones (Jones Dec.) at 2 (attached as "Exhibit 2").  The Parties and the Independent Reviewer agree that the State is in substantial compliance with SA § III.B.1. and that this provision is appropriate to be terminated.

SA § III.B.2.a Intensive Services for Individuals with SPMI.

Section III.B.2.a, "Intensive Services for Individuals with SPMI," requires the State to provide people with SPMI (i) Assertive Community Treatment ("ACT"); (ii) Community Support Teams ("CSTs"); (iii) Intensive Case Management ("ICM"); and (iv) Case Management Services.

*Assertive Community Treatment.* ACT delivers comprehensive, individualized, and flexible treatment, support, and rehabilitation to individuals where they work and live. A multidisciplinary team delivers these services in a manner customized to the individual's current needs. SA § III.B.2.a.i.(A). The Parties and Independent Reviewer previously agreed, Joint Motion to Remove Discrete Agreement Provisions from Active Monitoring, September 30, 2024 ECF No. 394 (Sept. 30, 2024 Joint Motion) and the Court ordered, Sept. 30, 2024 Order, that the State's sustained substantial compliance with the Agreement's ACT provisions warranted removing those provisions from active monitoring. The Parties and the Independent Reviewer, Jones Dec. at 2, agree that the State has maintained compliance with these provisions and that they be terminated.

*Community Support Teams.* CSTs consist of defined interdisciplinary team members who provide services in the individual's home and ensure that the individual has the necessary resources to remain in the community. SA § III.B.2.a.ii.(A). The

Parties and Independent Reviewer previously agreed, and the Court ordered, Sept. 30, 2024 Order, that the State's sustained substantial compliance with the Agreement's Community Support Teams provisions warranted removing those provisions from active monitoring.  The Parties and Independent Reviewer, Jones Dec. at 2, agree that the State has maintained compliance with these provisions and that they be terminated.

*Intensive Case Management & Case Management Services*.  Both Intensive Case Management and Case Management Services provide coordination of treatment and support services for individuals in the target population who need ongoing, routinely accessible professional or paraprofessional involvement in order to fully utilize and maintain the customized services and supports that are in place for them. Intensive Case Management has a lower client-to-staff ratio and is designed to support individuals who require more frequent attention or greater assistance.  *See* SA § III.B.2.a.iii-iv.   Case Management services are established across the State through multiple provider agencies. *See* Jones Dec. at 3.  With the exception of Region 4, Intensive Case Management is also available statewide.  The State discontinued the Region 4 team due to contracting issues with the previous provider.  Other options are being explored.  Meanwhile, to ensure intensive case management where needed in Region 4, an individual may be enrolled there in both ACT and Case Management,

and the ACT team provides the additional case management oversight and assistance. Accordingly, the Parties and the Independent Reviewer, *id.,* agree that the State has maintained compliance with these provisions and that they may be terminated.

SA § III.B.2.b.  Crisis Services for Individuals with SPMI

*Crisis Service Centers.*  The SA requires the State to provide 24/7, walk-in, psychiatric and counseling services by licensed professionals in at least six Crisis Services Centers (CSCs) to individuals in crisis, including individuals with co-occurring substance use disorders; CSCs can provide assessments, services and supports, and referrals.  SA § III.B.2.b.i.

The State currently operates 15 CSCs across Georgia on a 24/7 basis.  They serve hundreds of individuals each month, and they are staffed and provide services in compliance with the SA.  *See* Jones Dec at 4.  The Parties and the Independent Reviewer, *id.*, agree that the State is in substantial compliance with SA § III.B.2.b.i, and that this provision is appropriate for termination.

*Crisis Stabilization Programs.* The SA requires the State to add three 16-bed community-based residential stabilization and detoxification service programs, as an alternative to psychiatric hospitalization.  SA § III.B.2.b.ii(B)(1-3).  When the SA was entered, in October 2010, the State already funded 18 CSPs across the State.  The

State now has the equivalent of 23 such programs, renamed as Crisis Stabilization Units (CSUs), two more than the SA requires.   Jones Dec. at 4.

*Community Hospital Beds*.  The SA requires the State to maintain funding for at least 35 beds for psychiatric observation, treatment, or both, in non-State community hospitals; the beds can be located in either general hospitals or free-standing psychiatric hospitals.  SA § III.B.2.b.iii(A).  Currently, there are hundreds of beds in about two dozen non-State hospitals throughout Georgia that more than satisfy the 35-bed requirement in the SA.  Jones Dec at 4.

*Crisis Line*.  The SA requires the State to operate a statewide toll-free telephone crisis line, staffed by skilled professionals 24/7, for individuals to access information about resources in the community and to assist with a crisis.  SA § III.B.2.b.iv(A)(B).  The crisis line is to promptly answer and respond to all crisis inquiries; provide assistance, advice, and assessments; and facilitate the delivery of individualized mental health services, through referrals to and dispatch of available mobile services.  *Id*.

The State currently operates a 24/7, statewide, toll-free, and confidential crisis inquiry center called the Georgia Crisis & Access Line (GCAL) that meets all aspects of the SA's requirements.  Jones Dec at 4.

*Mobile Crisis Services*.  The SA requires the State to have six mobile crisis teams for people with Developmental Disabilities (DD).  SA § III.A.2.c.i(A).  The SA also requires the State to have statewide mobile crisis services within all 159 counties for people with mental illness.  SA § III.B.2.b.v(A)(B)(1-3).  In 2019, the State consolidated DD and Mental Health (MH) mobile crisis services into a unified, statewide system, where teams are to respond to both DD and behavioral health crises in all counties in Georgia.  The DD-specific mobile crisis teams were eliminated.  This effectively expanded DD mobile crisis services statewide, thus exceeding the SA's requirements.

The mobile crisis services are to respond to crises "anywhere in the community," be available 24/7, and be offered by clinicians trained to provide emergency services, including staff with competency in Substance Use Disorders, and by peers (when available); average annual response times are to be one hour or less. *Id*.

Consistent with the SA's requirements, the State reports that all mobile crisis teams operate 24/7, every day of the year, in all 159 counties statewide.  Further, current State staffing practices meet or exceed the staffing/competency requirements of the SA.  As for response times, the statewide average is about 70-80 minutes, slightly exceeding the 60 minutes that the SA requires.  Jones Dec at 4-5.  Given the

size of this program, the many rural areas of the State where travel takes longer, and with the explicit understanding that the State will continue to monitor and seek to shorten response times as appropriate, the Parties and the Independent Reviewer agree that this average constitutes substantial compliance.

*Crisis Respite Homes and Apartments.* The SA requires the State to provide 18 MH crisis apartments, as an alternative to crisis stabilization programs and to psychiatric hospitalization, each able to serve two individuals with SPMI.  SA § III.B.2.b.vi.

The State currently funds 83 beds at 20 MH crisis apartment locations, providing 47 more beds than specified in the SA.  These apartments are dispersed in community locations throughout the State; each of the State's six service regions has at least two such apartments.  All but one of the apartments has the capacity to serve at least two individuals.  As specified by the SA, the MH crisis apartments are staffed by paraprofessionals, and peers when available; serve as an alternative to crisis stabilization programs and psychiatric hospitalization; and provide short-term respite housing and placement assistance to prevent avoidable admission or readmission to a congregate setting and as a transitional residence for individuals with unstable housing who are discharged from crisis centers or other inpatient facilities.  Jones Dec. at 5.

The State's status of compliance with the SA's crisis provisions mean that, in the State's current behavioral health system, hundreds of people in distress each year now receive crisis and other services at home, in the community, or in non-hospital settings, as an alternative to contact with a hospital emergency department, a State Hospital, or some other institutional setting, furthering the overall purpose and intent of the SA. In recognition of this accomplishment, the Parties and the Independent Reviewer, *id.,* agree that the provisions related to the Crisis Service Centers (CSCs), the Crisis Stabilization Units (CSUs), the Community Hospital Beds, the Crisis Line, the Mobile Crisis Services, and the MH Crisis Apartments have been met and should be terminated.

SA § III.B.2.c and EA ¶¶s 36-40 – Supported Housing

*Supported Housing Capacity.* SA § III.B.2.c. sets out requirements for "Housing Supports for Individuals with SPMI," including psycho-social supports and integrated permanent housing. SA § III.B.2.c.ii.(A) provides that, "[b]y July 1, 2015, the State will have the capacity to provide Supported Housing to any of the 9,000 persons in the target population who needs such support." SA § III.B.2.c.ii.(B) requires the State to provide a total of 2,000 supported housing beds "to individuals in the target population with SPMI that are deemed ineligible for any other benefits." EA Paragraphs 36-40 contain similar requirements. In particular, EA Paragraph 38

requires that, by June 30, 2018, "the State will have capacity to provide Supported Housing to any of the individuals in the Target Population who have an assessed need for such support."

The Parties have differing perspectives regarding the metrics imposed by these provisions and, consequently, the exact number of Supported Housing units that the SA and EA obligate the State to provide. The Parties agree, however, with the Independent Reviewer's verification that, at the time of the filing of this Joint Motion, the State is providing 3,459 Supported Housing Beds in substantial compliance with the provisions of the Agreement.

To avoid the uncertainty of litigation, achieve clarity, continue to expand the State's existing Supported Housing services, and in the light of the State's transformation of its mental-health services delivery system, the Parties and the Independent Reviewer, Jones Dec. at 8 agree that these provisions of the SA and EA should be terminated in their entirety. The Parties and Independent Reviewer further agree that, if terminated, these portions of the SA and the EA should be replaced with provisions that achieve the Parties' intended goals and provide for an objective

measure of substantial compliance.  The proposed new obligations are addressed in Section II of this Joint Motion and included in the proposed order.

*Bridge Funding*.  SA §§ III.B.2.c.i.(C), III.B.2.c.ii.(C) and EA Paragraphs 31-35 each address bridge funding, which is a specific type of housing assistance that may include the provision of security deposits, household necessities, living expenses, and other supports during the time needed for a person to become eligible and receive federal disability or other supplemental income.  The Parties and the Independent Reviewer previously agreed, and the Court ordered, Sept. 30, 2024 Order, that the State's sustained substantial compliance with SA §§ III.B.2.c.i.(C), III.B.2.c.ii(C), and EA Paragraphs 31-32 warranted removing those provisions from active monitoring.  The Parties and the Independent Reviewer, Jones Dec. at 2-3, agree that the State has maintained compliance with these provisions and that they now be terminated.

*Georgia Housing Voucher Program*.  EA Paragraphs 34-35 require the State to provide Georgia Housing Voucher Program (GHVP) vouchers to at least 633 individuals in the Target Population by June 30, 2017.  The Parties and the Independent Reviewer, Jones Dec at 6, agree that the State provided at least 633

individuals in the Target Population with vouchers by that date and that these provisions be terminated.

SA § III.B.2.d  Supported Employment

The Parties and the Independent Reviewer previously agreed, and the Court ordered, Sept. 30, 2024 Order that the State's sustained substantial compliance with the SA's Supported Employment provisions warranted removing those provisions from active monitoring.  The Parties and the Independent Reviewer, Jones Dec. at 2, now agree that the State has maintained compliance with these provisions and that they be terminated.

SA § III.B.2.e  Peer Support Services

Under the SA, "Peer Support Services are delivered by peers to improve an individual's community living skills, including their ability to cope with and manage symptoms and to develop and utilize existing community supports."  SA § III.B.2.e. The SA requires the State to provide Peer Support Services to 835 individuals with SPMI.  SA § III.B.2.e.ii.C.

Peer Support services are an integral part of the State's mental health system. Peers have an important role in helping individuals improve their community living skills, including their ability to cope with and manage symptoms and to develop and utilize existing community-based supports.  The State met the numerical obligations

included in the SA.   Furthermore, as described in the Independent Reviewer's
Declaration, Jones Dec. at 4, the State has continued to invest in the training of peers,
especially in order to ensure their availability as staff on ACT teams and in other
mental health programs.  A contract awarded to the Georgia Mental Health Consumer
Network will result in additional training opportunities, beginning in early 2026.
Under this contract, hundreds of Peer Specialists will receive training and certification
annually.  The Parties and the Independent Reviewer, *id.,* agree that the requirements
of the SA have been satisfied and that these provisions should now be terminated.

II.    <u>REVISED PROVISIONS FOR SUPPORTED HOUSING</u>

For the sake of clarity, the Parties and the Independent Reviewer agree that the
existing provisions of the Agreements regarding Supported Housing—SA
§§ III.2.B.c.i and III.2.B.c.ii(A) and (B); EA ¶¶ 36-40—should be terminated, and
those provisions should be replaced with revised requirements as provided for below.

Specifically, the Parties and the Independent Reviewer request that any order
of this Court that terminates the provisions identified above also contain provisions,
as set forth in the proposed order, that

1. Recognizes that, at the time of the filing of this Joint Motion, the
   Independent Reviewer has verified that the State has made 3,459 Supported

17

Housing Beds available to members of the Target Population in a manner that complies with the SA and the EA.

2. Defines the terms "Target Population," "Qualifying Georgia Housing Vouchers," and "Supported Housing."

3. Requires the State to make a total of 4,000 Supported Housing Beds available to members of the Target Population, which represents a compromise that would not require the State to add more than 541 additional Supported Housing Beds above those that have been verified by the Independent Reviewer. Of the new 541 Supported Housing Beds, not less than 404 must be satisfied by the use of new Georgia Housing Vouchers to be made available to members of the Target Population.

4. Further requires, consistent with Section III.B.2.c.1 of the SA and Paragraph 37 of the EA, that at least 50% of the 4,000 total Supported Housing Beds shall be provided in scattered-site housing, which requires that no more than 20% of the units be in one building, or no more than two units in one building (whichever is greater). The State shall also be required to maintain existing or materially similar policies that prioritize scattered site housing when administering the additional 404 new Georgia Housing Vouchers addressed in the proposed order.

5. Establishes that the State must meet this deadline on or before September 1, 2028.

6. Provides that, once the State contends that it has substantially complied with the new obligation before September 1, 2028, the State shall provide notice of its substantial compliance to the United States and the Independent Reviewer.  Within ninety days of this notice, the Independent Reviewer shall complete any verification necessary of the additional 541 Supported Housing Beds and not any previously existing inventory that has already been verified by the Independent Reviewer.

7. Finally, orders that, upon verification that the State has added 541 new Supported Housing Beds as provided in the proposed order, the Parties will file a notice of substantial compliance with this Court that will terminate these new provisions.

The Parties and Independent Reviewer submit that these new provisions achieve certainty, as well as timely and significantly expand the State's existing Supported Housing units.

III. <u>CONCLUSION</u>

For the reasons set forth above, the Parties ask the Court to grant the Joint Motion.

Respectfully submitted, this 20th day of January, 2026.

FOR THE UNITED STATES:

THEODORE S. HERTZBERG
United States Attorney
Northern District of Georgia

HARMEET K. DHILLON
Assistant Attorney General
Civil Rights Division

R. JONAS GEISSLER
Deputy Assistant Attorney General
Civil Rights Division

PATRICK MCCARTHY
Chief

/s/ Aileen Bell Hughes
AILEEN BELL HUGHES
Assistant United States Attorney
United States Attorney's Office
Georgia Bar No. 375505
Northern District of Georgia
600 United States Courthouse
75 Ted Turner Drive, SW
Atlanta, GA  30303
Phone: (404) 581-6000
Fax: (404) 581-4667
Email: aileen.bell.hughes@usdoj.gov

/s/ Benjamin O. Tayloe
BENJAMIN O. TAYLOE (D.C. Bar 425691)
Deputy Chief
Special Litigation Section
Civil Rights Division
United States Department of Justice
950 Pennsylvania Ave., NW – 4CON
Washington, D.C. 20530
Phone: (202) 305-5141
Email:  Benjamin.tayloe@usdoj.gov

FOR THE STATE OF GEORGIA:

CHRISTOPHER M. CARR          /s/ Josh Belinfante
Attorney General                JOSH BELINFANTE
Georgia Bar No. 112505          Special Assistant Attorney General
                                Georgia Bar No. 047399
BRYAN K. WEBB                   Robbins Alloy Belinfante Littlefield LLC
Deputy Attorney General         500 14th Street, NW
Georgia Bar No. 743580          Atlanta, GA  30318
                                Phone: (678) 701-9381 Fax: (404) 856-3255
JASON NAUNAS                    Email: josh.belinfante@robbinsfirm.com
Senior Assistant Attorney General
Georgia Bar No. 142051
State Law Department
40 Capitol Square, SW
Atlanta, GA  30334
Phone: (404) 458-3416 Fax: (404) 463-1062

**CERTIFICATE OF SERVICE**

I hereby certify that on January 20, 2026, a copy of the foregoing document was filed electronically with the Clerk of Court and served on all parties of record by operation of the Court's CM/ECF system.  I also certify, consistent with L.R. 5.1(C) and 7.1(D), that this document has been prepared in 14-point Times New Roman font.

*/s/ Josh Belinfante*
Josh Belinfante