Declaration

In the Matter of

United States of America v. the State of Georgia

Civil Action No. 1: 10-CV-249-ELR

Submitted by:

Elizabeth Jones

Independent Reviewer

Declaration of Elizabeth Jones

In the Matter of

United States of America v. the State of Georgia

Civil Action No. 1: 10-CV-249-ELR

I have been the Independent Reviewer since the inception of the Settlement Agreement (SA) in 2010 and its Extension Agreement (EA) in 2016. My role involves the monitoring of the State's compliance with its obligations under these Agreements and subsequently advising the Court whether a determination of compliance is warranted.

I am submitting this Declaration in support of the Parties' Motion, to be filed on January 20, 2026, to request that the Court enter an Order that 1) terminates all mental-health related provisions of the Agreements and 2) establishes new, limited provisions regarding Supported Housing for individuals with severe and persistent mental illness (SPMI).

My opinion in this matter is based on my own on-site reviews of the mental health services implemented under the terms of the Agreements; reports obtained from consultants retained by me who are recognized for their knowledge of and experience with discrete services and practices in the field of mental health; factual information provided by the State; interviews with individuals included in the target population identified in the Agreements; and service providers, including the Department of Behavioral Health and Developmental Disabilities (DBHDD) and other State agencies.

Throughout the preparation of the Parties' Motion, I conferred with Counsel for the United States and the State of Georgia and met on a regular basis with the Commissioner of DBHDD, Kevin Tanner. I appreciate his attention to the obligations under these Agreements and his interest in ensuring the sustainability of the mental health services implemented as a result. In particular, I wish to note his intent to request additional funding for the Georgia Housing Voucher Program and his recent contract to increase the training and certification of Certified Peer Specialists. Both of these initiatives are important to the sustainability of resources initiated under the Agreements.

As an integral part of my responsibilities as the Independent Reviewer, I speak to and meet regularly with representatives of the Amici and the Georgia Advocacy Office to update them on factual information and to learn from their observations about the mental health system as a whole, as well as their concerns about individual cases. I spoke with them about the Parties' intent to file a Motion terminating the mental health related provisions and my own intent to file this Declaration in support.

I discuss the Agreements' mental health related provisions proposed for termination further below.

Discrete Mental Health Provisions

Provisions Reported to the Court in the September 30, 2024 Joint Motion

On September 30, 2024, the Court promptly approved the Parties' Joint Motion to Remove Discrete Provisions from Active Monitoring. (The Motion was also filed on September 30, 2024.) With the exception of the requirement prohibiting admission of people with a primary diagnosis of a developmental disability (DD) to any State Hospital (SA III.A.I.a.), the provisions included in the September 30, 2024 Joint Motion are now proposed for termination. As summarized below, each of these provisions has been found to be in compliance.

*Target Population and Mental Health Olmstead List.* Prior to the filing of the September 30, 2024 Motion, I reviewed the provisions (SA III.B.1.a-d.) related to the Target Population and the Mental Health Olmstead List, in place at the effective date of the Settlement Agreement, and concurred that they were in compliance.

*ACT.* I retained a consultant to review Assertive Community Treatment (ACT) Teams. Her evaluation found the State to be in overall compliance, with the exception of Teams that were operating but were without certain required staffing. As agreed, the State has continued to monitor the staffing levels of the ACT Teams. As of December 2025, 10 of the 22 ACT Teams (45%) now have no vacant positions. Nine Teams (41%) report one vacancy; three Teams (14%) report two vacancies. Vacancies for Peer Specialists are present on four Teams. To address this staffing shortage, DBHDD has contracted with a consumer organization to train hundreds of Certified Peer Specialists so that these positions can be filled with qualified staff. In addition, DBHDD is continuing to support ACT Teams through mentoring and other learning opportunities, such as workshops and in-person fidelity reviews. Based on the information provided to me, I agree that the State is in substantial compliance with the provisions related to ACT (SA III.B.2.a.i.) and that they can be terminated.

*CSTs.* I reviewed the Community Support Teams (CSTs) throughout the State. There are nine CSTs statewide, one more than required. As with ACT, staffing continues to be monitored. Seven CSTs (78%) have no staff vacancies. Two Teams have a combined total of three vacancies. As a result, I agree that the provision (SA III.B.2.a.ii.) related to CSTs is in substantial compliance and can be terminated.

*Supported Employment.* I reviewed Supported Employment programs throughout Georgia. The State has exceeded the requirements in the Settlement Agreement and compliance has been met. I agree that the provision (SA III.B.2.d.) related to Supported Employment can be terminated.

*Bridge Funding.* Bridge Funding to assist individuals with SPMI to pay expenses related to housing has been consistently available, frequently in highly individualized ways, throughout the implementation of the Settlement and Extension Agreements. In fact, the State has far exceeded the requirements regarding the number of individuals to be provided with this resource. From April 2018 until March 31, 2024 alone, the State provided Bridge Funding to 3,220 unduplicated individuals with SPMI. (The 4,850 people provided with Bridge Funding prior to 2018 could not be verified as unduplicated.) Since the Agreements require 2,400 Bridge subsidies, it is

undisputed that this obligation has been more than fully met. I agree that these provisions related to Bridge Funding (SA III.B.2.c.i.(C) and III.B.2.c.ii.(C) and EA 31-33) should be terminated. I would also note that the State has not indicated to me that it intends to discontinue the use of Bridge Funding.

Therefore, based on the findings documented in the Joint Motion approved by the Court on September 30, 2024, I agree that all of the provisions included in that Motion, with the one exception cited regarding the admission of people with DD to a State Hospital (SA.III.A.i.a.), can be terminated.

The State should be commended for these accomplishments in establishing the structure of and resources for a community-based mental health system.

Provisions Now Proposed for Termination

In addition to the mental health services included in the September 30, 2024 Joint Motion referenced above, the Settlement Agreement required the statewide establishment of other core services.

1) *Case Management and Intensive Case Management.* Both Case Management and Intensive Case Management provide coordination of treatment and support services for individuals in the target population who need ongoing, routinely accessible professional or paraprofessional involvement in order to fully utilize and maintain the customized services and supports that are in place for them. Intensive Case Management has a lower client to staff ratio and is designed to support individuals who require more frequent attention or greater assistance.

   There are now more than 80 agencies providing Case Management services across the State. The numerical target in the Settlement Agreement (45 service providers) has been exceeded.

   With the exception of Region 4, there are 14 Intensive Case Management teams available statewide. In Region 4, Intensive Case Management is provided through three ACT Teams and one CST. I agree with this solution to a staffing problem.

   DBHDD has documented that the Case Management teams and the Intensive Case Management teams are in compliance with the staffing ratios prescribed by the Settlement Agreement.

   Based on the information provided to me, I agree that the provisions (SA III.B.2.a.iii. and iv.) related to Case Management and Intensive Case Management for people included in the target population should be terminated.

2) *Crisis Services.* In order to evaluate the State's compliance with the requirements related to crisis services for individuals with SPMI, I retained a team of crisis consultants to

3

conduct a review of the State's crisis services. I provided the Parties with a report summarizing the consultants' findings and recommendations.

Based on the work completed by my consultants and through my own site visits, as discussed further below, I agree that the State has met or exceeded the requirements to establish Crisis Service Centers, Crisis Stabilization Programs, Community Hospital Beds, a Crisis Line, Mobile Crisis Services, and Mental Health Crisis Apartments.

*Crisis Service Centers.* The State currently operates 15 Crisis Service Centers across Georgia on a 24/7 basis. They serve hundreds of individuals each month and are staffed as required by the SA. My consultants concluded that the Crisis Service Centers are a "vital component" of the mental health system and play a "crucial role" by offering "accessible and effective care" for individuals in crisis. Based on these verified facts, I concur that the applicable provision (SA III.B.2.b.i.) can be terminated.

*Crisis Stabilization Programs.* The State was required by the SA to add three 16-bed community-based residential stabilization and detoxification service programs to its existing capacity of 18 such programs statewide. There are now 23 such programs, renamed as Crisis Stabilization Units (CSUs). My consultants documented that treatment models across the CSUs were generally consistent, met the basic standards for care, incorporated expedited treatment planning, and offered daily psychiatric and clinical contact, including multiple group therapy sessions each day. As a result, I agree that this provision (SA III.B.2.b.ii(B)(1-3)) should be terminated.

*Community Hospital Beds.* The State now has hundreds of beds funded throughout Georgia to satisfy the requirement for at least 35 non-State Hospital beds for psychiatric observation and/or treatment. Consequently, the obligation required by SA III.B.2.b.iii(A) has been met and may be terminated.

*Crisis Line.* Consistent with the requirements of the SA, the State operates a 24/7, statewide, toll-free, and confidential crisis inquiry center called the Georgia Crisis & Access Line (GCAL). This resource is staffed as required by the SA. Based on a review of a small sample of calls, my consultants reported that GCAL staff demonstrated a "high level of professionalism, maintaining calm, non-judgmental tones even in high acuity situations" and that they consistently adhered to risk assessment protocols, effectively employed de-escalation techniques, and guided callers towards coping strategies. The State is in substantial compliance with SA III.B.2.b.iv(A)(B). Although recommendations have been made to the State for improving performance, I agree that this provision has been met and can be terminated.

*Mobile Crisis Services.* The SA requires the State to have mobile crisis service coverage in all 159 counties. These services are to be available 24/7 and are to be staffed by clinicians trained to provide emergency services. These requirements have been met. Annual response times are to average one hour or less. Reportedly, the statewide average is about 70-80 minutes, slightly exceeding the expectation required by the SA. Given the size of the program, the many rural areas of the State where travel takes longer, and with

4

the explicit understanding that the State will continue to monitor and seek to shorten response times as appropriate, I agree with the Parties that this average can constitute substantial compliance. Therefore, the provisions related to mobile crisis services required by SA III.2.b.v.(A)(B) have been met and can be terminated.

*Mental Health Crisis Apartments.* The State now has 83 beds in 20 crisis apartment locations throughout all six service regions. They are staffed by paraprofessionals and peer specialists, when available, and serve as an alternative to crisis stabilization programs and to psychiatric hospitalization by providing support and treatment on a short-term basis. They may also be used as transitional housing. The State has exceeded the numerical requirement of 36 beds and is in compliance with the purpose for these settings. I agree that the obligation contained in SA III.2.b.vi. has been met and this provision can be terminated.

To its notable credit, the State has made an extensive effort to develop and sustain a responsive network of crisis services. As a result, I agree that these provisions (SA III.2.b.i.,ii.,iii.,iv.,v., and vi.) can be terminated.

In support of DBHDD's actions to consistently evaluate its systemic performance, I again recommend that the State continue to use its own resources to monitor and seek to shorten response times as appropriate; that the CSU staff be helped to foster a therapeutic environment that prioritizes accessibility and warmth through enhanced staff visibility with structured engagement and interaction; that Crisis Line staff be provided with ongoing training to maximize their listening skills; and that measures be implemented to prompt the timely dispatch of mobile teams in order to help resolve the crisis episode onsite, without resort to transfer to a more restrictive setting. The State has stated its commitment to reviewing the criteria used by the Crisis Line dispatchers to determine which situations are appropriate for mobile crisis dispatch and which ones present a genuine need for a crisis center admission or active rescue by law enforcement.

3) *Peer Support Services.* Peer Support Services are delivered by peers to improve an individual with SPMI's community living skills, including their ability to cope with and manage symptoms, and to develop and utilize existing community supports.

   Peer Support Services are an integral, highly valued component of the State's mental health system. The contributions of Peers on ACT teams and CSTs are widely recognized. However, maintaining the presence of Peers in staff roles has required diligent attention. A recent contract issued by DBHDD to a consumer-run organization is expected to result in hundreds of additional Certified Peer Specialists annually who are qualified to work in mental health programs. The increased number of Peer Specialists will help sustain this important resource throughout Georgia. DBHDD should be commended for this initiative.

   The State has met the Settlement Agreement obligations related to Peer Support Services and I agree that these provisions (SA III.B.2.e.) should be terminated.

    4) *Georgia Housing Voucher Program.* EA Paragraphs 34-35 require the State to provide Georgia Housing Voucher Program (GHVP) vouchers to at least 633 individuals in the Target Population by June 30, 2017. The State met this obligation and I agree that these provisions can be terminated.

In conclusion, I agree that the obligations summarized above have been met and that they should be terminated.

Provisions Proposed to be Terminated and Replaced

Throughout the many years of implementation of these Agreements, it has always been important to remember and recognize the stated intent of the Parties:

> "…the Parties intend that the principle of self-determination is honored and that the goals of community integration, appropriate planning and services to support individuals at risk of institutionalization are achieved." (SA,I.,K.)

Supported Housing is at the very core of the intent to respect self-determination and to help individuals with SPMI become meaningfully engaged in their communities and to interact with non-disabled people.

The State's funding of Supported Housing has been a notable accomplishment. The work of the Office of Supportive Housing is directed by very capable leadership that continues to develop and implement systemic improvements as well as those directly related to individual tenants included in the target population. There is a strong configuration of Housing Support Programs throughout Georgia with the responsibility of working with landlords and tenants to ensure stable housing with mental health supports, as desired. There has been the advantageous involvement of an internationally recognized consultant who has initiated the community of practice model and performed fidelity evaluations.

The programmatic strengths that have evolved over the course of the Agreements are expected to continue and to be supplemented. For example, DBHDD has redesigned a staff position as the Housing Quality and Fidelity Coordinator in order to conduct fidelity reviews of providers one to two times per year. DBHDD has begun work with the Department of Community Affairs (DCA) to potentially establish interagency standards for Public Supported Housing (PSH) in order to expand fidelity monitoring beyond the State-funded Georgia Housing Voucher Program (GHVP). There will be statewide community of practice calls to foster collaboration and peer-learning, as well as to maintain lines of communication and feedback between front line staff and program leadership at DBHDD.

The development of Supported Housing implementation strategies has not been without its difficulties. Budget constraints required the prioritization of housing funded by the federal government and administered by DCA. These resources are allowable for use under the terms of the Agreements. Unfortunately, difficulties with the prioritization of federally funded housing created numerous problems, including serious delays in the application approval process at DCA and the loss of GHVP options. These problems were addressed in part by DBHDD funding two

staff positions to be assigned to DCA in order to process applications at an improved pace. Although there is beginning to be progress in awarding the federally funded Housing Choice Vouchers, the waiting list for housing has not yet been eliminated and the GHVP housing is not as available as it was before the federally funded housing was prioritized. DBHDD has stated its ongoing commitment to ensure that its Supported Housing initiatives remain viable and that any necessary adjustments are implemented when remedial action is warranted. The additional funding requested for 404 new Georgia Housing Vouchers will be an important contribution to DBHDD's efforts.

In preparation for this Declaration, Martha Knisley, an expert consultant who has helped me with analyzing the State's compliance since 2010, participated with me in discussions with DBHDD regarding the scope of Supported Housing. We determined that the provisions regarding scattered site locations have been met as required. (SA III.2.c.(A) and (B).)

Ms. Knisley notes:

> Through persistent efforts, DBHDD has made significant progress toward fulfilling the Agreements' requirements for Supported Housing. DBHDD has leveraged expert technical assistance to inform its strategies and has awarded contracts to a well-established network of service providers to develop Housing Support Teams. This has significantly improved DBHDD's ability to serve adults with SPMI in Supported Housing. Previously, many individuals in the priority groups did not have access to housing or struggled to maintain stable living arrangements. These advancements have come during a period marked by difficulty in finding and accessing safe and affordable housing.
>
> In addition to expanding access to housing, DBHDD is committed to assisting Housing Support Program providers to maintain fidelity to a well-established effective services and supports model. By maintaining high standards in service delivery, DBHDD aims to ensure that individuals not only obtain housing but also receive the necessary supports to maintain stability. Also, DBHDD has initiated efforts to identify and track outcomes associated with individuals gaining access to housing. This focus on outcomes is essential to evaluating and enhancing the effectiveness of the program, as it will guide long-term improvements and ensure the continued support of individuals with SPMI.
>
> To continue building on this progress, it is recommended that DBHDD create a single comprehensive online data base for management of the DBHDD housing network. This system can serve as a crucial tool for tracking availability of housing in each community by type and site and utilization by individuals in each priority group. The system should detail the availability of various federal and state rental housing by funding sources. The system can also track dates of housing inspection, success in utilizing reasonable accommodation and other key indicators.

I concur with Ms. Knisley's findings. Although her recommendation regarding an online database is not binding, given the many housing-related elements that must be tracked, a

resource that can assist with data management may help streamline the work involved and help ensure its accuracy and reliability.

The Parties are proposing that specific provisions regarding Supported Housing be terminated and replaced. I agree that such changes are necessary and that it is important to secure additional funding for the GHVP. This model has demonstrated successful outcomes, including a reduction in State Hospital admissions and lengths of stay.

In addition, Commissioner Tanner's decision to formally invite the advocacy community, including the Amici, to an annual meeting of the Behavioral Health Coordinating Council to address its views regarding the ongoing need for Supported Housing, as well as any need for additional funding, is an important independent safeguard to continuing oversight of this critical resource.

It is important that the Supported Housing initiatives implemented by DBHDD in response to the Agreements be sustained. These initiatives mirror the stated intent of the Parties and enable people with SPMI to benefit from the reforms in Georgia's mental health system that replace the risks of institutionalization with opportunities for meaningful integration into community-based experiences.

Respectfully Submitted,

Elizabeth Jones

January 20, 2026